# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | ) | |
| STATE OF FLORIDA *ex rel.* | ) | |
| BARBARA SCHUBERT, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 8:11-cv-1687-T-27-EAJ |
| | ) | |
| v. | ) | ~~FILED IN CAMERA~~ |
| | ) | ~~AND UNDER SEAL~~ |
| ALL CHILDREN'S HEALTH SYSTEM, INC., | ) | |
| PEDIATRIC PHYSICIANS SERVICES, INC. | ) | |
| and ALL CHILDREN'S HOSPITAL, INC., | ) | ~~DO NOT SERVE~~ |
| | ) | |
| Defendants. | ) | |

---

## SECOND AMENDED *QUI TAM* COMPLAINT

---

This is an action brought by Plaintiff/Relator Barbara Schubert on behalf of the United States of America and the State of Florida pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.* In support thereof, Relator alleges as follows:

1.     From 2007 to the present, All Children's Health System, Inc. and its subsidiaries (collectively "ACHS"), an integrated delivery system focused on children's healthcare, have embarked upon an aggressive expansion and acquisition program intended to ensure exclusive physician referral relationships which, in turn, maximize access to federal- and state-subsidized healthcare funds. In spite of the clear cut regulations set forth herein, ACHS courted physicians with lucrative compensation plans coupled with additional perks memorialized outside of the actual employment contract. The solicitations were tremendously successful: in little more than

three years, subsidiary Pediatric Physicians Services grew from a handful of employed physicians to more than one-hundred.

2. The physicians were often employed at salaries that far exceeded fair market value, which effectively induced the physicians' exclusive referrals and use of in-house surgical, diagnostic and therapeutic facilities. Because of the financial success of this strategy, ACHS continues to cultivate agreements to ensure that federal and state funding flows to the hospital's coffers.

3. Defendants All Children's Health System, Inc. and its subsidiaries Pediatric Physicians Services, Inc. and All Children's Hospital, Inc., have knowingly violated the Federal False Claims Act, the Florida False Claims Act, the Stark Statute and the Anti-Kickback Act through these improper relationships and have caused the government great financial harm.

## JURISDICTION AND VENUE

4. This action arises under the Federal False Claims Act, 31 U.S.C. §§ 3729 – 3732, and the Florida False Claims Act, Fla. Stat. §§ 68.081-68.092. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, 28 U.S.C. § 1367, and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730. Additionally, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for state-law claims that arise under the same transactions or occurrences as an action brought under 31 U.S.C. § 3730.

5. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because at least one of the Defendants can be found in, resides in, transacts business in and has committed the alleged acts in Pinellas County, which is in the Middle District of Florida.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C.

§ 3732(a) because at least one of the Defendants can be found in, resides in and transacts

business in the Middle District of Florida, and many of the alleged acts occurred in this District.

7.      Relator knows of no other complaints that have been filed against the Defendants

alleging the same or similar allegations.  Relator is an original source as defined by the False

Claims Act in 31 U.S.C. § 3730(e)(4)(B) and the Florida False Claims Act in Fla. Stat. §

60.087(3).  Relator has made voluntary disclosures to the United States and the State of Florida

prior to filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2).

## PARTIES

8.      Relator Barbara Schubert is a resident of Bradenton, Florida and a former

employee of Defendant Pediatric Physicians Services, Inc.  From 1998 to 2011, Relator was the

Director of Operations for Pediatric Physicians Services, Inc.

9.      Defendant All Children's Health System, Inc. is a Florida corporation that owns

and operates All Children's Hospital ("ACH"), a specialty children's hospital predominantly

serving the west central Florida community.  In 2010, ACH moved into a brand new, $400

million state-of-the-art facility.  In its inaugural year, the new hospital served 9,732 inpatient

admissions, 9,734 surgeries and 41,781 emergency room visits.  More than 70% of patient care

in 2010 was paid for by the Florida Medicaid program.

10.     Defendant Pediatric Physicians Services, Inc. ("PPS") is a Florida corporation that

is wholly owned and operated by Defendant All Children's Health Systems, Inc.  PPS's

predominant role is to manage physician staffing to support All Children's Hospital.  PPS is

responsible for implementing the strategy of physician recruitment and practice acquisition, and

for providing administrative oversight of employee-physicians.

3

11.     Defendant All Children's Hospital, Inc. ("ACHI") is a Florida corporation that is wholly owned and operated by Defendant ACHS.  ACHI is responsible for the management and daily operations of All Children's Hospital, including making claims and receiving payment for services rendered pursuant to government healthcare coverage.  All Children's Hospital became a fully integrated member of Johns Hopkins Medicine on April 5, 2011.

