# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF FLORIDA *ex rel.* BARBARA SCHUBERT,<br><br>       Plaintiffs,<br><br>v.<br><br>ALL CHILDREN'S HEALTH SYSTEM, INC., PEDIATRIC PHYSICIANS SERVICES, INC. and ALL CHILDREN'S HOSPITAL, INC.,<br><br>       Defendants. | **Case No.: 8:11-cv-1687-T-27-EAJ**<br><br>**Dispositive Motion** |

## DEFENDANTS' MOTION TO DISMISS RELATOR'S
## SECOND AMENDED COMPLAINT AND MEMORANDUM OF LAW

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendants respectfully move this Court for an Order dismissing with prejudice Relator's Second Amended Complaint. In support, Defendants state as follows:

1.     Relator Barbara Schubert filed her Second Amended Complaint ("SAC") on May 1, 2012, asserting claims under the federal and Florida False Claims Acts ("FCAs").

2.     Neither the United States nor the State of Florida has intervened, and on August 13, 2012, the Court unsealed the SAC. [Dkt. 3, 5]

3.     On November 5, 2012, Relator moved for leave to file a Third Amended Complaint. [Dkt. 21]. The Court denied Relator's motion on January 9, 2013. [Dkt. 33].

4.     The SAC should be dismissed for failure to plead the circumstances of fraud with particularity as required by Rule 9(b). For example, although Relator brings this action

under the federal and Florida FCAs, the SAC does not identify any supposed false claims. That failure alone is fatal under Rule 9(b), as the Eleventh Circuit has repeatedly held.

5. Counts I and III, predicated on alleged violations of the federal Ethics in Patient Referrals Act ("Stark Law"), also should be dismissed under Rule 12(b)(6) because the Stark Law applies only to *Medicare* and not to *Medicaid*, and the SAC fails to allege that Defendants submitted false Medicare claims. Relator asserts that, as a result of 42 U.S.C. § 1396b(s), the Stark Law "effectively applies" to Medicaid; however, Relator misconstrues that provision. In fact, 42 U.S.C. § 1396b(s) applies only where a state Medicaid program and Medicare provide coverage for designated health services "*to the same extent and under the same terms and conditions*." As demonstrated below, Florida Medicaid and Medicare provide coverage for hospital services under significantly different terms and conditions, and Relator does not allege otherwise.

6. Even if Relator's interpretation of 42 U.S.C. § 1396b(s) were correct, Counts I and III should be dismissed because the SAC has failed to allege any Stark Law violations.

7. Count II, premised on allegations that compensation paid to employed physicians violated the federal Anti-Kickback Statute, should be dismissed because the statute specifically exempts such payments. *See* 42 U.S.C. § 1320a-7b(b)(3)(B).

## MEMORANDUM OF LAW

## ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

### A.    The Parties

Defendant All Children's Hospital, Inc. ("ACH") is a not-for-profit corporation that owns and operates All Children's Hospital, a children's hospital in St. Petersburg, Florida.

SAC ¶ 9.  The hospital cares for many poor and disabled children who are Medicaid

beneficiaries.  *Id.* ¶¶ 9, 11.  Defendant Pediatric Physicians Services, Inc. ("PPS") is a not-

for-profit corporation that employs physicians, many of whom provide care at All Children's

Hospital.  *Id.* ¶ 10.  Defendant All Children's Health System, Inc. ("ACHS") is the sole

member of PPS and is an affiliate of ACH.  *Id.*  Relator Schubert is the former PPS Director

of Operations.  *Id.* ¶ 8.

### B.        Medicaid and Medicare Programs

Medicaid is a joint federal-state program that provides health coverage and benefits

for the poor and disabled.  *Id.* ¶ 12.  The Florida Agency for Health Care Administration

("AHCA") administers Florida Medicaid, with oversight from the federal Centers for

Medicare and Medicaid Services ("CMS").  *Id.*  Under Medicaid, the State pays claims

submitted by health care providers, and the State may then submit claims to CMS to

reimburse the State for a portion of its Medicaid expenditures.  *Id.* ¶¶ 13, 47.  The federal

payment is referred to as the "federal financial participation" or "FFP," with the percentage

amount based on a statutory formula.  *See* 42 U.S.C. § 1396b; SAC ¶ 12.

The Medicare program is a federal program that provides health care coverage for the

aged, individuals with end-stage renal disease, and, in certain circumstances, the disabled.

*See* 42 U.S.C. § 1395c.  As ACH is a children's hospital, its Medicare patient volume is very

low.  The SAC makes no allegations concerning Medicare.

### C.        Allegations Regarding Financial Arrangements With Physicians

Relator alleges that in 2007 she was tasked with restructuring the physician

compensation plan for PPS and developing a bonus plan.  SAC ¶ 33.  Relator alleges that she

"drew from" three national physician salary surveys "to determine an actual fair market value median range," which she used to formulate a compensation plan such that each physician's guaranteed base salary would fall between the nationwide 25th and 75th percentiles of compensation. *Id.*

In 2007, PPS came to employ twelve pediatric emergency room physicians, ten of whom had previously provided ER services at ACH while employed by an independent group. *Id.* ¶ 34.  The base salaries PPS offered to these twelve ER physicians ranged from $250,000 to $330,000. *Id.*  Relator alleges that the *nationwide* 25th to 75th percentile range for pediatric ER physicians in FY08 was $141,000 to $179,000, and that she complained that the salaries offered to the ER physicians "far exceeded fair market value," but was nevertheless told to proceed. *Id.* ¶ 35.  The SAC makes no allegations regarding fair market value compensation in the Tampa Bay market for pediatric ER physicians.

