## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | ) | |
| STATE OF FLORIDA *ex rel.* | ) | |
| BARBARA SCHUBERT, | ) | |
|     Plaintiffs, | ) | |
| v. | ) | Case No. 8:11-cv-1687-T-27-EAJ |
| | ) | |
| ALL CHILDREN'S HEALTH SYSTEM, INC., | ) | |
| PEDIATRIC PHYSICIAN SERVICES, INC. | ) | |
| and ALL CHILDREN'S HOSPITAL, INC., | ) | |
|     Defendants. | ) | |

## RELATOR'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

In her Second Amended Complaint ("SAC"), **Relator Barbara Schubert**, alleges that Defendants **All Children's Health System, Inc**. and its subsidiaries **Pediatric Physician Services, Inc.** and **All Children's Hospital, Inc.** (collectively "Defendants") violated the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*., and the Florida False Claims Act, Fla. Stat. § 68.081, *et seq*., by submitting or causing to be submitted claims in violation of the Stark Amendment ("Stark") and Anti-Kickback Statute ("AKS"). Defendants now ask the Court to dismiss Relator's claims based on Rule 9(b) and 12(b)(6). As described below, Defendants' assertions fail both legally and factually, and their motion should be denied in its entirety.

As set forth in the SAC, in the early 2000s Defendants found themselves in a precarious financial position amid a changing healthcare landscape in the Tampa Bay region. SAC at ¶30. Facing increasing competition for Medicaid patients, All Children's Health System, Inc. launched an aggressive recruitment plan wherein its subsidiary, Pediatric Physician Services,

Inc., would employ physicians for the exclusive benefit of another subsidiary, All Children's Hospital, Inc.  *Id*. at ¶1, 10, 31.  By employing the physicians, the Defendants could ensure that the physicians performed their surgeries and other procedures exclusively at All Children's Hospital, rather than at competing hospitals such as Tampa General Hospital and St. Joseph's Hospital, thereby increasing All Children's Hospital's revenues.  *Id*. at ¶30.  Although well aware of the Stark and AKS prohibitions against compensation arrangements based on the volume or value of referrals, Defendants enticed physicians into exclusive referral relationships by paying salaries that far exceeded fair market value.  *Id*. at ¶¶33 – 40.  Defendants lavished the physicians with additional perks carefully hidden in "side letters" which provided valuable incentives such as employment offers to family members or additional non-salary compensation. *Id*. at ¶38.

The plan was successful.  Defendants secured exclusive employment relationships with more than seventy-five physicians in just three years.  *Id*. at ¶40.  But the high-volume referral sources came at a cost: nearly one-third of PPS-employed physicians were paid above the 75th percentile of the nationwide salary range, and at least eighteen of the physicians exceeded the 90th percentile.  *Id*.

In reviewing a motion to dismiss a complaint under F.R.C.P. Rule 12(b)(6), a court shall accept as true all factual allegations set forth in the complaint and construe the complaint in the light most favorable to the plaintiff.  *Amnesty Intern., USA v. Battle*, 559 F.3d 1170, 1176 (11th Cir. 2009).  A complaint's factual allegations must "raise the right of relief above the speculative level," but "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise the reasonable expectation that discovery will reveal evidence" supporting Relator's claims.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

As detailed herein, Defendants overstate or misrepresent applicable law, ignore key allegations of Relator's complaint, and fail to set forth any legal basis why the SAC should be dismissed.  Relator has met the requirements of Rules 8(a) and 9(b) in setting forth allegations that entitle the United States, the State of Florida and Relator to relief under the Federal and Florida False Claims Acts.  Accordingly, Relator respectfully requests that this Court deny Defendants' Motion to Dismiss ("MTD").

## I.  THE SECOND AMENDED COMPLAINT SATISFIES RULE 9(b).

Claims brought under the False Claims Act must satisfy F.R.C.P. Rule 8(a)(2) and must also be stated with particularity pursuant to Rule 9(b).   *U.S. ex rel. Clausen v. Laboratory Corporation of America*, 290 F.3d 1301, 1308-09 (11th Cir. 2002).  The Eleventh Circuit recently stated that Rule 9(b) is satisfied if the complaint alleges "facts as to time, place, and substance of the defendants' alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.,* 671 F.3d 1217, 1222 (11th Cir. 2012).  The Eleventh Circuit has cautioned that, "Rule 9(b) must not be read to abrogate Rule 8... and a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directive of Rule 9(b) with the broader policy of notice pleading." *Friedlander v. Nims*, 755 F.2d 810, 813 n.3 (11th Cir. 1985).