## REGULATORY OVERVIEW

### Federal and State-Funded Healthcare Programs

12.     Medicaid is a joint federal-state program that provides coverage and benefits for certain groups of citizens, primarily the poor and disabled.  Florida Medicaid is regulated by the Florida Agency for Health Care Administration ("AHCA") and includes federal government oversight through the Centers for Medicare and Medicaid Services ("CMS").  Florida Medicaid has the fifth highest Medicaid expenditures in the country with $20.3 billion spending in FY2010.

13.     The Social Security Act provides for open-ended federal matching determined by a statutory formula.  In FY2010, the Federal Medical Assistance Percentage (the "FMAP" or the "federal share") was set at 67.64%, which corresponds with a state share of 32.36%.  The federal share was set at 55.45% for FY2011 and is presently 56.04% for FY2012.  It will rise to 58.08% in FY2013.

14.     Nearly three million Floridians are Medicaid-eligible, including 27% of children in the state.  Eligibility for Florida Medicaid is determined by the Social Security Administration for SSI recipients, or the Department of Children and Families for low-income families with children, children only, pregnant women, non-citizens and certain elderly and disabled individuals.

4

15.     Medicaid coverage is set forth in Florida Statutes § 409.901, *et seq*. Mandatory Medicaid services include, *inter alia*, hospital inpatient services, hospital outpatient services, independent laboratory services, physician services and therapeutic services for children. Fla. Stat. § 409.905. The mandatory services made up $9.4 billion of the $20.3 billion spent in FY2010. Both mandatory and optional Medicaid services often have coverage restrictions such as financial caps or day limits. *Id.*; Fla. Stat. § 409.906. However, such limits are typically not applicable to individuals under 21 years of age. *Id.*

16.     Institutional providers are reimbursed on a fee-for-service or a capitated basis. Regardless of the method of reimbursement, institutional providers, such as All Children's Hospital, are regularly required to sign certifications which enable them to qualify for claim payments. Each certification includes a statement that the institution is operating in accordance with all applicable state and federal laws.

### The Federal False Claims Act

17.     The federal False Claims Act, as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21 provides, in relevant parts,

> **Liability for Certain Acts.** (1) In general ... [A]ny person who
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or ...
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
> is liable to the United States for a civil penalty of not less than [$5,500] and not more than [$11,000]...plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

**Costs of civil actions.** A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

31 U.S.C. § 3729(a)(3).

**Actions by Private Persons.** A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government.

31 U.S.C. § 3730(b).

### The Florida False Claims Act

18.     The State of Florida enacted the Florida False Claims Act to "deter persons from knowingly causing or assisting in causing state government to pay claims that are false or fraudulent...." Fla. Stat. § 68.081(2) (2010). In June 2007, Attorney General Bill McCollum emphasized its extreme importance: "Our state's Medicaid program exists to provide essential health care services to our citizens who are in critical need of those specific services. Anyone who attempts to exploit and defraud that program is depriving those Floridians in need."

19.     Markedly similar to the federal FCA, the Florida FCA provides, in relevant part,

Any person who:
(a) knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;
(b) knowingly makes, uses or causes to be made or used a false record of statement to get a false or fraudulent claim paid or approved by an agency; or
(g) knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an agency,
is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the acts or omissions of that person.

Fla. Stat. §68.082(2) (2010).

### The Stark Statute and Medicaid Limitations

20.     In 1989, the U.S. Department of Health and Human Services, Office of Inspector General ("HHS-OIG") issued an alarming report that patients of referring physicians who owned

6

or invested in independent clinical labs received 45% more lab services that Medicare patients in general and 34% more services from the clinical labs directly.  U.S. Department of Health and Human Services, Office of the Inspector General, *Financial Arrangements Between Physicians and Health Care Businesses,* OAI-12-88-01410, May 1989.  Not only were patients adversely impacted, but the over-utilization cost Medicare an estimated $28 million in 1987 alone.  *Id.* Largely in response to this study, Congressman Pete Stark (D-CA) championed the Stark Statute, which was introduced as part of the Omnibus Budget Reconciliation Act of 1989.  Narrow in scope, the original Stark Statute only prohibited Medicare payments made for clinical laboratory services which were referred by physicians with prohibited financial relationships with the clinical lab provider.

21.     A series of subsequent studies revealed equally damaging self-referrals at other types of healthcare facilities.  In response, "Stark II" was enacted in the Omnibus Budget Reconciliation Act of 1993.  Notably, Stark II extended the ban in the original Stark Statute to ten additional "designated health services": (1) inpatient and outpatient hospital services, (2) physical therapy, (3) occupational therapy, (4) radiology, (5) radiation therapy, services and supplies, (6) durable medical equipment and supplies, (7) parental and enteral nutrients, equipment and supplies, (8) prosthetics, orthotics and prosthetic devices and supplies, (9) outpatient prescription drugs and (10) home health services.  42 U.S.C. § 1395nn(h)(6).