Relator also makes allegations concerning Dr. Paul Danielson, a pediatric surgeon. According to Relator, in 2007, ACH *had only one pediatric surgeon on staff. Id.* ¶ 39. Seeking another pediatric surgeon, [1] in 2008, PPS recruited Dr. Danielson and employed him at a base salary of $600,000. *Id.*  Dr. Danielson was also "given . . . a side letter that agreed to an employment opportunity for his spouse," and his wife was hired as a "per diem pediatrician" six months later. *Id.*  Relator alleges that Dr. Danielson was paid too much, and that under Relator's "approved compensation plan[]," ACH should have offered $340,000 to

---

[1] Aside from the obvious challenges of having only one pediatric surgeon on the medical staff, Florida law requires a pediatric trauma center such as ACH to have "[a]t least one qualified trauma surgeon . . . to be on primary trauma call at all times to provide trauma service care."  Fl. DHP 150-9 at 4.4; *see also* Fla. Admin. Code Ann. r. 64J-2.011 (requiring a pediatric trauma center to satisfy DHP 150-9).  Obviously, one surgeon cannot physically "be on primary trauma call at all times."

$360,000.  *Id*.  Relator does not allege that the salary negotiations with Dr. Danielson were

conducted on anything other than an appropriate, arms-length basis, that Dr. Danielson

would have agreed to accept $340,000 to $360,000 to relocate to Tampa-St. Petersburg, or

that PPS could have hired another qualified surgeon at that salary.

Finally, Relator identifies eighteen PPS physicians who, she claims, are paid salaries

that "exceed the 90th percentile" of the *nationwide* salary range.  *See id*. ¶ 40.  Aside from Dr.

Danielson (pediatric surgeon) and Drs. Ricardo Jimenez and Patrick Mularoni (ER

specialists), Relator does not allege the practice specialties of the eighteen physicians or even

that they make referrals to the hospital.  *See id*. ¶¶ 34, 40.  Furthermore, she again makes no

allegations that the compensation paid to these physicians is inconsistent with fair market

value for pediatric specialists in the Tampa-St. Petersburg market.  And, again, Relator does

not allege that Defendants and the physicians failed to negotiate in an appropriate, arms-

length manner in arriving at the physician compensation terms.

### D.    False Claims Act Counts

Relator alleges that Defendants are liable under the FCAs by allegedly falsely

certifying compliance with the Stark Law and the Anti-Kickback Statute when submitting

Medicaid claims.

Counts I and III are predicated on Defendants' supposed Stark Law violations.  In

Count I, Relator alleges that Defendants' alleged Stark Law violations caused the State of

Florida to submit false claims to CMS for Medicaid FFP payments.  There is no allegation

that Defendants themselves submitted false claims to the federal government; instead,

Relator asserts that Florida must have submitted claims to the federal government and that

these must have been false under the federal False Claims Act. *Id.* ¶¶ 46-49.

In Count III, Relator asserts that Defendants violated the Florida False Claims Act as a result of their having supposedly violated the Stark Law. *Id.* ¶¶ 58-61. Her theory is that the Medicaid claims submitted by Defendants to the AHCA were false because Florida was allegedly not entitled to seek FFP for reimbursements made to Defendants. *Id.*

In Count II, Relator alleges that Defendants violated the federal FCA as a result of their having supposedly violated the federal Anti-Kickback Statute. *Id.* ¶¶ 52-56.

## LEGAL STANDARDS

Relators must satisfy two separate pleading requirements. *Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718, 720 (11th Cir. 2012). First, the SAC must provide a statement of the claim showing that the pleader is entitled to relief with sufficient facts to raise the right to relief above a speculative level. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This requires more than a statement of facts merely *consistent* with liability, and pleading mere conclusions will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added).

Second, the SAC must satisfy Rule 9(b)'s heightened pleading standard, which requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012). Rule 9(b) requires the complaint to "set forth 'facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (internal quotes and

citations omitted).  This particularity requirement is necessary to alert defendants to the precise misconduct with which they are charged and to protect defendants against spurious charges of immoral and fraudulent behavior.  *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002).  Unless Relator states the "'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government," the Complaint must be dismissed.  *Hopper*, 588 F.3d at 1327.

## ARGUMENT

## I.     THE SECOND AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO SATISFY RULE 9(B).

The SAC fails to plead facts required to satisfy Rule 9(b) in at least two critical ways.  First, the SAC fails to allege with particularity any of the supposed false claims that are at issue.  Second, the SAC fails to allege with particularity that compensation provided to any physician exceeded fair market value for the Tampa-St. Petersburg market.  Each failure is fatal to the SAC.