The purpose of Rule 9(b)'s requirements is to provide defendants with notice of "the precise misconduct with which they are charged" and to protect "defendants against spurious charges[.]" *Clausen*, 290 F.3d at 1310, *citing Ziemba v. Cascade Int'l, Inc*., 256 F.3d 1194, 1202 (11th Cir. 2001)); *see also U.S. ex rel. King v. DSE, Inc*., No. 8:08–CV–2416–T–23EAJ, 2011 WL 1884012, at *1 (M.D. Fla. May 17, 2011) ("The purpose of Rule 9(b), as interpreted by

*Clausen*, is to ensure (1) that an opportunistic relator is unable to tarnish the reputation of a medical provider by instituting a spurious lawsuit and (2) that a minor deviation from a standard of care does not expand into a quasi-criminal proceeding in federal court.").

Notably, Defendants do not suggest that the SAC does not provide them with proper notice of the allegations made against them, or that the allegations would be "minor deviations" if true, or that they cannot ascertain the scope of the allegations.  Indeed, the MTD demonstrates a clear understanding of the specifics of Relator's claims.

### A.    The Second Amended Complaint Describes the Fraud with Specificity and Adequately Alleges Scienter.

Although Defendants do not assert that the SAC fails to put them on notice of the alleged fraud, they assert that the SAC must be dismissed because it "does not identify any supposed false claims" and therefore fails to plead the requisite specificity.  MTD at 2.  This mischaracterizes Rule 9(b)'s pleading requirements.  Eleventh Circuit precedent **does not** require that a complaint provide "specific details" – or indeed any details – of a particular fraudulent submission in order to satisfy Rule 9(b).  Rather, it requires that a complaint contain "some indicia of reliability" to support the allegation that false claims were submitted.  *Clausen*, 290 F.3d at 1311; *U.S. ex rel. Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *3 (11th Cir. 2003); *see also U.S. ex rel. Singh v. Bradford Reg'l Med. Ctr.*, No. 04-186-ERIE, 2006 WL 2642518, at *5 (W.D.Pa. Sept. 13, 2006) (recognizing that "*Clausen* does not stand for the proposition that identification of specific claims is required to satisfy Rule 9(b) at the motion to dismiss stage").

The ultimate question is whether the relator's allegations are "sufficient to explain why [the relator] believed [the defendant] submitted false or fraudulent claims for services rendered." *U.S. ex rel. Walker v. R & F Props. of Lake County*, Inc., 433 F.3d 1349, 1360 (11th Cir. 2005).

The inquiry as to whether a complaint meets the Rule 9(b) requirements is made on a case-by-case basis.  *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1385 (11th Cir. 2006).  This case is fundamentally different from the cases cited by Defendants, such as *Clausen*, where the Eleventh Circuit dismissed allegations that the defendant violated the FCA in submitting individual claims that were fraudulent on their faces.  In those cases, the complaints were inadequate because either the relator was an outsider to the fraud who was merely providing conjecture as to whether false claims were submitted[1] or because the submitted claims at issue were only factually false, rather than legally false. [2]  Neither of those pleading defects are present here.

Relator has exceeded the threshold of reliability to show why she believes that Defendants caused false or fraudulent claims to be submitted by entering into financial relationships in violation of Stark and AKS.  First, Relator has alleged that there is a statutory obligation for the federal government to reimburse Florida for a percentage of Medicaid expenditures pursuant to the Social Security Act.  SAC at ¶13, 47.  The decision to reimburse for proper Medicaid expenditures, or the amount of the reimbursement, is not discretionary. [3]  *Id.* There is more than just an "indicia of reliability" that Florida sought and received reimbursement from CMS – it is a required operation of law.

The only remaining question is whether Defendants engaged in a scheme whereby they falsely certified compliance with Stark and the AKS to obtain Medicaid reimbursements for services rendered as a result of referrals from the physicians at issue.  Relator has alleged that

---

[1] *Atkins*, 470 F.3d  at 1359; *Klusmeier v. Bell Constr., Inc.,* 469 Fed.Appx. 718 (11th Cir. 2012).

[2] *Atkins,* 470 F.3d at 1359; *Hopper v. Solvay Pharmaceuticals, Inc.*, 588 F.3d 1318 (11th Cir. 2009); *U.S. ex rel. Sanchez v. Lymphatx, Inc*., 596 F.3d 1300 (11th Cir. 2010); *U.S. ex rel. Seal 1 v. Lockheed Martin Corp*., 429 Fed.Appx. 818 (11th Cir. 2011); *Mitchell v. Beverly Enterprises, Inc*., 248 Fed.Appx. 73 (11th Cir. 2007).