22.     Following a series of minor technical amendments, the Stark Statute presently provides, in relevant part,

**(a) Prohibition on certain referrals.**
**(1) In general** – Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then –

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

**(2) Financial relationship specified** – For purposes of this section, a financial relationship of a physician (or an immediate family member of such physician) with an entity specified in this paragraph is –

(A) except as provided in subsections (c) and (d) of this section, an ownership or investment interest in the entity, or

(B) except as provided in subsection (e) of this section, a compensation arrangement (as defined in subsection (h)(1) of this section) between the physician (or an immediate family member of such physician) and the entity.

42 U.S.C. § 1395nn(a).

23.      The Stark Statute and its corresponding regulations contain exceptions for certain compensation arrangements.  The exceptions include a "bona fide employment relationship."  42 U.S.C. § 1395nn(e).  In order to qualify for this exception, the arrangement must meet, *inter alia*, the following statutory requirements: (1) the amount of remuneration is consistent with the fair market value of the services without taking into account the volume or value of referrals, and (2) the remuneration is commercially reasonable even in the absence of referrals.  42 U.S.C. § 1395nn(e)(2)(B), (C).

24.      When an employment relationship is made in excess of the fair market value for a physician's services, the precise concern that Congressman Stark raised may be realized.  A physician is induced to perform a high volume of procedures exclusively at the paying facility in the interest of maintaining the lucrative employment opportunity.  The facility, in turn, is rewarded for the inducement by being able to bill for facility costs and technical components of each of the physician's procedures.  Employment contracts in excess of fair market value are the

very relationships sought to be prohibited by the Stark Statute and are not protected by any safe harbor.

25.     The federal statute that governs Medicaid includes a limitation on referrals and reimbursements if the same services would be prohibited under Stark. Specifically, the Medicaid statute provides,

> [N]o payment shall be made to a State under this section for expenditures for medical assistance under the State plan consisting of a designated health service (as defined in subsection (h)(6) of section 1395nn of this title) furnished to an individual on the basis of a referral that would result in the denial of payment for the service under subchapter XVIII of this chapter if such subchapter provided for coverage of such service to the same extent and under the same terms and conditions as under the State plan....

42 U.S.C. § 1396b(s).

26.     Therefore, no state may obtain federal share reimbursement for expenditures on services that would have been rejected had the services been covered by Medicare and prohibited by the Stark Statute. Through this provision, Stark is effectively applied to the Medicaid program.

### The Anti-Kickback Statute

27.     The federal Anti-Kickback Statute ("AKS") creates a penalty for any person who knowingly and willfully offers or pays any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, (1) to refer an individual to a person for the furnishing or arranging for the furnishing of an item or service for which payment can be made in part or in whole under a Federal health care program, or (2) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(2). The commission of such an act is a felony punishable by a fine of $25,000, five years in prison or

both. *Id.* Any individual who solicits or receives such an offer is equally liable and faces the same punishment. 42 U.S.C. § 1320a-7b(b)(1).

28.    The AKS specifically excludes "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B).

29.    Compliance with the Anti-Kickback Statute is a precondition to participation in any federal healthcare program, including Medicaid.

### DEFENDANTS' WRONGFUL CONDUCT

30.    In or about 2005 and 2006, ACHS became concerned about a rapidly changing climate in the pediatric healthcare industry. While All Children's Hospital had long enjoyed the status as the predominant children's hospital in the region, several new facilities began to threaten its market-share and thus its financial stability. ACHS, a long-time affiliate of the University of South Florida, attempted to shore its position by seeking an exclusivity arrangement with USF which would guarantee that ACH would be the sole children's healthcare affiliate for USF. USF rejected the request.

31.    William Horton, the Vice President of Strategic Business Services for All Children's Healthcare System, Inc., launched an aggressive plan to secure ACHS's financial position. Horton's plan included seeking new colleges that might be willing to enter into a mutually beneficial relationship. More importantly, however, Horton determined that the best case scenario would be to employ as many physicians as possible to guarantee their loyalty, and therefore their referrals, to ACH.

32.    At that time, the compensation plan for hiring physicians was in its second iteration, a version created by physician leaders and former Executive Director Maureen Cassidy.

Cassidy's plan was very favorable to the physicians with little benefit to the hospital. A subsequent Executive Director, Maria Sheats, attempted to overhaul the plan in or around 2005. However, Sheats met resistance from Dr. Roberto Sosa, the president of Defendant PPS, so Cassidy's plan remained substantially in effect.