### A.     Relator Has Not Identified Any Claims That Defendants Submitted Or Caused The State Of Florida To Submit.

"The submission of a claim is . . . the *sine qua non* of a False Claims Act violation," and the failure to allege the particular false claims is fatal under Rule 9(b).  *Clausen*, 290 F.3d at 1311.  Indeed, on at least ten occasions, the Eleventh Circuit has affirmed Rule 9(b) dismissals where a False Claims Act complaint failed to allege or identify the false claims.  *See id.*; *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302-03 (11th Cir. 2010); *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006); *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005); *Hopper*, 588 F.3d at 1328;

*United States ex rel. Jallali v. Nova S.E. Univ.*, No. 12-10148, 2012 WL 3234278 (11th Cir. Aug. 9, 2012); *United States ex rel. Seal 1 v. Lockheed Martin Corp.*, 429 F. App'x 818 (11th Cir. 2011); *Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718 (11th Cir. 2010); *United States ex rel. Shurick v. Boeing Co.*, 330 F. App'x 781 (11th Cir. 2009); *Mitchell v. Beverly Enters., Inc.*, 248 Fed. App'x 73 (11th Cir. 2007).

Rule 9(b) requires a relator to state the "'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." *Hopper*, 588 F.3d at 1327. "Because it is the submission of a fraudulent claim that gives rise to liability under the False Claims Act, that submission must be pleaded with particularity and not inferred from the circumstances." *Corsello*, 428 F.3d at 1013. Thus, a relator cannot rely on the mere suggestion or inference that claims were made, but must plead particular facts relating to the false claims submission. *See Lymphatx*, 596 F.3d at 1302-03 (affirming dismissal where relator "failed to provide any specific details regarding either the dates on or the frequency with which the defendants submitted false claims, the amounts of those claims, or the patients whose treatment served as the basis for the claims."); *Atkins*, 470 F.3d at 1359 (affirming Rule 9(b) dismissal where relator "summarily concludes that the defendants submitted false claims to the government for reimbursement"); *Hopper*, 588 F.3d at 1326 (11th Cir. 2009) (affirming Rule 9(b) dismissal where relator relied on inference that claims were made rather than allege specific facts regarding claims). The relator must "allege some factual basis for the allegation that an actual claim in some actual amount was submitted." *Clausen*, 290 F.3d at 1313.

Here, two different types of "claims" are relevant: (1) Defendants' claims to Florida AHCA; and (2) AHCA's claims submitted to CMS for FFP reimbursement. The SAC,

however, fails to allege specific facts concerning *any* false claims or false statements.  It fails

to identify any claims that Defendants submitted to Florida Medicaid.  It also fails to identify

any claims that that the State of Florida submitted to CMS that Defendants allegedly caused

to be false.  *See* SAC ¶¶ 47-48, 59.

The Eleventh Circuit affirmed the dismissal of an FCA complaint predicated on a

health care provider's alleged illegal financial relationships with physicians where the relator

omitted allegations regarding the actual claims–just as in this case.  In *Corsello,* 428 F.3d

1008, a former sales employee alleged that home oxygen supply companies paid illegal

kickbacks to physicians to induce Medicare patient referrals, and that the oxygen supply

companies violated the FCA by submitting claims for services that resulted from the

unlawful referrals.  Although the relator provided a detailed recitation of the alleged kickback

scheme, the relator's complaint failed to satisfy Rule 9(b) because it did not allege facts

regarding specific fraudulent submissions to the government.  *Id.* at 1013.  The Eleventh

Circuit explained that "when reviewing a motion to dismiss, we decline to make inferences

about the submission of fraudulent claims because such an assumption would 'strip[ ] all

meaning from Rule 9(b)'s requirements of specificity.'"  *Id.* (quoting *Clausen*, 290 F.3d at

1312 n. 21) (alterations in the original); *see also Hopper*, 588 F.3d at 1325 (discussing

*Corsello*, "in which a relator alleged that medical equipment companies engaged in kickback

and referral schemes," but failed to satisfy Rule 9(b) due to the failure to allege "specific

fraudulent submissions to the government").

Likewise, in *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 869 F. Supp.

2d 1336, 2012 WL 523623, at *2 (M.D. Fla. Feb. 16, 2012), reconsideration denied (July 13,

2012), the relator alleged that a hospital chain violated the Stark Law and Anti-Kickback

Statute. The *Mastej* relator, however, "fail[ed] to identify a single claim for reimbursement

for patients who were referred by the [defendants]" and instead "summarily conclude[d]" that

the scheme "necessarily resulted in the defendant's systematic submission of false claims."

*Id.* at *7. The Court found that the relator failed to satisfy Rule 9(b): "[a] court may not

make an assumption about a FCA defendant's submission of actual claims to the

Government without stripping all meaning from Rule 9(b)'s mandate of specificity or

ignoring that the 'true essence of the fraud' involves an actual claim for payment from the

Government and not merely a preparatory scheme." *Id.* at *3. The Court specifically

rejected the relator's argument that he was excused from alleging false claims because he

was alleging unlawful financial relationships with physicians and that, therefore, "all claims"

submitted to the government pursuant to their referrals were false. *See id.* at *10; *see also*

*United States ex rel. Wilson v. Crestwood Healthcare, LP*, 2012 U.S. Dist. LEXIS 69763,

*18-23, 34 (N.D. Ala. May 18, 2012) (dismissing FCA case against hospital predicated on

Anti-Kickback and Stark Law violations due to failure to allege specific false claims).