[3] Defendants assert that the state "may" submit claims for reimbursement and cite to Relator's SAC ¶¶ 13 and 47 in support.  That is not true and the SAC does not state that in either of the referenced paragraphs.

they did.  SAC at ¶¶ 47, 53, 59.  Relator alleged that Defendants became concerned about changes in the pediatric healthcare industry and crafted a plan designed to increase referrals to All Children's Hospital.  SAC at ¶¶ 1, 30-31.  As part of this plan, William Horton, Vice President of Strategic Business Services for All Children's Health Systems, Inc., directed Relator to determine basic compensation rates based on fair market value and develop a bonus plan to incentivize physicians.  *Id*. at ¶33.   The SAC further describes (and attaches) the compensation plan, which Defendants approved and implemented on October 1, 2007.  *Id.* at ¶33, 36, Exhibit A.  Yet, despite Relator clearly laying out the range of salaries that would fall within fair market value, Defendants disregarded the plan and acquired physicians and practice groups at any cost in order to ensure a steady stream of future referrals from those physicians.  *Id*. at ¶¶1, 2, 33-40.

Relator provides specific examples of the physician groups acquired and the dates the acquisitions occurred, and alleges that all claims based on referrals by those physicians from their dates of employment forward constitute false claims.  *Id.* at ¶¶34, 35, 37-41.  For example, in February of 2007, Horton successfully negotiated the acquisition of a group of emergency department physicians, including first-year practitioners Drs. Ricardo Jimenez and Patrick Mularoni.  *Id*. at ¶34.  Pursuant to the arrangement, these doctors were given base salaries of $250,000 each—far in excess of the fair market value for similarly qualified physicians.  *Id*. at ¶35.  Additionally, the SAC details that Defendants targeted Dr. Paul Danielson, and provided him a salary of $600,000 (more than $200,000 above the approved compensation range) and also included a side arrangement that allowed for his wife to also be employed with Defendants.  *Id*. at ¶39.  In total, the SAC identifies, by name, eighteen physicians, their salaries, bonus payments, dates they were hired, their Medicaid provider numbers,[4] and demonstrates how these

---

[4] Defendants briefly assert that the provider numbers are not significant because the issue is the referral by that doctor, not the services personally rendered by the doctor.  FL AHCA tracks referrals by the

financial arrangements were in excess of fair market value.  *Id*. at ¶¶40-41.  Despite entering into

these relationships, Defendants obtained 70% of their patient care payments from Medicaid,

which required certification that Defendants had complied with Stark and the AKS.  *Id.* at ¶ 9,

13, 16.  These allegations expressly set forth the "who, what, where, when and how" of the

Defendants' wrongful conduct that forms the basis of their liability under the False Claims Act.

The conduct in violation of Stark and the AKS, combined with the statutorily mandated federal

reimbursement, provides far more than just an "indicia of reliability" that fraudulent claims were

submitted by the State of Florida to the United States.

    Additionally, the SAC satisfactorily alleges scienter.  In contrast to the particularity

required in alleging the mechanics of the fraud, a complainant may plead the scienter portion of

fraud generally. *Matheny*, 671 F.3d at 1224; Fed.R.Civ.P. 9(b) ("[K]nowledge, and other

conditions of a person's mind may be alleged generally").  As noted in the SAC, after Relator

determined that Defendants' compensation plan far exceeded fair market value, she informed

Horton of her concerns and in spite of this knowledge, Horton instructed Relator to proceed as

directed.  SAC at ¶35.  Further, on August 31, 2009, Horton demonstrated his understanding that

such arrangements violate Stark and could trigger False Claims Act liability when he emailed

Relator (along with other executives) explaining that a False Claims Act case had been filed

against an Iowa medical center for overpaying physicians in violation of the Stark Amendment –

exactly the same violations as Relator alleges in the SAC.   *Id*. at ¶42.

---

referring doctor, so the provision of these numbers properly equips the government to (1) verify that
referrals did occur and (2) ascertain the number of referrals made by each doctor for purposes of
calculating damages.  This is entirely consistent with the notion of pleading a complaint specific enough
to allow the government and the defendants to evaluate the alleged fraud.