33.     In recognition of the new focus on acquiring physician groups, Relator Barbara Schubert was ultimately tasked with restructuring the compensation plan. In or about the summer of 2007, Relator began intensive preparations to create a comprehensive compensation plan which would satisfy the needs of both the physicians and the hospital. Relator was directed to determine basic compensation rates and also to develop a bonus plan to incentivize physicians. Relator's plan ultimately drew from three nationwide salary surveys to determine an actual fair market value median range: the Sullivan-Cotter Physician Compensation and Productivity Survey, the Medical Group Management Association Physician Compensation and Production Survey, and the Medical Group Management Association – Academic Practice Compensation and Production Survey. In sum, the plan provided that "guaranteed base salary will not exceed the 75th percentile or fall below the 25th percentile. Within the 25th to 75th percentile range, initial guaranteed base salary will be established based on the number of years of experience post-residency or post-fellowship up to a maximum of 10 years." See Exhibit 1 for full narrative explaining the approved compensation plan.

34.     Regardless of the pending compensation plan changes, ACHS began to aggressively pursue pediatric practices for acquisition in or about early 2007. For the first target – a group of pediatric emergency medicine physicians – Horton engaged Dr. Jim Hillman, a well-respected ER physician to convince the physicians to accept employment directly with ACHS. The ER doctors were already working on the premises, but were employed by a third-

party called Team Health and were contracted out to ACH. In or about February 2007, Horton notified Relator that the negotiations were successful and that Relator should begin the on-boarding process for ten new physicians starting work on April 1, 2007. Horton provided Relator with fully executed contracts and salary figures for the new physicians; the base salaries ranged from $260,000 to $330,000. Drs. Ricardo Jimenez and Patrick Mularoni joined the original ten physicians on July 1, 2007, immediately following the completion of their fellowships. With no post-fellowship experience, they were given salaries of $250,000 each.

35.     The nationwide 25th to 75th percentile range for pediatric emergency medicine physicians in FY08 was $141,000 to $179,800. Relator complained to Horton that the salaries far exceeded fair market value and would cause PPS to lose even more money. Horton instructed Relator to proceed as directed.

36.     The new Compensation Plan was approved by the Board of Directors for Defendant PPS and implemented on October 1, 2007, the beginning of FY2008.

37.     The physician group acquisitions continued from at least 2007 to 2009 and are believed to be on-going. Practice groups in the following fields were acquired in just over two years:

| Practice Type | Date of Acquisition |
| --- | --- |
| Pediatric Emergency Medicine | 04/01/2007 |
| Pediatric Hematology/Oncology | 11/01/2007 |
| Pediatric Surgery | 12/24/2007 |
| Pediatric Plastic Surgery | 03/01/2008 |
| Pediatric Cardiology | 11/03/2008 |
| Pediatric Radiology | 04/01/2009 |
| Pediatric Anesthesiology | 08/01/2009 |
| Pediatric Neurosurgery | 08/10/2009 |

38.     During the courting periods, key physicians were identified in some practice areas and were targeted for incentives and inducements in return for convincing the rest of the practice group to come to ACH. In addition to the standard Employment Agreement, many key physicians also received "side letters" to provide individualized "perks" as incentives. The side letters memorialized benefits such as compensation for additional staff, profit-sharing, the hiring of a physician's family member or additional compensation for on-call duty (which could be as high as an additional $4,000 *per week*).

39.     For example, ACH had only one pediatric general surgeon on staff in or around 2007 and was losing cases to a USF pediatric surgeon at Tampa General Hospital. In order to obtain referrals for more surgical cases, ACHS actively sought to recruit additional surgeons. Dr. Paul Danielson was a pediatric surgeon with eight years of experience when he was courted by ACHS in 2008. The approved compensation plan's range of salary for a pediatric surgeon with his experience was $340,000 to $360,000. However, Danielson was given a base salary of $600,000 and a side letter that agreed to an employment opportunity for his spouse. Danielson's wife joined the staff of ACH as a per diem pediatrician six months after her husband. By FY2011, Dr. Danielson's base salary was $605,997, nearly $200,000 more than the approved FMV salary for a pediatric surgeon of his experience and $80,000 more than the nationwide median 90th percentile salary.