Finally, Relator provides the Medicaid provider numbers for sixteen PPS-employed

physicians, SAC ¶ 41, but the physician provider numbers are not relevant. First, this

paragraph does not allege false claims. Furthermore, claims submitted on account of

physician services are not the relevant claims. The Stark Law and Anti-Kickback Statute

regulate physician referrals to hospitals, and the FCA addresses claims submitted by

hospitals following an unlawful referral. It is the *claims for hospital services* that are the

result of an unlawful referral that constitute supposed false claims – not *claims for physician*

*services*.  *See* 42 C.F.R. § 411.351 (definition of "referral" under Stark Law expressly excludes physician's own services).  Relator has not identified any referrals, any false claims submitted to Medicaid, any false claims for FFP submitted by Florida to CMS, or any payments made on account of false claims.

### B.    Relator Has Not Pled Sufficient Facts To Support Her Allegations That Defendants Provided Compensation In Excess Of Fair Market Value.

Relator's allegations of Stark Law and Anti-Kickback Statute violations are based on the assertion that Defendants paid compensation to physicians that exceeds fair market value.  Relator's fair-market-value allegations, however, are not adequately supported with factual allegations, as required under Rule 9(b).  *See United States ex rel. Osheroff v. Tenet Healthcare Corp.*, 09-22253-CIV, 2012 WL 2871264, at *7 (S.D. Fla. July 12, 2012)[2] (Rule 9(b) requires that "fair market value" allegations be pled with particularity in an FCA case predicated on alleged Stark Law violations).  Relator must plead a benchmark of fair market value *in the same market* against which the compensation arrangements can be measured, with adequate consideration for the various elements of the compensation.  *Id.*

Even if all the facts asserted in the SAC are assumed to be true, Relator has not made relevant factual allegations to establish that the compensation paid by Defendants exceeds fair market value.  Most obviously, the SAC alleges nothing regarding fair market value standards in the relevant market for physician services, which is presumably the Tampa-St. Petersburg market.  Rather, Relator's assertions are all based on her consideration of *nationwide* physician surveys, which are not the appropriate measure.  SAC ¶¶ 33, 39-40.

---

[2] Reconsideration granted, in part, and denied, in part, by *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, 2012 U.S. Dist. LEXIS 108713 (S.D. Fla. Aug. 2, 2012) without affecting the holding.

In addition, Relator alleges nothing concerning other factors relevant to determining whether compensation is consistent with fair market value, such as the physician's reputation, seniority, special skills, productivity or agreement to work long hours. Relator "drew from" three national salary surveys, but has not explained her methodology. SAC ¶ 33. Moreover, she applies her numbers in a mechanical way, asserting that the 25th to 75th national percentile range reflects "fair market value" in all instances. *Id.* She has not pled with particularity facts to demonstrate that her fair market value allegations are based on data regarding physicians with similar training and experience, reflect a weighing of similar services and terms (including bonus, call pay, insurance or other elements of compensation), properly represent physicians in the same practice area and specialty (surgeons v. pediatric surgeons), or take into consideration unique circumstances relevant to compensation negotiations (such as the urgent need to hire a pediatric general surgeon in 2007, at a time when there was only one pediatric general surgeon on the ACH medical staff, *see* SAC ¶ 39).

Relator's non-fair-market-value allegations also fail to satisfy Rule 9(b) when viewed in the overall context of PPS physician compensation. Relator states that PPS employs "more than one-hundred" physicians, yet alleges only 18 as being compensated above the 90th percentile based on national surveys. *See* SAC ¶¶ 1, 40. Likewise, Relator admits that at least two-thirds of the employed physicians are compensated below the 75th percentile. *See id.* ¶ 40. Relator cannot satisfy Rule 9(b), let alone Rule 8, by merely cherry-picking, out of more than 100 physicians, the physicians whose compensation falls at the high end when compared to national surveys without pleading more particular facts. *See United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1049 (N.D. Ill. 2002)

(dismissing complaint alleging above fair-market value acquisitions where Relator failed to identify what assets were purchased, the amounts paid, or anything beyond conclusory allegations that they were not commercially reasonable).

Just as "parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007), Relator's naked allegation of compensation above the nationwide 75th percentile, or even the 90th percentile, "does not supply facts adequate to show" that ACH paid its employed physicians above fair market value.

Accordingly, in addition to the SAC's failure to plead false claims, the failure to plead sufficient facts to establish that Defendants paid compensation in excess of fair market value is grounds for dismissal.

## II. COUNTS I AND III SHOULD BE DISMISSED BECAUSE RELATOR HAS MISCONSTRUED 42 U.S.C. § 1396b(s).

As noted, Count I alleges that Defendants caused the State of Florida to submit false claims to CMS seeking FFP reimbursement due to Defendants' alleged violations of the Stark Law.  Count III alleges that the same conduct resulted in a violation of the Florida False Claims Act.  SAC ¶¶ 58-61.  These counts fail as a matter of law because they are based on Relator's misinterpretation of 42 U.S.C. § 1396b(s).