**B.      The Second Amended Complaint Establishes that Relator is a Corporate Insider.**

In *Clausen*, the relator's complaint was held deficient because it did not contain any description of "policies about billing or even second-hand information about billing" of a private medical lab testing company.  290 F.3d. at 1306.  However, the *Clausen* relator was **not** a corporate insider, but was a competitor of the defendant without knowledge of the internal workings of the company and did not provide "any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government."  *Id*. at 1311.  These issues do not arise when the relator is an insider with personal knowledge of the fraud.  *See Matheny*, 671 F.3d at 1230 ("[W]e are more tolerant toward complaints that leave out some particularities of the submissions of a false claim **if the complaint also alleges personal knowledge or participation in the fraudulent conduct**.")(emphasis added);  *King*, No. 8:08–CV–2416–T–23EAJ, 2011 WL 1884012, at *1–3 (finding that where relator's allegation of the falsity of the defendant's certification was based upon his own knowledge and involvement in the manufacturing process, complaint afforded the requisite reliability to support the relator's False Claims Act claims).

As shown in the SAC, Relator Schubert was a corporate insider who developed personal knowledge of Defendants' fraudulent scheme to increase patient referrals.  From 1998 to 2011, she was the Director of Operations for Defendant Pediatric Physician Services, Inc. ("**PPS**"), the subsidiary of Defendant All Children's Health System, Inc. that actually employed physicians.  SAC at ¶8, 10.  In this capacity, Relator oversaw operations for PPS, which was responsible for implementing the physician contracts and practice acquisitions, and for providing administrative oversight of employee-physicians.  *Id*. at ¶10.  In that role, Relator structured a physician compensation plan designed to attract physicians to All Children's Hospital.  *Id*. at ¶33.  Relator

carefully crafted a compensation plan to consider the fair market value for physician compensation in the pediatric specialties.  *Id*.  As Horton negotiated new acquisitions, Relator was responsible for "on-boarding" the physicians pursuant to the terms of their contracts.  *Id*. at ¶34.  When Relator complained to Horton that the negotiated salaries far exceeded fair market value, he instructed her to proceed as directed.  *Id*. at ¶35.   Relator was included on emails with ACHS executives discussing the risks of not complying with Stark.  *Id.* at ¶42.

Relator was unquestionably a corporate insider with unique, first-hand personal knowledge of Defendants' fraud.  Consequently, the SAC alleges the specific details required to show a reasonable belief that false claims had been filed and avoids the type of "conjecture" that proved fatal to the relator in *Clausen*.  290 F.3d at 1313.

### C.   Violations of the Anti-Kickback Statute and the Stark Amendment Render Any Resulting Claims for Payment False.

Relator has alleged in the complaint that: (1) compliance with Stark and the AKS is a prerequisite for receiving payment from Medicaid (*Id*. at ¶¶25, 26, 29); (2) Defendants were aware that their arrangement violated Stark and the AKS, and as such, they were not entitled to receive payment for their claims from Medicaid (*Id*. at ¶¶35, 42); and (3) despite this knowledge, they submitted claims to AHCA for payment by Medicaid that were predicated on false certifications of their compliance with Stark and the AKS (*Id*. at ¶¶41, 47, 56).

A violation of the AKS and the Stark Amendment renders all resulting claims to government payors "false" for False Claims Act purposes.  *See McNutt v. Haleyville Medical Supplies, Inc.,* 423 F.3d 1256, 1259 (11th Cir.2005); *U. S. ex rel. Baklid–Kunz v. Halifax Hosp. Med. Ctr*., No. 6:09–cv–1002, 2012 WL 921147, at *4 (M.D.Fla. Mar. 19, 2012); *U.S. ex rel. Kosenke v. Carlisle HMA, Inc*., 554 F.3d 88, 94 (3d Cir. 2009) ("Falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a claim submitted to a federally funded

insurance program is actionable under the FCA."). In other words, the claims at issue are not rendered false due to any issues on the face of an individual claim, as was the case in *Clausen*. Instead, the claims were false because the medical services subject to federal reimbursement were the result improper referrals. Accordingly, Relator need only plead with particularity the **existence** of the fraud to establish falsity, not the contents of any specific bill for service that was actually submitted.

In light of the Stark and Anti-Kickback prohibitions, the only way Relator's allegations would lack merit would be if Defendants **never** submitted claims to the government for services pursuant to referrals by the doctors named in the SAC—an assertion which Defendants do not, and cannot, make. Rather, Relator sufficiently alleges that the physicians were employed for the purpose of ensuring exclusive referrals to All Children's Hospital, and that the vast majority patients at All Children's Hospital are Medicaid patients. SAC ¶1, 9, 31. These facts alone are sufficient to establish that fraudulent claims were submitted to the government.