40.     The result of ACHS's efforts was immediate: at least seventy-five physicians were acquired in approximately three years. Nearly a third of all PPS physicians were paid above the 75th percentile of the nationwide salary range despite the compensation plan, and at least eighteen of those exceed the 90th percentile. The eighteen physicians paid at the highest level, based on FY2010 figures, are:

| Physician | Base Salary | Base + Bonus | 90th Percentile of FMV |
|---|---|---|---|
| Laleh Bahar-Posey* | $267,314 | $284,467 | $239,600 |
| Alan Causey* | $267,340 | $283,704 | $239,600 |
| Ricardo Jimenez | $254,613 | $266,826 | $239,600 |
| Craig Kizewic* | $286,444 | $295,229 | $239,600 |
| Thomas McLoughlin, Jr.* | $275,835 | $283,574 | $239,600 |
| Phillip Mularoni | $254,613 | $262,566 | $239,600 |
| Joseph Perno | $297,044 | $312,101 | $239,600 |
| Wassam Rahman | $339,498 | $363,925 | $239,600 |
| Rafael Santiago | $275,835 | $284,479 | $239,600 |
| Wilfredo Chamizo | $379,794 | $379,794 | $320,093 |
| Jerry Barbosa* | $505,000 | $505,000 | $297,459 |
| Gregory Hale | $305,198 | $323,166 | $297,459 |
| Richard Harmel** | $510,037 | $522,798 | $500,858 |
| Paul Danielson** | $605,987 | $621,748 | $500,858 |
| Marguerite Crawford* | $320,000 | $337,990 | $352,800 |
| Gul Dadlani | $339,488 | $358,978 | $352,800 |
| Gary Stapleton | $339,488 | $357,978 | $352,800 |
| Hector Monforte*** | $308,734 | $333,433 | $281,934 |

\* = Physician works at less than 1.0 FTE; salary shown at 1.0 FTE equivalent
\*\* = Does not include on-call trauma pay of at least $1,500/night every 3rd or 4th night
\*\*\* = Only FY2009 salary information available

    41.    All of the above-identified physicians are approved Florida Medicaid providers.

From their respective dates of hire to the present, ACHS has submitted and continues to submit

false claims to Medicaid for services rendered by the physicians using the following provider

numbers:

| Physician | Date of Hire | Medicaid Provider Number |
|---|---|---|
| Laleh Bahar-Posey | 10/23/2007 | 371322900 |
| Alan Causey | 04/01/2007 | 252285300 |
| Ricardo Jimenez | 07/01/2007 | 279467500 |
| Craig Kizewic | 04/01/2007 | 272007800 |
| Thomas McLoughlin Jr. | 04/01/2007 | 258515400 |
| Phillip Mularoni | 07/11/2007 | 277977300 |
| Joseph Perno | 04/01/2007 | 267346100 |
| Wassam Rahman | 04/01/2007 | 252262400 |
| Rafael Santiago | 07/24/2007 | 269833100 |
| Wilfredo Chamizo | 07/01/1992 | 373015800 |
| Jerry Barbosa | 11/01/2007 | 057182200 |
| Gregory Hale | 12/01/2008 | 000522800 |
| Richard Harmel | 12/24/2007 | 061134400 |

| Paul Danielson | 08/01/2008 | 000081400 |
| Marguerite Crawford | 06/02/2008 | 274263200 |
| Gul Dadlani | 11/03/2008 | 270510900 |
| Gary Stapleton | 11/03/2008 | 278183200 |
| Hector Monforte | 05/02/2005 | 272325500 |

42.    On or about August 31, 2009, Horton emailed Relator and several other ACHS executives regarding a False Claims Act case in which Covenant Medical Center in Waterloo, Iowa agreed to pay $4.5 million for overpaying five physicians in violation of the Stark Statute. Horton stated, in part, that "this is one that's a good [follow-up] for our most recent deal with NS, so will share with Dr Carey.....this is a REAL exposure with REAL consequence if we very (sic) to any significant degree from published comp experience...."

43.    In total, the salaries of PPS physicians exceeded fair market value by approximately $5 million in FY2010.

44.    On or about July 20, 2010, ACHS signed a letter of intent to become an integrated member of the Johns Hopkins Health System.  Upon information and belief, Johns Hopkins contracted with an outside consulting company to review the arrangements due to a serious concern about PPS's high-value physician compensation contracts.

**Count I:**
**Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a),**
**Presenting or Causing to be Presented Claims to Medicaid for Designated Health Services**
**Rendered in Violation of the Stark Statute**

45.    Relator incorporates paragraphs 1 - 44 of this complaint as though fully set forth herein.  This count sets forth claims for treble damages and forfeitures under the federal False Claims Act, 31 U.S.C. §§ 3729-3732, as amended.

46.    As a Medicaid-providing hospital, Defendants have certified and continue to certify that they will comply with all applicable federal and state regulations.  As described

above, Defendants have engaged in false or fraudulent activities including offering and entering into financial compensation arrangements that far exceed fair market value and are not commercially reasonable for the purpose of inducing referrals by the employee physicians. This conduct is in violation of the Stark Statute, a federal regulation.