### A. Stark Law Overview

Congress enacted the Stark Law "to address perceived overutilization of services by physicians who stood to profit by referring patients to facilities or entities in which they had a financial interest."  *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 705 (D.C. Cir. 2011).  The law contains two prohibitions:  a referral prohibition; and a billing prohibition

that applies in the event the Medicare referral prohibition has been violated.

The referral prohibition provides that if a physician (or immediate family member) has a financial relationship with a hospital (or other entity) that does not fit within an exception, then the physician may not refer a patient to the hospital for the furnishing of "designated health services for which payment otherwise may be made under this subchapter [*i.e.*, subchapter XVII, referring to Medicare]."[3] 42 U.S.C. § 1395nn(a)(1)(A); *see also* 42 C.F.R. § 411.353(a) (stating Medicare referral prohibition).  Hospital inpatient and outpatient services are examples of "designated health services."  42 U.S.C. § 1395nn(h)(6)(K); 42 C.F.R. § 411.351.  The billing prohibition provides that if a physician refers a Medicare beneficiary contrary to the referral prohibition, then the hospital may not bill Medicare (or anyone else)[4] for services furnished to the Medicare beneficiary.  *See* 42 U.S.C. § 1395nn(a)(1)(B); 42 C.F.R. § 411.353(b).

The Health Care Financing Administration (now known as CMS) has clearly stated that the Stark Law prohibitions do not apply to Medicaid: "[W]e do not believe these [Stark Law] rules and sanctions apply to physicians and providers when the referral involves Medicaid services."  63 Fed. Reg. 1659, 1704 (Jan. 9, 1998).  CMS further advised that physicians and hospitals are "not precluded from referring Medicaid patients or from billing for designated health services."  *Id*.

Florida has enacted a self-referral statute that does apply to Medicaid patients, but the

---

[3] Subchapter XVIII of the Social Security Act creates the Medicare program.  *See* 42 U.S.C. §§ 1395a-1395kkk.

[4] Hospitals sometimes bill non-Medicare payors for services furnished to a Medicare patient if the patient or a MediGap insurer is responsible for copayment or deductible liability or if Medicare is the secondary payor and the primary payor is the patient's employer group health plan.  *See Vencor, Inc. v. Standard Life & Acc. Ins. Co.*, 317 F.3d 629, 632 (6th Cir. 2003); 42 U.S.C. § 1395ss; 57 Fed. Reg. 8588, 8596 (March 11, 1992).

Florida law only prohibits physicians from referring to entities in which they have an

*ownership interest*.  *See* Fla. Stat. § 456.053(5).  This law does not apply here because the

physicians do not have ownership interests in All Children's Hospital.

> **B.     42 U.S.C. § 1396b(s) Does Not Apply Because Florida Medicaid and Medicare Do Not Provide Coverage For Hospital Services "To The Same Extent And Under the Same Terms and Conditions."**

Although CMS has advised physicians and hospitals that they are "not precluded

from referring Medicaid patients or from billing for designated health services" as a result of

the Stark Law, 63 Fed. Reg. at 1704, Relator asserts that Defendants are nonetheless liable.

Relator relies (erroneously) upon 42 U.S.C. § 1396b(s), a provision of the Medicaid statute.[5]

Under that provision, "*if*" Medicare and a state Medicaid program cover a designated health

service "to the same extent and under the same terms and conditions," then "no payment

shall be made" by the federal government to the state for FFP for the services in question.  *Id*.

(emphasis added).  According to Relator, "[t]hrough this provision, Stark is effectively

applied to the Medicaid program."  SAC ¶ 26.

Relator's statement regarding 42 U.S.C. § 1396b(s) is a legal assertion, not an

allegation of fact, and is not assumed to be true for purposes of a motion to dismiss.  *See*

*Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Moreover, it is an erroneous legal assertion

that renders superfluous the word "if" and the phrase "to the same extent and under the same

terms and conditions."  *See TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (statutes are to be

---

[5] This provision provides in pertinent part: "[N]o payment shall be made to a State under this section [Medicaid] for expenditures for medical assistance under the State plan consisting of a designated health service (as defined in [42 U.S.C. §1395nn(h)(6)]) furnished to an individual on the basis of a referral that would result in the denial of payment for service under title XVIII of this chapter [Medicare] *if* such title provided for coverage of such service *to the same extent and under the same terms and conditions as under the State plan. . . .*"  42 U.S.C. § 1396b(s) (emphasis added).

interpreted so as to avoid rendering any terms superfluous).

42 U.S.C. § 1396b(s) is not triggered because Florida Medicaid and Medicare do **not** provide coverage for hospital services "to the same extent" and "under the same terms and conditions."  The SAC fails to allege facts establishing that Florida Medicaid and Medicare cover hospital services under the same terms and conditions.  Indeed, it is readily demonstrated that Florida Medicaid and Medicare do *not* cover hospital services under the same terms and conditions, as shown by comparing the following: (1) medical necessity conditions; (2) reimbursement terms; and (3) copayment and deductible terms:

*Medical Necessity.*  The Florida Medicaid program covers only hospital services that are "medically necessary."  Fla. Stat. Ann. § 409.905.  Under Florida law, this requires that there must not be available anywhere within the state an "equally effective and more conservative or less costly treatment."  Fla. Admin. Code 59G-1.010(166)(a); *see also* AHCA, "Florida Medicaid Hospital Services Coverage and Limitations Handbook" at 2-1 (December 2011) ("Hospital Handbook");[6] *Hunter v. Chiles*, 944 F. Supp. 914, 921 (S.D. Fla. 1996) (under Florida Medicaid, medical necessity requires no equally effective and more conservative or less costly treatment alternative).