In the instant case, the submitted claims at issue are false or fraudulent by virtue of **an underlying statutory violation that taints all resulting claims**. Because Defendants' conduct taints **all claims** submitted to the government by Defendants, the SAC does not "require the Court to make unwarranted inferences about the submission of claims." *U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09–22253–CIV, 2012 WL 2871264, at *6 (S.D. Fla. July 12, 2012); *see also A1 Procurement, LLC v. Hendry Corp.*, 11–23582–CIV, 2012 WL 6214546, at 8* (S.D. Fla. December 13, 2012) ("[t]his is not a situation where only a general scheme of fraud was alleged that might have resulted in the submission of false claims. Here, the fraudulent scheme was the submission of the claims themselves.") (citing *U.S. ex rel. Taylor v. Gabelli*, 345 F.Supp.2d 313, 339 (S.D.N.Y.2004)).

II.     **THE SECOND AMENDED COMPLAINT IS PREDICATED ON THE PROPER APPLICATION OF 42 U.S.C. § 1396b(s).**

    A.     **The Plain Language of 42 U.S.C. § 1396b(s) Clearly Applies the Stark Prohibitions to Medicaid Federal Financial Participation ("FFP") Payments.[5]**

Under the Medicaid statute, the federal government provides money directly to state Medicaid programs in order to assist in paying for the cost of medical care for program beneficiaries such as the poor and the disabled. *See generally* 42 U.S.C. § 1396b. The federal government does not pay Medicaid providers directly, but provides each state with a monetary advance on a quarterly basis to pay a portion of the program's quarterly costs. Individual states then use these federal funds, along with their own funds, to reimburse providers directly for providing such care. *See generally* 42 U.S.C. § 1395b.

The Medicaid statute specifically prohibits any state from using federal funds to pay for Medicaid services furnished in violation of the Stark Amendment. *See* 42 U.S.C. 1396b(s); SAC at ¶25. Thus, federal program funds may not be used to pay a provider for services performed in violation of the Stark Amendment. Defendants' argument that Stark does not extend to Medicaid is patently at odds with the plain language of the statute and every discussion of the statute available. Defendants present a singular statement to the Court in support of their position – a portion of a sentence from a 1998 proposed regulation (that was never enacted), which Defendants offer as saying, "[W]e do not believe these [Stark Law] rule and sanctions apply to physicians and providers when the referral involves Medicaid services." MTD at 14, citing 63 Fed. Reg. 1659, 1704 (Jan. 9, 1998). However, Defendants' representation of CMS's statement is misleading. That sentence is referencing *only* Section 1877 of the Social Security

---

[5] Relator refers to the FFP as "FMAP" or "Federal Medical Assistance Percentage." The terms are synonymous, but Relator will use FFP herein for purposes of consistency with Defendants' Motion.

Act, which explicitly deals with Medicare.  However, the proposed regulation continues and *the very next sentences* say,

> The first part of [42 U.S.C. § 1396b(s)] prohibits the Secretary from paying FFP to a State for designated health services furnished on the basis of a referral that would result in a denial of payment under Medicare if Medicare covered the services in the same way as the State plan.  This part of the provision is strictly an FFP provision.  It imposes a requirement on the Secretary to review a Medicaid claim, as if it were under Medicare, and deny FFP if a referral would result in the denial of payment under Medicare.

Defendants did not, and cannot, cite a single instance where their alternative interpretation was employed.  In fact, Defendants acknowledge that the most on-point case reaches exactly the opposite conclusion.  *Halifax*, No. 09-1002, 2012 WL 921147, at *4.  In evaluating a nearly identical theory of liability in context of 42 U.S.C. § 1396b(s), the *Halifax* court expressly held that, "the Medicaid statute prohibits payments to a state for medical services resulting from improper referrals, as defined under the Stark Amendment."  *Id.*  The holding was consistent with every other court's application of the provision.  *See Fresenius Medical Care Holdings, Inc. v. Francois*, 832 F.Supp.2d 1364, 1367 (N.D. Fla. 2011)(citing to 42 U.S.C. §1396b(s) for the proposition that "The Stark law generally prohibits a physician from referring Medicare and Medicaid patients for designated health services with an entity in which the physician has a nonexempt financial interest."); *Osheroff*, No. 09-22253-CIV, 2012 WL 2871264, at *1, n.2 (same).