47.    Defendants submitted claims to the Florida Agency for Health Care Administration (AHCA) for reimbursement of the services rendered as a result of the improper referrals. Defendants knew that submitting a claim to the State of Florida would, in turn, cause the State of Florida to submit a claim for reimbursement to the federal Medicaid program.

48.    The Medicaid statute (see *supra*, at Paragraph 24) prohibits the state from receiving payments for services that would be refused payment if the service was covered under Medicare and prohibited by Stark. Therefore, when Defendants submitted a claim to FL AHCA that they knew would cause Florida to submit a claim to the federal government, Defendants knowingly caused the State of Florida to submit a false claim to the United States of America.

49.    In doing so, Defendants knowingly violated:

(1) 31 U.S.C. § 3729(a)(1)(A) by presenting, or caused to be presented, false and fraudulent claims for payment or approval to the United States, in the form of claims for reimbursement from the State of Florida to the United States for designated health services rendered to patients who were referred by physicians with whom Defendants had entered into a prohibited financial relationship in violation of the Stark Statute, and

(2) 31 U.S.C. § 3729(a)(1)(B) by making, using or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States, by certifying that the hospital was in compliance with all applicable laws and regulations.

50.     To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator alleges that Defendants knowingly violated 31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(2), prior to amendment, by engaging in the conduct described in Paragraph 48 (1) and (2), respectively.

51.     Because of the false or fraudulent claims made by Defendants, the United States has suffered, and continues to suffer damages and is therefore entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Count II:
### Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a),
### Presenting or Causing to be Presented Claims to Medicaid for Designated Health Services Rendered in Violation of the Anti-Kickback Act

52.     Relator realleges incorporates paragraphs 1 - 44 of this complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the federal False Claims Act, 31 U.S.C. §§ 3729-3732, as amended.

53.     As described above, Defendants have engaged in false or fraudulent activities including offering and entering into financial compensation arrangements that were made for the purpose of inducing referrals to All Children's Hospital. This conduct is in direct violation of the Anti-Kickback Statute and therefore every claim made as a result of an improper referral was tainted as a false claim.

54.     By engaging in this conduct, Defendants knowingly violated:

(1) 31 U.S.C. § 3729(a)(1)(A) by presenting, or caused to be presented, false and fraudulent claims for payment or approval to the United States and the State of Florida, in the form of claims for reimbursement for services rendered to patients who were referred

17

by physicians with whom Defendants had entered into a prohibited financial relationship in violation of the Anti-Kickback Act, and

(2) 31 U.S.C. § 3729(a)(1)(B) by making, using or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States and the State of Florida, in the form of certifying that the hospital was in compliance with all applicable laws and regulations.

55.     To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator alleges that Defendants knowingly violated 31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(2), prior to amendment, by engaging in the conduct described in Paragraph 53 (1) and (2), respectively.

56.     Because of the false or fraudulent claims made by Defendants, the United States and the State of Florida have suffered, and continue to suffer damages and are therefore entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count III:
### Violations of Florida False Claims Act, Fla. Stat. § 68.082

57.     Relator realleges incorporates paragraphs 1 - 44 of this complaint as though fully set forth herein.  This count sets forth claims for treble damages and forfeitures under the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*

58.     As a Medicaid-providing hospital, Defendants have certified and continue to certify that they will comply with all applicable federal and state regulations.  As described above, Defendants have engaged in false or fraudulent activities including offering and entering into financial compensation arrangements that far exceed fair market value and are not

commercially reasonable for the purpose of inducing referrals by the employee physicians. This conduct is in violation of the Stark Statute, a federal regulation.

59.     Defendants knew that the certification that ACHS complied with all state and federal regulations was false and that the federal regulations prohibited the State of Florida from receiving reimbursement for these services. Defendants also knew that the State of Florida would not make a payment for any claim which was not reimbursable by the federal government in accordance with the Federal Medical Assistance Percentage. Still, Defendants submitted claims to the Florida Agency for Health Care Administration (AHCA) for reimbursement for services rendered as a result of improper referrals.

60.     But for Defendants false certifications and statements of compliance with the federal regulations, the State of Florida would not have paid any portion of the claims made by Defendants. Therefore, Defendants made false claims which damaged the State of Florida in the amount of the state share of every claim for services rendered as a result of a prohibited referral.

61.     In doing so, Defendants knowingly violated:

(1) Fla. Stat. § 68.082(2)(a) by knowing presenting or causing to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval; and

(2) Fla. Stat. § 68.082(2)(b) by knowingly making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.