By contrast, Medicare provides coverage even if there is a more conservative or less costly alternative.  Medicare requires only that the services be "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. §1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1); *see also Yale-New*

---

[6] The handbook is incorporated into the Florida Administrative Code.  *See* Fla. Admin. Code 59G-4.150 & 4.160.  The AHCA has published the handbook at https://www.flrules.org/Gateway/reference.asp?No=Ref-01232 (last visited January 10, 2013).

*Haven Hosp. v. Leavitt*, 470 F.3d 71, 73-74 (2d Cir. 2006) (discussing "reasonable and necessary" standard).  Medicare cannot deny coverage on grounds that a less costly treatment alternative is available.  *See Hays v. Sebelius*, 589 F.3d 1279, 1283 (D.C. Cir. 2009).

The differences in the medical necessity definition are significant.  Florida has elected to combat the risk of overutilization with a narrower definition of medical necessity.  For Medicaid coverage, Florida requires that health care services be the least costly alternative or the least conservative alternative.  The provision in question, 42 U.S.C. § 1396b(s), applies only where a state Medicaid program and Medicare provide coverage under the same terms and conditions, presumably because Congress recognized that a state has other ways to address potential overutilization.  Florida's approach involves, in part, applying a narrower definition of medical necessity than Medicare uses.

*Reimbursement Terms*.  Florida Medicaid pays a per diem (daily rate) for inpatient hospital care and treatment.  *See* Hospital Handbook at 2-2.  Total payment for an inpatient Florida Medicaid claim equals the number of covered inpatient days times the per diem minus any third party payments.  *See id*.  Medicare reimbursement terms are very different.  Medicare pays a fixed, pre-determined amount based on the diagnosis-related group ("DRG") that applies to a patient's condition, regardless of the number of days the patient is in the hospital.  *See* 42 U.S.C. § 1395ww(d); *Huntington Hosp. v. Thompson*, 319 F.3d 74 (2d Cir. 2003) (explaining the Medicare Prospective Payment System and the use of DRGs).

*Beneficiary Copayment and Deductible Conditions*.  In general, Florida Medicaid beneficiaries are required to pay only a $3.00 copayment for inpatient or outpatient hospital services.  *See id.* at 3-1.  A Florida Medicaid beneficiary who uses a hospital emergency

room for non-emergency services is also responsible for a five percent coinsurance on the first $300 of the Medicaid payment.  *See* Fla. Stat. Ann. § 409.9081; Hospital Handbook at. 3-1.  Additionally, a Florida Medicaid beneficiary is liable for all outpatient hospital services in excess of $1,500 with certain exceptions.  *See id*. at 3-4.  Medicare copayment and deductible terms are quite different.  For example, between 2010 and 2012, Medicare beneficiaries had to pay a deductible of $1,100 to $1,156 for the first 60 days of an inpatient hospitalization, with a $275-289 per-day deductible between the 61st and 90th days, followed by a $550-578 per-day deductible thereafter.  *See* 42 U.S.C. § 1395e(a)-(b); 75 Fed. Reg. 65799 (Nov. 9, 2010); 76 Fed. Reg. 67568 (Nov. 1, 2011).

Given these distinctions, Relator has not alleged (and cannot demonstrate) that Medicare and Florida Medicaid cover hospital services under the same "terms and conditions."  42 U.S.C. §1396b(s) is not triggered and Counts I and III should be dismissed.

**C.     Alternatively, Because 42 U.S.C. § 1396b(s) Is Ambiguous, Relator Has Not Pled Falsity.**

Even if the phrase "to the same extent and under the same terms and conditions" is read out of the statute, as Relator urges, there can be no dispute that 42 U.S.C. § 1396b(s) is ambiguous.  Given the many distinctions between Florida Medicaid and Medicare, 42 U.S.C. § 1396b(s) does not unambiguously regulate the conduct of Florida hospitals and physicians.

In *United States ex rel. Walker v. R&F Properties of Lake County*, 433 F.3d 1349 (11th Cir. 2005), the Court held that the knowing violation of an ambiguous regulation could be an FCA violation because there was extensive informal guidance explaining the regulation and clarifying the ambiguity.  *See id*. at 1356-57.  Other courts also have held that an FCA case cannot be predicated on the violation of an ambiguous law or regulation that has not

been subsequently clarified.  *See United States ex rel. Swafford v. Borgess Med. Ctr.*, 24 F. App'x 491 (6th Cir. 2001) ("Disputes as to the interpretation of regulations do not implicate False Claims Act liability."); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (no falsity where regulation is ambiguous); *United States ex rel. Jamison v. McKesson Corp.*, 784 F. Supp. 2d 664, 676-77 (N.D. Miss. 2011) (same).