Relator does not allege that the provisions of 42 U.S.C. § 1396b(s) directly prohibit a state from paying a Medicaid claim.  But, as Defendants acknowledge, that is not what this case is about.  "Count I alleges that Defendants <u>caused the State of Florida to submit false claims to CMS</u> seeking FFP reimbursement due to Defendants' alleged violations of the Stark Law.  Count III alleges that <u>the same conduct</u> resulted in a violation of the Florida False Claims Act."  MTD

at 13 (emphasis added).  Defendants' argument completely ignores that, under the FCA, a defendant may be liable not only for submitting a false claim, but also for causing another to submit a false claim.  *See* 31 U.S.C. § 3729(a)(1).  Thus, even if the Stark Amendment does not apply *directly* to Medicaid providers because the federal government does not *directly* pay Medicaid providers, it nevertheless may serve as the basis for an actionable violation of the FCA. See *Halifax*, No. 09-1002, 2012 WL 921147, at *4 ("[T]he Plaintiff's theory in regard to the Medicaid claims is that the Defendants caused the state of Florida to submit false claims to the federal government for services furnished on the basis of improper referrals. This allegation is sufficient to survive a Rule 12(b)(6) challenge.")

### B.    Defendants' Reconstruction of 42 U.S.C. § 1396b(s) is Unsupported.

Defendants contend that 42 U.S.C. § 1396b(s) creates an exacting point-by-point comparison test wherein Stark would only apply to Medicaid if each and every aspect of Medicare and Florida Medicaid were identical.  Because the plain language of the statute does not support their strained and illogical interpretation, Defendants take it upon themselves to rewrite the statute by moving around key clauses to create an interpretation which would render the entire provision superfluous.  By definition, there will never be an occasion where one program predominately for the elderly, and another program predominately for the poor or disabled, will have the exact same coverage, terms and conditions.  This interpretation would render the entire first half of 42 U.S.C. § 1396b(s) meaningless because it could never be employed.  *In re Read*, 692 F.3d 1185, 1191 (11th Cir. 2012), citing *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001)(recognizing that a cardinal principal of statutory construction is to construe statutes so "no clause, sentence, or word shall be superfluous, void, or insignificant.")

The *only* logical construction of 42 U.S.C. § 1396b(s) is that it protects the federal government from paying for services that it would otherwise reject if the service had been covered under Medicare instead of Medicaid. The 1998 Proposed Regulations address this exact issue and support the interpretation of flexibility rather than the impossible comparison standard set forth by Defendants:

> **3.   How the referral rules apply when Medicaid-covered designated health services differ from the services covered under Medicare.**   The statute specifically provides that a State cannot receive FFP for a designated health service if it is furnished to an individual on the basis of a referral that would result in a denial of payment for the service under Medicare *if Medicare* covered the services to the same extent and under the same terms and conditions as under the State plan.   We believe this means that Congress was aware of the differences in the two programs and specifically intended to cover under section 1877 designated health services as they are covered under a State's Medicaid plan whenever this coverage differs from coverage under Medicare.

63 Fed Reg. 1659, 1704 (Emphasis in original).

Defendants attempt to preemptively reject *Halifax* because neither party nor the court in that case engaged in the point-by-point comparison that Defendants' create.  MTD at 19-20.  The absence of that analysis is for good reason – the statute does not provide for such a comparison and it is contrary to the plain meaning of the law.

## C.   Defendants' Attack On Falsity Fails Because There Is No Ambiguity.

Defendants' misinterpretation seems to have a singular purpose – to escape False Claims Act liability by claiming that Relator could not have pled falsity because the statute is so ambiguous that the falsity element is precluded as a matter of law.  The argument fails for one major reason: there is no ambiguity in 42 U.S.C. § 1396b(s). "Ambiguity suggests that reasonable persons can find different meaning in the same language." *Eberli v. Cirrus Design Corp.*, 615 F.Supp.2d 1369, 1372 (S.D.Fla. May 28, 2009), quoting *State v. Huggins*, 802 So.2d 276, 277 (Fla.2001); *U.S. v. Water Supply and Storage, Co.*, 546 F.Supp.2d 1146, 1151 (D. Colo.

2008)("A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses.")  Here, Defendants admit that no court, party, or anyone else has ever evaluated 42 U.S.C. § 1396b(s) in the manner that Defendants propose. Defendants provide no support for their interpretation other than an inaccurate representation of a proposed regulation which was excerpted to distort its meaning.  Their interpretation is not reasonable and is contrary to the plain language of the statute.  *Reeves v. Asture*, 526 F.3d 732, 734 (11th Cir. 2008)("Statutory interpretation begins and ends with the text of the statute so long as the text's meaning is clear.")