62.     Because of the false or fraudulent claims made by Defendants, the State of Florida has suffered, and continues to suffer damages and is therefore entitled to recovery as provided by

the Florida False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## PRAYER

WHEREFORE, Relator Barbara Schubert, on behalf of the United States of America and the State of Florida, requests:

a.      That this Court enter an order determining that Defendants violated the Federal False Claims Act by engaging in conduct in violation of the Stark statutes;

b.      That this Court enter an order determining that Defendants violated the Federal False Claims Act by engaging in conduct in violation of the Anti-Kickback Statute;

c.      That this Court enter an order determining that Defendants violated the Florida False Claims Act;

d.      That Defendants be ordered to cease and desist from violating the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*,

e.      That Defendants be ordered to cease and desist from violating the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*,

f.      That Defendants be ordered to pay an amount equal to three times the amount of damages the United States and the State of Florida have sustained because of Defendants actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 and Fla. Stat. § 68.082(2);

g.      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and Fla. Stat. § 68.085;

h.      That Relator be awarded all costs of this action, including attorneys' fees, expenses and costs pursuant to 31 U .S.C. § 3730(d) and Fla. Stat. § 68.086(2); and

i.    That the United States, the State of Florida and Relator be granted all other relief as the Court deems just and proper.

<strong>DEMAND FOR JURY TRIAL</strong>

A jury trial is requested for all issues so triable.

Dated this 1st day of May, 2012.

Respectfully submitted,

JILLIAN L. ESTES
Fla. Bar No. 0055774
jestes@jameshoyer.com
CHRISTOPHER CASPER
Fla. Bar No. 048320
ccasper@jameshoyer.com
ELAINE STROMGREN
Fla. Bar No. 0471610
estromgren@jameshoyer.com
**JAMES, HOYER, NEWCOMER AND SMILJANICH, P.A.**
4830 West Kennedy Blvd.
One Urban Center, Suite 550
Tampa, FL 33609
Tel. 813-397-2300
Fax 813-397-2310

**Counsel for Relator**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Amended Complaint has been furnished by Certified Mail, Return Receipt Requested, this 1st day of May, 2012 to the following:

David Wiseman
United States Department of Justice
Civil Division
601 D Street, NW
Room 9032
Washington, D.C. 20004

Charles Harden
United States Attorney's Office
Middle District of Florida, Tampa Division
400 N. Tampa Street, Suite 3200
Tampa, FL  33602

Andrew 'Tripp' McElroy
Office of the Attorney General
Medicaid Fraud Control Unit
The Capitol PL-01
Tallahassee, FL  32399

Florida Department of Financial Services
Chief Financial Officer Jeff Atwater
200 East Gaines Street
Tallahassee, FL  32399

Because the case remains under seal by order of the Court, this Second Amended Complaint was not served on the Defendants.

_____
JILLIAN L. ESTES

# EXHIBIT A

**PPS Physician Compensation Plan – Approved, PPS Board, 9/3/08**
**Revised 4/5/10**

<u>Physicians in Practices Producing Financial Losses</u>

- The plan comprises a combination of guaranteed base salary (not lower than FY07 base) and incentive compensation for physicians with 1 year or more tenure with ACH at the beginning of the fiscal year October 1. Newly-hired physicians receive only a guaranteed base salary in their first year.
- Fair market value for base salary ranges is determined using appropriate specialty-specific national physician compensation surveys (e.g., MGMA) and using a "median of the medians" approach for all surveys at the 25th, 50th and 75th percentile levels for reference purposes.
- Guaranteed base salary will not exceed the 75th percentile or fall below the 25th percentile. Within the 25th to 75th percentile range, initial guaranteed base salary will be established based on the number of years of experience post-residency or post-fellowship up to a maximum of 10 years.
- The plan will be reviewed annually utilizing the most recent available salary surveys to verify or adjust dollar amounts associated with each percentile range as necessary to stay current with the national market for pediatric specialists.
- On an annual basis (October 1), all base salaries will be adjusted to 95% of each physician's benchmark based on years of experience post-residency or post-fellowship. *Hospitalists in the* <u>*ACH@SMH*</u> *program will have their base salaries set at 100% of benchmarks.* Physicians for whom base salary exceeds the 75th percentile benchmark, an increase of 1% is given. *Base salary will not be less than the base salary described in physician's initial Professional Services Employment Agreement.*
- Merit-based incentive compensation will be offered to physicians with 1 or more years of service to ACH in an amount equal to 10% of the base salary. Any physician whose base salary exceeds the benchmark for the 75th percentile/10 years experience post-residency will be eligible for incentive compensation equal to 10% of the (lower) benchmark amount.
- The incentive compensation plan will be administered in such a way that it rewards performance in keeping with stated Health System mission, vision and strategic priorities.
- Broad categories and category weighting for incentive compensation include: Clinical Productivity (70%); Teaching and/or Research (15%); and Professionalism and Service to All Children's (15%).
- Clinical Practice Directors: A stipend of $1,500 per year per FTE physician supervised will be paid (i.e., in a department of 4 FTE physicians, the Director's stipend would be 3 x $1,500 = $4,500).
- Clinical Productivity and Clinical Practice Director stipend will be paid quarterly.