Here, unlike *R&F Properties*, there are no federal agency clarifications that Florida Medicaid and Medicare provide coverage under same the "terms and conditions."  Even more, CMS actually assured providers that 42 U.S.C. § 1396b(s) does *not* regulate their conduct.  As noted, in 1998, discussing a proposed – but never finalized – regulation regarding 42 U.S.C. § 1396b(s), CMS advised providers that "[w]e do not believe these [Stark Law] rules and sanctions apply to physicians and providers when the referral involves Medicaid services," and that physicians and hospitals are "not precluded from referring Medicaid patients or from billing for designated health services."  63 Fed. Reg. at 1704. CMS's statements demonstrate that it is reasonable to conclude that a hospital may bill Medicaid even if it has a financial relationship with a physician that does not satisfy a Stark Law exception.

Accordingly, even if Florida Medicaid and Medicare are deemed to provide coverage "to the same extent and under the same terms and conditions," the phrase is so ambiguous that Relator cannot predicate an FCA action on her preferred interpretation where an equally reasonable interpretation exists.

**D.**     ***Halifax* Did Not Address The "Terms and Conditions" Argument.**

Relator will likely rely upon *United States ex rel. Balid-Kunz v. Halifax Med. Ctr.*,

No. 09-1002, 2012 WL 921147 (M.D. Fla. Mar. 19, 2012).  In *Halifax*, the district court held,

*inter alia*, that a complaint stated a cause of action against a hospital for causing Florida to

submit false claims for FFP payments due to alleged Stark Law violations.  Respectfully, that

case was wrongly decided, and this Court is not bound by the decision of another district

court.  *See Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991).

The *Halifax* Court was not presented with the arguments Defendants present in this

motion.  No party briefed whether Florida Medicaid and Medicare provide coverage under

the same terms and conditions, and no party pointed out CMS's 1998 statements that

physicians and hospitals are "not precluded" by the Stark Law from referring Medicaid

patients or billing Medicaid.  *See supra* at 20 (quoting 63 Fed. Reg. at 1704).

Furthermore, in *Halifax*, the relationship between the Stark Law and Medicaid was

just one of many legal issues raised by the motion to dismiss, and was a comparatively minor

issue since the hospital treated both Medicare and Medicaid patients.  In this case, by

contrast, the relationship between the Stark Law and Medicaid is the key legal issue, and is

dispositive as to Counts I and III since Relator has not alleged that ACH (a children's

hospital) improperly submitted claims for Medicare patients.  Under these circumstances, a

fresh consideration of the issues, without deference to the *Halifax* outcome, is warranted.

**III.    EVEN IF THE STARK LAW WERE APPLICABLE, RELATOR HAS NOT
         PLED A STARK LAW VIOLATION.**

Even if 42 U.S.C. § 1396b(s) did apply (which it does not), Counts I and III should be

dismissed because Relator has failed to allege that any of the Defendants violated the Stark

Law.  To state a Stark Law violation, Relator must allege: (1) a financial relationship

between a physician and an entity that does not satisfy an exception; (2) the physician refers

Medicare patients to the entity for certain designated health services (*e.g.*, hospital services); and (3) the entity billed for the improperly referred services. *See* 42 C.F.R. § 411.353(a)-(b). Here, Relator has failed to allege a "financial relationship" between ACH and any physician, and has failed to allege that any physician made referrals to PPS or ACHS for designated health services (*see* III.A and B, respectively). Since Relator has not alleged a Stark Law violation, she also has failed to allege a false certification of compliance.

> **A.    Relator Has Not Alleged A "Financial Relationship" Between ACH and Any Physician.**

CMS's Stark regulations define two types of "financial relationships": (1) ownership interests; and (2) compensation arrangements. *See* 42 C.F.R. § 411.354(a). The SAC does not allege that any physician has an ownership interest in either ACH or ACHS, leaving only the possibility of compensation arrangements. CMS's regulations further sub-divide "compensation arrangements" into two categories: (1) "direct compensation arrangements"; and (2) "indirect compensation arrangements." 42 C.F.R. § 411.354(a)(ii) & (c).

For a "direct compensation arrangement," remuneration must pass between ACH and a physician "without any intervening person or entities." 42 C.F.R. § 411.354(c)(1)(i). Relator has not alleged, however, that remuneration passes between ACH and any physician with no intervening person or entity. To the contrary, the SAC alleges that PPS employs and pays the physicians. *See* SAC ¶¶ 1, 10, 36, 40, 44.

Thus, the only possible financial relationship between ACH and a referring physician is an "indirect financial relationship." *See United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 398, 407 (4th Cir. 2012) (performing an "indirect financial relationship" analysis). Among other requirements, to allege an "indirect

compensation arrangement," Relator must allege that the referring physicians received "aggregate compensation from the … entity in the chain with which the physician (or immediate family member) has a direct financial relationship that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the designated health services [ACH]."  42 C.F.R. § 411.354(c)(2)(ii).  The SAC, however, fails to allege facts necessary to establish that element of an indirect financial relationship.