Other than their incorrect interpretation, Defendants do not, and cannot, identify any flaws in Relator's Second Amended Complaint as to the applicability of the Stark Law prohibitions to Medicaid claims.

## III.   THE SECOND AMENDED COMPLAINT SUFFICIENTLY PLEADS A STARK VIOLATION BASED ON IMPROPER FINANCIAL RELATIONSHIPS.

The Stark Amendment places limits on referrals such that, if a physician has a financial relationship with an entity, he or she may not make a referral to the entity for the furnishing of designated health services ("DHS") and the entity may not present or cause to be presented a claim or bill for DHS furnished pursuant to a prohibited referral. 42 U.S.C. § 1395nn(a)(1).  The Stark Amendment specifies the financial relationships which would trigger the Stark prohibitions.  42 C.F.R. § 411.354 (2010).

### A.   Relator Sufficiently Pled a Financial Relationship between the Physicians and All Three Defendants.

The financial relationships at issue in this case are compensation arrangements.  *See* 42 C.F.R. § 411.354(c).  Compensation arrangements may be direct or indirect.  *Id.*  A direct compensation arrangement exists "if remuneration passes between the referring physician…and

~ 15 ~

the entity furnishing DHS without any intervening persons or entities."  42 C.F.R. §

411.354(c)(1)(i).  An indirect compensation arrangement exists if: (1) there is an unbroken chain

of financial relationships between the entity furnishing DHS and the referring physician; (2) the

referring physician receives compensation from the chain of financial relationships that varies

with, or takes into consideration, the volume or value of referrals or other business generated for

the entity furnishing DHS by the referring physician; and (3) the entity furnishing DHS had

actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the

compensation varies with, or takes into consideration, the volume or value of referrals or other

business generated for the entity furnishing DHS by the referring physician.  42 C.F.R.

§411.354(c)(2)(i)-(iii).

Under Stark, Relator has the burden of establishing a financial relationship between the

physician making referrals and the entity performing the DHS.  *Kosenke.*, 554 F.3d at 95.

However, while the Relator must allege that a financial relationship exists, nothing in the Stark

Amendment requires the Relator to plead the particulars of the financial relationship in her

complaint.  *Halifax*, No. 09-1002, 2012 WL 921147, at *4.  Relator alleged that "physicians

were often employed at salaries that far exceeded fair market value, which effectively induced

the physicians' exclusive referrals and use of in-house surgical, diagnostic and therapeutic

facilities."  *See* SAC at ¶¶ 2, 34, 35, 38, 39, 40.   This satisfies her pleading burden.

Defendants attempt to differentiate themselves from one another to argue that Relator has

not identified actionable financial relationships with each defendant.  Relator alleged that All

Children's Health System, Inc. wholly owns and operates both All Children's Hospital, Inc. (*Id.*

at ¶ 9, 11) and Pediatric Physicians Services, Inc. (*Id.* at ¶10).  Defendants acknowledge that

Relator pled that the physicians were employed by PPS.  MTD at 21; SAC at ¶¶1, 10, 40, 43.

Relator also identifies that the purpose of PPS is to provide and support physicians for All Children's Hospital, and that William Horton was the Vice President of Strategic Business Services for All Children's Healthcare System, Inc. but was responsible for conducting employment negotiations on behalf of Pediatric Physician Services.  SAC at ¶¶ 10, 31, 34, 42. Relator further alleges that each corporate entity was complicit in the scheme to cause the State of Florida to submit false claims for FFP in violation of 42 U.S.C. § 1396b(s).  *Id.* at ¶1 ("Defendant All Children's Health System, Inc. **and its subsidiaries** embarked on an aggressive expansion and acquisition program intended to ensure exclusive physician referral relationships.")(Emphasis added.)  Relator has indisputably pled an unbroken chain among all three defendants and established conduct contributing to the submission of false claims by all three entities.  Defendants do not offer any law or theories to the contrary.  *See generally U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp.2d 1017 (S.D. Tex. 1998).

Defendants make a final attempt to offer explanations for the excessive compensation arrangements which might defend their conduct.  MTD at 22.  Essentially, Defendants argue that the compensation agreements do not violate fair market value in the Tampa market or may meet some sort of exception and therefore Relator has not alleged a Stark violation.  Relator has alleged that her compensation plan, which considered three nationwide surveys identified in the SAC, was reviewed and approved by the PPS Board of Directors.  SAC at ¶33, 36.  The Board approval is a clear indication that the method of determining fair market value was proper and reasonable.  Additionally, that is a factual assertion that must be accepted as true at this phase. *Amnesty Intern., USA*, 559 F.3d at 1176.