## Incentive Compensation Plan – Implementation Standards

**Weight (on scale of 100 points)**

**70 points**

**Clinical Production**

A range of RVUs will be established for incentive purposes from the median of the MGMA Academic Faculty Practice survey, plus 1 standard deviation above the median. Any physician producing fewer RVUs than the median for their specialty would receive no incentive compensation in this category. Any physician producing a greater number of RVUs than median plus 1 standard deviation will receive additional incentive compensation ($5 per RVU above the range, roughly 15% of Medicaid reimbursement). RVU production values falling within the range will be incentivized proportionally as shown in below.

**Example**

Dr. Spock, a general pediatrician, produced 3800 RVUs in FY07.

The proposed RVU range for general pediatrics is 3,416 (median) to 5,386 (median + 1 S.D.).

Dr. Spock's production is 19.5% above the minimum for his specialty.

19.5% of 70 points is 13.65 points (or percent) of his total incentive compensation.

If Dr. Spock's base salary is $150,000; his maximum incentive compensation attainment would be $15,000; 13.65% given for clinical productivity would result in incentive compensation to Dr. Spock of $2,047 in this category.

**<u>Weight on scale of 100 points)</u>**

**15 points**   <u>Teaching and/or Research</u>

<u>Teaching</u>
- Receipt of "Teacher of the Year" award (15 points)
- Receipt of other teaching award (10 points)
- Resident/fellow/student evaluation of 3.5 or higher (5 points)
- All resident/fellow/ evaluations submitted on time (5 points)
- Lectures to residents/nurses/students (1 point each)
- ACH Grand Rounds presentation (5 points)
- Presentation at Practical Pediatrics (5 points)
- Speaker at national academic conference (10 points)
- Invited lectureships (5 points each)
- Development of approved fellowship program (15 points)
- Maintenance of existing fellowship program (5 points)
- Attainment of academic appointment in previous 12 months (3 points)
- Promotion in academic rank in previous 12 months (3 points)

<u>Research</u>
- Initiation of IRB-approved study in previous 12 months (5 points each)
- Receipt of new grants in previous 12 months (5 points each)
- Peer-reviewed articles published in previous 12 months (5 points each)
- Invited authorship (e.g., book chapters published in previous 12 months) (10 points)
- Member of editorial board for peer-reviewed journal (10 points)
- Principal Investigators – Initiate participation in multicenter studies (3 points each)
- Development and direction of professional clinical education courses (e.g., AHEC, Asthma Day, CF Day, etc.) (3 points)
- Award of "center of excellence" for specific class of diagnoses (15 points)
- Lead development/implementation of new clinical pathway (5 points each)

<u>Weight (on
scale of 100
points)</u>

15 points      <u>Professionalism and Service to All Children's</u>

- Officer of the medical staff (5 points)
- Attendance at medical staff committee meetings (1 point per meeting)
- Leadership of hospital or medical staff committee (5 points)
- Clinical Practice Director (5 points)
- Board member of child health/advocacy organization (5 points)
- Government or school board membership (5 points)
- Officer of county/state/national medical organization (5 points)
- Attendance at Risk Management meetings (1 point per meeting)
- Attendance at annual general meeting of the medical staff (3 points)
- Attendance at Clinical Practice Director meetings (1 point per meeting)
- Improvement in department's annual collected revenue of 10% or more (3 points); improvement of 15% or more (5 points); 20% or more (7 points)
- Improvement in PPS's annual collected revenue of 10% or more (3 points); improvement of 15% or more (5 points); 20% or more (7 points), excluding new programs in first 2 years
- Clinical utilization of Specialty Care Centers monthly (3 points)
- Participation in ACH Marketing/Community Relations physician outreach visitation program (1 point per trip)
- Clinical Practice Directors: Individual or departmental performance criteria as assigned by President (points determined at President's discretion)
- Other Physicians: Individual or departmental performance criteria as assigned by Clinical Practice Director (points determined at Director's discretion)

**Physicians in Practices Producing a Net Profit**

- In addition to the foregoing, it is recommended that physicians in practices that produce a net fiscal year profit be incentivized with a percentage of the total profit going to the practice.