The SAC does not allege that any of the physicians received aggregate compensation from PPS that "varies with, or takes into account, the volume or value of referrals, or other business generated" by the physician for ACH.  Instead, it alleges that the physicians were compensated in excess of fair market value.  Compensation in excess of fair market value and compensation that "varies with, or takes into account, the volume or value of referrals, or other business generated" are different concepts, however.  There are many reasons why a physician may be compensated in excess of fair market value that have nothing to do with the volume or value of referrals or other business generated.  Most obviously, the employer may have misjudged the market and overpaid.  Alternatively, the local supply-and-demand conditions for physician labor in certain specialties may not be consistent with the survey data relied upon in the SAC.  Or, for some reason, there could be a pressing need to fill a position, driving up the salary.  Thus, the SAC fails to allege a Stark Law violation by ACH.

**B.      There is No Allegation That Physicians Referred Patients To ACHS Or PPS For Designated Health Services, Or That ACHS Or PPS Billed For Designated Health Services.**

The SAC fails to allege that any physician made referrals to ACHS or to PPS for

designated health services, and therefore also fails to allege that ACHS or PPS billed for

designated health services.  Although inpatient and outpatient hospital services are examples

of designated health services, neither ACHS nor PPS is a hospital and neither provides

hospital services.  *See* SAC ¶¶ 10-11.  There is an allegation that ACHS submits claims for

services rendered by the 18 physicians, *see* SAC ¶ 41, but a physician does not "refer" when

he or she performs the services.  *See* 42 C.F.R. § 411.351 (definition of "referral" excludes

services personally performed by the physician).  Accordingly, the SAC fails to allege a

Stark Law violation on the part of either ACHS or PPS.

IV.    **COUNT II SHOULD BE DISMISSED BECAUSE RELATOR HAS NOT
       ALLEGED AN ANTI-KICKBACK STATUTE VIOLATION.**

       In Count II, Relator alleges that Defendants violated the Anti-Kickback Statute by

paying excessive remuneration to employed physicians.  The Anti-Kickback Statute makes it

a crime, among other things, to knowingly and willfully offer or pay remuneration to induce

referrals of Medicare or Medicaid patients.  *See* 42 U.S.C. § 1320a-7b(b)(2)(A).  The Anti-

Kickback Statute, however, contains an exception for remuneration provided to employees:

"[The Anti-Kickback Statute prohibitions] shall not apply to any amount paid by an

employer to an employee (who has a bona fide employment relationship with such employer)

for employment in the provision of covered items or services."  42 U.S.C. § 1320a-

7b(b)(3)(B).  In addition, pursuant to 42 U.S.C. § 1320a-7b(b)(3)(E), the Department of

Health and Human Services (through its Office of Inspector General ("OIG")) has issued a

safe harbor regulation that also exempts remuneration paid to a *bona fide* employee.  *See* 42

C.F.R. § 1001.952(i).

       The SAC does not allege that the physicians are anything other than *bona fide*

employees.  Accordingly, the statutory exception and the safe harbor apply.  *See Florida v. Harden*, 938 So. 2d 480 (Fla. 2006) (federal employee safe harbor covered an arrangement in which a dental practice paid an employee to locate patients); *see also* 54 Fed. Reg. 3088, 3093 (Jan. 23, 1989) (The "statutory exemption permits an employer to pay an employee in whatever manner he or she chooses for having the employee assist in the solicitation of Medicare or State health care program business.").  There are no factual allegations that the employment agreements with the physicians were shams.  *Cf. United States v. Starks*, 157 F.3d 833 (11th Cir. 1998).

Finally, Relator's allegation that the compensation paid to the employed physicians exceeds fair market value does not negate the employment exemption.  The OIG has explained that the employment exception does not require that compensation paid to employees be consistent with fair market value.  *See* OIG Advisory Opinion No. 08-22 at 4 n.2.[7]  In this regard, the employment safe harbor differs from other safe harbors that do require consistency with fair market value.  *Cf.* 42 C.F.R. §§ 1001.952(b), (c) & (d) (safe harbors covering rental of office space and equipment, and services agreements with non-employees).  Accordingly, Count II should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, the Second Amended Complaint should be dismissed.

---

[7] This advisory opinion, issued pursuant to 42 U.S.C. 1320a-7d(b), is available on the OIG web site, at https://oig.hhs.gov/fraud/docs/advisoryopinions/2008/AdvOpn08-22.pdf .

Dated January 10, 2013.                    Respectfully submitted,


                                           s/Latour "LT" Lafferty
Jesse A. Witten (*pro hac vice*)           Latour "LT" Lafferty, FBN 0975575
Mark H. M. Sosnowsky (*pro hac vice*)      Fowler White Boggs P.A.
Drinker Biddle & Reath LLP                 501 E. Kennedy Blvd., Suite 1700
1500 K Street, NW, Suite 1100              Tampa, FL  33602
Washington, DC 20005                       Tel.:  (813) 222-1106
Telephone:  (202) 842-8800                 Fax:  (813) 384-2830
Facsimile:  (202) 842-8465                 ltlafferty@fowlerwhite.com
jesse.witten@dbr.com
mark.sosnowsky@dbr.com


                                           *Attorneys for Defendants*


## CERTIFICATE OF SERVICE

I certify that on January 10, 2013, I electronically filed the foregoing document with

the Clerk of the Court using the CM/ECF system.

                                           s/Latour "LT" Lafferty
                                           Latour "LT" Lafferty, FBN 0975575