Further, while Relator disagrees that any safe harbor applies here, that is for Defendants to argue.  Defendants are attempting to place a pleading burden on Relator that does not exist.

"The burden of establishing whether a fixed compensation arrangement is consistent with fair market value rests with the defendant when raising an exception." *U.S. ex rel. Singh v. Bradford Reg'l. Med. Ctr.*, 752 F.Supp.2d. 602, 629 (W.D.Pa. 2010)  Relator has no obligation to posit other reasons why Defendants entered into excessive compensation agreements, and Defendants' assertions actually highlight the appropriateness of discovery on the underlying issues.

## IV.   COUNT II SUFFICIENTLY SETS FORTH AN ACTIONABLE VIOLATION OF THE ANTI-KICKBACK STATUTE.

The Anti-Kickback Statute "has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals." *U.S. ex rel. Westmoreland v. Amgen*, 812 F.Supp.2d 39, 47 (D. Mass. 2011). Defendants do not, and cannot, argue that Relator has not pled a compensation arrangement where one of the purposes was to induce referrals to All Children's Hospital.  Rather, Defendants assert only that their compensation scheme may be protected by one of the statutory "safe harbors" and because Relator did not specifically allege that the Defendants are *not* protected by the safe harbor, the claim should be dismissed.  MTD at 23.  As they attempted to do with the Stark violation, Defendants once again seek to burden Relator with a pleading requirement that does not exist.  "The burden is on the party seeking protection under a safe harbor provision to demonstrate strict compliance with each and every element of the safe harbor." *U.S. ex rel. Armfield v. Gills*, No. 8:07-cv-2374-T-27TBM, 2012 WL 5340131, at *5 (M.D.Fla. Oct. 29, 2012); *see also Singh*, 752 F.Supp.2d at 634. ("The requirements for qualifying for an exception under the Stark Act and for fitting within the corresponding safe harbor provision under the Anti-Kickback Act are substantially similar and thus the same analysis would apply to both.")

Relator has expressly pled kickbacks that would not qualify for the employee exception, which addresses only payments made "for employment in the provision of covered items or

services." 42 U.S.C. § 1320a-7b(b)(3)(B).  For example, Relator specifically alleges that Dr.

Paul Danielson was promised a job for his wife, an offer clearly not related to Dr. Danielson's

provision of medical services.  SAC at ¶39.  Relator also alleges that physicians were provided

with non-salary compensation as incentives to accept exclusive employment offers.  *Id.* at ¶38.

Although Relator disagrees that Defendants' conduct is protected by any exception or safe

harbor, Defendants may assert such affirmative defenses in their Answer, when one is filed.  See

*Halifax*, No. 09-1002, 2012 WL 921147, at *5 (specifically considering the *bona fide*

employment exception and holding, "as [these exceptions] most closely resemble affirmative

defenses, it is the Defendants' obligation to plead that they apply rather than the Government's

obligation to plead that they do not apply.")  Defendants do not, and cannot, raise any other

issues with the Anti-Kickback Act violation that is sufficient pled in Count II.  Accordingly, their

attack on the Count should be denied.

## V.      CONCLUSION

Relator Barbara Schubert, on behalf of the United States and the State of Florida, has set

forth specific allegations that Defendants knowingly entered into compensation arrangements

with physicians that far exceed fair market value for the purpose of inducing referrals to All

Children's Hospital in violation of the Stark Amendment and the Federal Anti-Kickback Statute,

and in doing so caused the State of Florida to submit false claims to the United States in violation

of the Federal False Claims Act and the Florida False Claims Act.  Accordingly, Defendants'

Motion to Dismiss the Second Amended Complaint should be denied in its entirety.

Dated: January 24, 2013

Respectfully submitted,

**/s/ Jillian L. Estes**
JILLIAN L. ESTES  (FBN 0055774)

CHRISTOPHER C. CASPER (FBN 048320)
SEAN P. KEEFE (FBN 413828)
**JAMES, HOYER, NEWCOMER AND
SMILJANICH, P.A.**
4830 W. Kennedy Blvd.
One Urban Center, Suite 550
Tampa, FL   33609
Tel. 813-397-2300
Fax 813-397-2310
Email: jestes@jameshoyer.com

**Counsel for Relator**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 24, 2013, I caused a true and accurate copy of the foregoing to be filed using the Court's CM/ECF system, which will send an electronic notice of filing to all counsel of record.

**/s/ Jillian L. Estes**
Jillian L. Estes