## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and ) | |
| STATE OF FLORIDA *ex rel.* ) | |
| BARBARA SCHUBERT, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No.: 8:11-cv-1687-T-27-EAJ |
| v. ) | |
| ) | |
| ALL CHILDREN'S HEALTH SYSTEM, INC., ) | |
| PEDIATRIC PHYSICIAN SERVICES, INC. ) | |
| and ALL CHILDREN'S HOSPITAL, INC., ) | |
| ) | |
| Defendants. ) | |

## THIRD AMENDED *QUI TAM* COMPLAINT

This is an action brought by Plaintiff/Relator Barbara Schubert on behalf of the United States of America and the State of Florida pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, et seq., and the Florida False Claims Act, Fla. Stat. § 68.081, et seq.  In support thereof, Relator alleges as follows:

### INTRODUCTION

1.      In the mid-2000's, All Children's Health Systems, Inc., began to feel the sting of lost Medicaid patients and referrals as local competition increased and physicians began referring their patients to other facilities, just as the health system broke ground on a new, $400 million hospital facility.  In response, All Children's Health System, Inc., through its subsidiaries, hired key physicians at inflated salaries to cut off the physicians from the competition, promised hundreds of thousands of dollars in bonuses and perks, bought out private medical practices, and

overpaid new recruits.  The plan was simple – pay whatever it takes to guarantee that the medical procedures, ancillary services and referrals were directed to All Children's Hospital.

2.     Outwardly, Pediatric Physician Services, Inc., the subsidiary corporation which actually employed the physicians, took steps to lend an appearance of legal compliance.  Relator Barbara Schubert created a compensation plan designed to keep salaries, incentive, and benefits in line with industry norms.  Senior executives hired valuation experts to estimate the worth of medical practices.  Executives regularly used the term "fair market value."  But internally, it was little more than a façade.  Defendants hired physicians and acquired private medical practices at any cost, disregarding statutory and regulatory limitations.  Multiple physicians were hired at salaries that far exceeded fair market value without justification.  Two practice groups were lavished with on-call pay that added $150,000 to $250,000 per year to their already-excessive salaries.  Select physicians were promised significant bonuses based on the number of procedures performed at All Children's Hospital.

3.     As the buying and hiring spree progressed, finances at PPS unraveled, with the operating deficit tripling from just over $2 million in 2006 to $6.5 million in 2008 – an inevitable consequence of paying physicians far more than the professional components of the physicians' claims could cover.  To compensate, All Children's Hospital – the beneficiary of the referral stream – transferred more than $14 million to its parent, All Children's Health System, in 2009, which in turn passed the money to PPS.  The following year, another $10 million was funneled to PPS from the Hospital.  The cash infusions served only one purpose – to enable PPS to continue to over-pay the physicians and offer lucrative bonuses to maintain the income stream of referrals to All Children's Hospital.

4.      Two years after launching the aggressive hiring spree, net revenues to All Children's Hospital had increased by more than $5 million.  By the third year, some 80 physicians in ten specialties had been added - each one with an exclusivity agreement, a financial incentive, or both to keep all of their referrals within All Children's Hospital.  All Children's Health System, Inc. CEO Gary Carnes and Vice President of Strategic Business Services William "Bill" Horton were rewarded handsomely for their acquisition efforts.  As the referrals and revenues flowed in, the executives' salaries doubled.

5.      As detailed more fully herein, Defendants' conduct exhibited an awareness of the applicable Stark regulations, as well as a blatant disregard for the statute's restrictions. Defendants created the exact relationships that the Stark Statute was put in place to avoid – those which call into question the necessity and reasonability of referrals made by physicians in a financial relationship with the provider of the referred services.  As a result of Defendants' on-going conduct, the United States and the State of Florida have been harmed by making or causing to be made hundreds of millions of dollars in payments for improper referrals from at least 2007 to the present.

## JURISDICTION AND VENUE

6.      This action arises under the Federal False Claims Act, 31 U.S.C. §§ 3729 – 3732, and the Florida False Claims Act, Fla. Stat. §§ 68.081 – 68.092.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, 28 U.S.C. § 1367 and 31 U.S.C. §3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.  Additionally, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for state-law claims that arise under the same transactions or occurrences as an action brought under 31 U.S.C. § 3730.

7.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because the Defendants can be found in, reside in, transact business in, and have committed the alleged acts in Pinellas County, which is in the Middle District of Florida.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because the Defendants can be found in, reside in, and transact business in the Middle District of Florida, and the alleged acts occurred in this District.

9.     Relator knows of no other complaints that have been filed against the Defendants alleging the same or similar allegations.  Relator is an original source as defined by the Federal False Claims Act in 31 U.S.C. § 3730(e)(4)(B) and the Florida False Claims Act in Fla. Stat. § 60.087(3) and as described more fully herein.  Relator has made voluntary disclosures to the United States of America and the State of Florida prior to the filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2).

## PARTIES

10.    Relator Barbara Schubert is a resident of Bradenton, Florida and a former employee of Defendant Pediatric Physician Services, Inc. ("PPS").  From 1998 to 2011, Relator was the Director of Operations for PPS.  For at least four years of her employment, Relator reported directly to William Horton, the Vice President of Strategic Business Services for All Children's Health System, Inc.  In her role as the Director of Operations, Schubert was privy to conversations – both written and oral – regarding the negotiations for practice acquisitions and the intended consequences of such acquisitions.  Vice President of Strategic Services William Horton, one of the executives responsible for physician recruitment and practice acquisitions, gave specific authority for copies of all signed documents to be provided to Schubert.  With

those documents in hand, Schubert was responsible for "on-boarding" each new physician.  The on-boarding process required a detailed review of the employment contract, side letters, and any other relevant employment documents to set up the physicians on payroll with the appropriate salary and agreed-upon perks, as well as getting the physicians' credentialed to bill claims to all payors, including Medicaid.  Additionally, in May 2010, Johns Hopkins requested a database of the details of all employed physicians' contracts.  To accomplish this task, Relator and Executive Director Natalia Cruz reviewed every single employment contract and side letter.  The database was created by Cruz identifying key elements from every contract and Relator recording the information.  This project caused Relator to have the opportunity to review each and every physician employment contract, side letter, and associated document in the course of her employment.

11.      Defendant All Children's Health System, Inc. (collectively with its subsidiaries "ACHS") is an integrated healthcare delivery system predominately centered around the operation and management of All Children's Hospital in St. Petersburg, Florida.  In 2011, ACHS was fully integrated into the Johns Hopkins Health System Corporation, based in Baltimore, Maryland.  ACHS includes nine subsidiary corporations, including All Children's Hospital, Inc., the All Children's Hospital Foundation, Inc., West Coast Neonatology, Inc. and Pediatric Physician Services, Inc., among others.

12.      Defendant Pediatric Physician Services, Inc., ("PPS") is a Florida corporation that is wholly owned and operated by All Children's Health System, Inc.  PPS's purpose is to manage physician staffing to serve All Children's Hospital patients.  In additional to practice management, PPS is responsible for "on-boarding" newly hired physicians and newly acquired practice groups, and providing continuing administrative oversight of employee-physicians.

13.     Defendant All Children's Hospital, Inc. ("ACH") is a Florida corporation that is wholly owned and operated by All Children's Health System, Inc.  ACH is responsible for the management and daily operations of All Children's Hospital, including making claims and receiving payments for services rendered pursuant to government healthcare coverage.  In 2010, All Children's Hospital moved into a brand-new, $400 million state-of-the-art facility designed to serve 1.2 million children from 17 counties in west central Florida.  According to the hospital's annual report, more than 70% of patient care at ACH was paid for by the Florida Medicaid program that year.  In that fiscal year, All Children's Hospital charged the Florida Medicaid program $370.6 million for care, a 24% increase over the $297.9 million charge a year earlier.

## A BRIEF OVERVIEW OF FLORIDA MEDICAID: A FEDERAL- AND STATE-FUNDED GOVERNMENT HEALTHCARE PROGRAM

14.     Medicaid is a joint federal- and state-funded program that provides healthcare coverage and benefits for certain groups of individuals, primarily the poor and disabled.  Florida Medicaid is regulated by the Florida Agency for Health Care Administration ("AHCA") and includes federal government oversight through the Centers for Medicare and Medicaid Services ("CMS").  Florida Medicaid serves approximately 3.2 million people and had estimated expenditures of $20.3 billion for FY2011-2012.  More than half of the Medicaid recipients in Florida are children or adolescents under 20-years-old.  The 17-county area serviced by All Children's Hospital includes approximately 325,000 children on Medicaid.

15.     The Social Security Act provides for open-ended federal matching for a state's Medicaid program.  The amount varies year to year based on a program called the Federal Medical Assistance Percentage and a state-specific multiplier.  The following figures represent the applicable FMAP for Florida for FY2008 through the present:

6

| Fiscal Year | Federal Share | State Share |
|-------------|---------------|-------------|
| FY2008 | 56.83% | 43.17% |
| FY2009 | 67.64% | 32.36% |
| FY2010 | 67.64% | 32.36% |
| FY2011 | 55.45% | 44.55% |
| FY2012 | 56.04% | 43.96% |
| FY2013 | 58.08% | 41.92% |

16.     Medicaid coverage is set forth in Florida Statutes § 409.901, *et seq*.  Mandatory

Medicaid-covered services include, *inter alia*, hospital inpatient services, hospital outpatient

services, independent laboratory services, physician services and therapeutic services for

children.  Fla. Stat. § 409.905.  Mandatory services made up $9.4 billion of the expected $20.3

billion expenditures for FY2012.  There are typically no coverage limits for individuals under 21

years of age.  *Id*.; Fla. Stat. 409.906.

17.     To provide Medicaid-reimbursable services, All Children's Hospital signed an

initial application and annual renewals which enabled it to obtain reimbursement for services

rendered to Medicaid patients.  Florida Medicaid's "Institutional Medicaid Provider Agreement"

states, in relevant part,

> The Provider agrees to participate in the Florida Medicaid program under the
> following terms and conditions:
>
> **(3) Compliance.**  The provider agrees to comply with local, state, and federal
> laws as well as rules, regulations, and statements of policy applicable to the
> Medicaid program, including the Medicaid Provider Handbooks issued by
> AHCA.

All Children's Hospital, represented by CEO Gary Carnes, knew that the certifications signed

from at least 2007 through the present were false because, at the time the certifications were

made, All Children's Hospital was submitting, and has continued to submit, claims based on

referrals from physicians whose compensation agreements were in violation of the Stark Statute

and associated regulations.  Based on the certifications, All Children's Hospital also knew that a

prerequisite to receiving payments from the Medicaid program was compliance with federal laws such as the Stark Statute.

18.     The federal Medicaid statute contains a provision entitled "Limitations on certain physician referrals" which provides, in sum, that a state shall not receive federal reimbursement for a claim submitted through the Medicaid program if the same claim would be rejected under the terms of the Medicare program, had the service been covered by Medicare instead of Medicaid.  42 U.S.C. 1396b(s).  This provision exists to apply the federal government's protections provided by the Stark Statute to its fiscal responsibilities under the Medicaid program, such that conduct which is prohibited by Medicare is not compensated under Medicaid.

19.     Defendants regularly engaged in conduct which exhibited knowledge of the applicability of the Stark Statute and the need to comply with its mandates.  By way of example, Relator reviewed an October 31, 2007 Stock Purchase Agreement between Pediatric Physician Services and Dr. Jerry Barbosa which contained a section wherein PPS required that Barbosa certify that neither he nor his company engaged in activities which were prohibited by the Stark Statute or related regulations.  In August 2009, ACHS Vice President of Strategic Business Services William Horton emailed Relator and several other executives regarding a False Claims Act case from Iowa wherein Covenant Medical Center paid $4.5 million for overcompensation of physicians in violation of the Stark Statute.  Horton stated, in part, "[T]his is a REAL exposure with REAL consequences if we very *[sic]* to any significant degree from published comp experience…."

## DEFENDANTS' WRONGFUL CONDUCT COMMON TO ALL COUNTS

### Defendants' Acquisitions and Revision of Compensation Plan

20.     In the mid-2000s, All Children's[1] was forced to respond to multiple practice groups that were actively moving their procedures away from the hospital.  When All Children's attempted to shore its position by seeking an exclusivity agreement with long-time affiliate University of South Florida, USF rejected the request.  In or about 2005 and 2006, senior executives began implementing a long-discussed physician recruitment scheme aimed at securing the hospital's market share and financial position amid the rapidly changing competitive landscape.

21.     William Horton, the Vice President of Strategic Business Services for ACHS, began the process of actively recruiting physician practice groups to hire as hospital employees with exclusive practice and referral agreements.  In the summer of 2007, Horton tasked Relator Barbara Schubert with creating a new physician compensation plan that would meet the needs of both the physicians and the hospital system.  Relator was directed to determine base compensation rates and to develop a bonus incentive plan.  After extensive research into compensation plan best practices, Relator determined that there was not a nationwide or regional commercial salary survey which accurately reflected the composition of All Children's Hospital's employed staff.  Therefore, Relator felt that it would be inappropriate to use any single physician compensation survey to determine fair market value for pediatric specialties.  Because the market for pediatric subspecialists is national and not local, Relator drew from three nationwide salary surveys to determine the fair market value median and a comparative salary range: (1) the Sullivan-Cotter Physician Compensation and Productivity Survey, which evaluated

---

[1] "All Children's" is used to broadly reference all three defendants collectively.  Defendants are specifically referenced by name – All Children's Health System, All Children's Hospital or Pediatric Physician Services – where the conduct of only one defendant is at issue.

a mix of private and employed physicians and typically reflected the highest overall salaries; (2)

the Medical Group Management Association (MGMA) Physician Compensation and Production

Survey, which evaluated only private practice physicians; and (3) the MGMA – Academic

Practice Compensation and Production Survey, which evaluated only physicians employed at

academic institutions and typically reflected the lowest overall salaries.  Relator's research

supported her finding that taking the median of the three data surveys provided the most realistic

market comparison.

22.     Relator developed a compensation plan that provided that "guaranteed base salary

will not exceed the 75th percentile or fall below the 25th percentile.  Within the 25th to 75th

percentile range, initial guaranteed base salary will be established based on the number of years

of experience post-residency or post-fellowship up to a maximum of 10 years."  Relator based

the 25th percentile baseline on directives that the plan provide salaries high enough to be

competitive nationwide.  However, she could not find any data to support exceeding the 75th

percentile, so she determined that to be the reasonable salary cap.  The new compensation plan

was approved by the PPS Board of Directors effective as of October 1, 2007, the beginning of

FY2008.

23.     Horton and ACHS CEO Gary Carnes began aggressively recruiting physicians

and pediatric practice groups for acquisition even before the new compensation plan was

completed or approved.  Of note, Horton and Carnes were employed by All Children's Health

System and/or All Children's Hospital, not Pediatric Physician Services, yet they conducted all

of the negotiations on behalf of PPS.  Every single physician's compensation agreement that

Horton or Carnes arranged resulted in a net operating loss to PPS.  However, because the true

value of the physicians' employment was the referrals to All Children's Hospital, Carnes and

Horton allowed the losses to PPS in exchange for the massive financial benefit that would accrue to All Children's Hospital.

24.     During the courting periods, key physicians were identified in highly-coveted practice areas and were targeted for incentives and inducements in return for convincing the rest of the practice group to come to All Children's.  In particular, practice group owners were heavily courted as an inducement to sell their practices to PPS.  In addition to the standard Employment Agreements, the most coveted physicians received "side letters" which provided customized perks as incentives.  The side letters memorialized benefits such as compensation for additional staff, cell phone service, and even the hiring of a physician's family member in exchange for the physician accepting the employment terms.

25.     In just over two years, physicians in the following practice types were either employed or the practice groups were acquired:

| Practice Type | Employment/ Acquisition Date |
|---|---|
| Pediatric Emergency Medicine | 04/01/2007 |
| Pediatric Hematology/ Oncology | 11/01/2007 |
| Pediatric Surgery | 12/24/2007 |
| Pediatric Plastic Surgery | 03/01/2008 |
| Pediatric Cardiology | 11/03/2008 |
| Pediatric Neurosurgery | 08/10/2009 |

The acquisitions continued through at least 2011 and, upon information and belief, are continuing through the present.

26.     The following examples are illustrative, though not comprehensive, examples of Defendants' most egregious conduct:

**Emergency Department Physician Employment**

27.     In 2006, All Children's Hospital was using a staffing firm called TEAM Health (later changed to InPhyNet) to provide physicians to staff its emergency department.  In her role

as Director of Operations for PPS, Schubert regularly heard the emergency room referred to as

the "front door" to the hospital, meaning it was the main source of patient admissions.  Schubert

learned from conversations with William Horton that All Children's Hospital wanted to "control

the front door" by directly employing the emergency room physicians.

28.     Horton and Carnes began aggressively targeting InPhyNet-employed physicians

for employment at ACH instead.  Sensing opportunity, Horton engaged a well-respected

emergency medicine physician, Dr. Jim Hillman, to convince the physicians to sign on to

exclusively work at All Children's Hospital and to create a staffing plan and compensation

package.  Ultimately, PPS paid InPhyNet approximately $400,000 to buy out the physicians'

restrictive covenants.  Relator learned of the deal when Horton boasted to her that it had cost less

than he had originally projected.

29.     In or about February 2007, Horton notified Relator that he had successfully

negotiated the acquisition of the ER physicians and that Relator should begin the on-boarding

process for the physicians.  Horton provided Relator with fully executed contracts and salary

figures for the new physicians; the base salaries ranged from $250,000 to $330,000 plus signing

bonuses of $20,000 to $50,000 each.  Upon information and belief, the ER physicians were paid

an average of $150,000 by InPhyNet.  Relator understood that the value of the contracts was not

based on the physicians' productivity because *all* of the physicians' salaries exceeded the 90th

percentile of fair market value, regardless of proven work or productivity experience.  For

example, Drs. Ricardo Jimenez and Patrick Mularoni joined the first wave of physicians in July

2007, immediately following the completion of their fellowships.  With no post-fellowship

experience and therefore no opportunity to evaluate productivity, Jimenez and Mularoni were

given salaries of $250,000 each.  Relator advised Horton that the salaries he had contracted far

exceeded fair market value and would cause PPS to lose money.  Horton instructed Relator to proceed as directed.

30.     In 2009, the vice president of InPhyNet, Natalia Cruz, was hired as PPS's new executive director and became Relator's immediate boss.  After arriving at PPS, Schubert was discussing the emergency room physicians' salaries with Cruz and Cruz stated to Schubert, "You didn't see me paying them that much money!"

31.     Upon information and belief, Horton conducted the salary negotiations without consulting with any outside valuation experts to determine the commercial reasonableness of the ER physicians' salaries in light of productivity or fair market value.  Horton also did not document his reasons for exceeding any defendable salary benchmarks.

32.     The nationwide 25th to 75th percentile range for pediatric emergency medicine physicians in FY2008, based on the aggregate of the three salary surveys, was $141,000 to $179,800, exactly the range which the physicians had been earning at InPhyNet.

33.     All of the employed emergency medicine physicians made referrals which resulted in false claims being submitted by All Children's Hospital to the State of Florida for payment by Florida and the United States of America.  The following figures reflect claims made from 2009 to 2012 as a result of each physicians' referrals:

| Physician Name | Medicaid Provider Number | Claims Resulting from Referrals | Total Amount Billed as a Result of Referrals | Total Amount Reimbursed as a Result of Referrals |
|---|---|---|---|---|
| Laleh Bahar-Posey | 371322900 | 3,944 | $7,955,456 | $2,120,382 |
| Alan Causey | 252285300 | 4,380 | $7,902,504 | $2,165,206 |
| Ricardo Jimenez | 279467500 | 4,696 | $8,010,906 | $2,092,460 |
| Craig Kizewic | 272007800 | 4,178 | $7,292,258 | $1,869,931 |
| Thomas McLoughlin | 258515400 | 2,189 | $3,755,904 | $1,025,315 |
| Phillip Mularoni | 277977300 | 4,920 | $9,157,513 | $2,486,526 |
| Joseph Perno | 267346100 | 4,245 | $7,573,592 | $2,024,170 |

| Wassam Rahman | 252262400 | 2,525 | $4,752,432 | $1,234,385 |
| Rafael Santiago | 269833100 | 4,020 | $8,196,448 | $2,139,645 |

**Pediatric Hematology/Oncology Practice Acquisition and Physician Employment**

34.     In or about mid-2006, Horton and Carnes began vigorously pursuing Dr. Jerry

Barbosa's Pediatric Hematology-Oncology Group once again.  Horton informed Relator that

they had sought to employ Barbosa previously, but had failed to reach an agreement in previous

years.  Hematology and oncology are particularly lucrative to a hospital facility because of the

high volume of referred services that flow naturally from the patient stream – i.e. extensive blood

work, radiology scans, chemotherapy, etc.  Horton informed Relator that Barbosa was driving a

hard bargain to be paid a top salary and demanding a full stock purchase of his practice, which

PPS was reluctant to do because the health system would assume all liabilities associated with

the practice and because they had never done it before.  However, Horton also said that he knew

that they would ultimately have to pay what Barbosa wanted to "close the deal."

35.     On October 31, 2007, PPS entered into a Stock Purchase Agreement with Barbosa

to purchase the practice for $2.5 million.  PPS also agreed to pay Barbosa a $375,000 salary to

work three-quarters time, which equates to $500,000 at the standard full-time equivalent.

Relator reviewed all the associated contracts and agreements in association with on-boarding

Barbosa.

36.     Shortly following Barbosa's practice acquisition and employment, PPS hired an

additional hematology/oncology physician named Gregory Hale.  Hale was hired at an annual

salary of $300,000 plus a $50,000 signing bonus.   As with Barbosa, Relator reviewed all the

associated contracts and agreements in association with on-boarding Hale.

37.     The nationwide 25th to 75th percentile range for pediatric hematology-oncology

physicians in FY2008, based on the aggregate of the three salary surveys, was $110,190 to

14

$182,750.  The 90th percentile of hematology-oncology physician salaries was $221,544, with even the highest individual compensation survey coming in at $284,166.

38.     As employed physicians, Drs. Jerry Barbosa and Gregory Hale made referrals which resulted in false claims being submitted by All Children's Hospital to the State of Florida for payment by Florida and the United States of America.  The following figures reflect claims made from 2009 to 2012 as a result of the physicians' referrals:

| Physician Name | Medicaid Provider Number | Claims Resulting from Referrals | Total Amount Billed as a Result of Referrals | Total Amount Reimbursed as a Result of Referrals |
|---|---|---|---|---|
| Jerry Barbosa | 057182200 | 2,212 | $5,969,782 | $1,211,329 |
| Gregory Hale | 000522800 | 3,868 | $38,676,071 | $6,505,574 |

**Pediatric General Surgery Physician Employment**

39.     In or around 2007, ACH had only one pediatric surgeon on staff and was losing cases to a USF pediatric surgeon who practiced at Tampa General Hospital.  ACH engaged multiple non-employed *locum tenens* physicians to maintain their staffing obligations to the Bayfront Medical Center trauma program, so hiring another physician was not critical to hospital operations.  In fact, with the *locum tenens* surgeons available, Relator heard surgeon Richard Harmel state that he had never had so much time off in his career.  But, in order to return the surgical cases to All Children's Hospital and secure the accompanying referrals, Horton and Carnes actively sought to recruit additional surgeons.

40.     PPS first brought on Harmel, an experienced surgeon with approximately 25 years in the industry.  Harmel's lengthy experience should have put him at the top end of the salary range, but PPS pushed even higher.  When Harmel started work in December 2007, he was given a salary of $500,000 annually, plus lucrative incentives including more than $200,000 per year in

additional trauma call pay.  Relator processed the documentation to on-board Harmel while Horton continued to recruit more surgeons.

41.     Dr. Paul Danielson was a pediatric surgeon in Massachusetts with eight years of experience when he was courted by PPS in 2008.  When Dr. Danielson signed on to work for PPS in February 2008, his contract provided for a base salary of $600,000, bonuses, trauma call pay of $1,500 per night, a $50,000 commitment to capital equipment expenditures to be paid by All Children's Hospital and other benefits.  In a side letter to Danielson that was reviewed by Relator, PPS agreed: "Upon your request, PPS will provide an opportunity for your wife, Dr. Kristen Smith Danielson, to work for and on behalf of PPS as a hospitalist or a physician in the All Children's Hospital QuickKid Program on a per diem basis for a minimum of one day per week…"  Notably, Danielson's salary was $100,000 more than the salary paid to Harmel, despite Harmel having nearly twenty years more experience than Danielson.

42.     The nationwide 25th to 75th percentile range for pediatric general surgeons in FY2009, based on the aggregate of the three salary surveys, was $231,883 to $340,625, but Harmel's salary that year was $500,000 and Danielson's was $600,000.  By FY2011, Dr. Danielson's base salary was $605,997 – nearly $200,000 more than the median fair market value salary for a pediatric general surgeon of his experience, and $80,000 more than the 90th percentile of nationwide salaries.

43.     As employed physicians, Drs. Harmel and Danielson made referrals which resulted in false claims being submitted by All Children's Hospital to the State of Florida for payment by Florida and the United States of America.  The following figures reflect claims made from 2009 to 2012 as a result of the physicians' referrals:

| Physician Name | Medicaid Provider Number | Claims Resulting from Referrals | Total Amount Billed as a Result of Referrals | Total Amount Reimbursed as a Result of Referrals |
|---|---|---|---|---|
| Richard Harmel | 061134400 | 823 | $10,680,679 | $2,495,082 |
| Paul Danielson | 000081400 | 581 | $7,972,077 | $1,822,700 |

**Pediatric Plastic Surgery Physician Employment**

44.     By 2007, Dr. Michael Gallant had been practicing as a plastic surgeon for nearly thirty years.  Gallant had clearly demonstrated his loyalty to All Children's and sought out employment by PPS, in part so he could dedicate his time to children instead of adults.  Relator understood that PPS agreed to employ Gallant because it wanted some assurances that the plastic surgery department at All Children's Hospital would grow, or at least maintain, its operating volumes to "fill the operating rooms" at the new hospital.

45.     Horton negotiated a base salary dependent on Gallant's volume of procedures, which Relator reviewed for the on-boarding process.  Relator believes that Dr. Gallant's employment agreement is the only physician employment agreement that creates a volume-based incentive for the *base* salary.  Specifically, Relator observed that Gallant's agreement read, "For the first nineteen (19) months of the Period of Active Employment, the Physician will be paid [$350,000] with an expectation that Physician perform at least 400 cases during the first year of the Period of Active Employment."

46.     In addition, Gallant's contract provided him with a potential bonus of $50,000 if he performed 495 procedures in his first year of employment.  Gallant and his team were well aware of this requirement and kept a large count-down to the bonus on a white board in his outpatient office on the All Children's campus.  Relator had the opportunity to see this countdown on multiple occasions when she was in Gallant's office.

17

47.     Based on conversations and observations, Relator understood that Gallant's contract was structured so that Gallant's base salary would be increased only if he could increase the number of procedures performed at All Children's by a significant margin.

48.     As an employed physician, Dr. Michael Gallant made referrals which resulted in false claims being submitted by All Children's Hospital to the State of Florida for payment by Florida and the United States of America.  The following figures reflect claims made from 2009 to 2012 as a result of his referrals:

| Physician Name | Medicaid Provider Number | Claims Resulting from Referrals | Total Amount Billed as a Result of Referrals | Total Amount Reimbursed as a Result of Referrals |
|---|---|---|---|---|
| Michael Gallant | 059276500 | 1,037 | $11,036,212 | $2,552,456 |

**Pediatric Cardiology Physician Employment**

49.     In early 2008, Pediatric Cardiology Associates ("PCA"), the main provider of cardiology services at All Children's Hospital, was acquired by Pediatrix, Inc., an independent practice management group.  Horton expressed his concerns to Relator that Pediatrix-employed physicians and PCA cardiologists would begin directing procedures away from ACH and to St. Joseph's Hospital, which would have resulted in the loss of millions of dollars in revenue to ACH.  To prevent Pediatrix from expanding, All Children's closed its ranks, refusing to grant privileges to any new, non-employed cardiologists.

50.     Horton and Carnes were desperate to pull at least some of the PCA physicians away from Pediatrix and hire them on staff at All Children's.  In May 2008, PPS secured employment contracts with three PCA physicians – Drs. Marguerite Crawford, Gul Dadlani, and Gary Stapleton – and Relator was provided with copies of all of the contracts and related documents for the on-boarding process.  Initially, Dr. Stapleton had a base salary of $250,000, Dr. Dadlani had a base salary of $320,000 and Dr. Crawford had a base salary of $187,500 at .75

18

FTE (equivalent to $250,000 FTE).  Drs. Stapleton and Dadlani also received $50,000 signing bonuses while Dr. Crawford received a $37,500 signing bonus.  All three received additional perks such as, *inter alia*, guaranteed equipment purchases, a profit-sharing plan, payment of tail coverage, cell phone support, and employment of associated staff members.

51.     One month later, the three cardiologists entered into a contract with All Children's Hospital, Inc. wherein All Children's Hospital – not PPS – agreed to hire counsel for the doctors in the event that PCA sued the doctors for breach of contract.  Relator reviewed the associated documentation and determined that All Children's Hospital had not placed a cap on the value of the legal services.  In addition, All Children's Hospital agreed to be responsible for any monetary liability found attributable to the cardiologists as a result of the breach of contract, up to the amount paid as a base salary by PCA before the cardiologists left the practice group. As a result of the limitless legal services agreement, All Children's Hospital was offering uncapped remuneration in exchange for the physicians being employed by PPS.  The Hospital had no relationship with the cardiologists that would justify such an extreme measure other than being the sole recipient of the high volume of anticipated referrals that would flow from the cardiologists' practice.

52.     The same day as ACH entered into the indemnification agreement, PPS entered into amendments to the employment agreements for each physician wherein PPS agreed to increase Dr. Stapleton's salary to $320,000 and Dr. Crawford's .75 FTE salary to $240,000. Copies of all of the amendments were provided to Relator.  When Dr. Crawford returned to work full time, her salary was again adjusted upward to equal her colleagues' $320,000 compensation. Each physician was also guaranteed annual salary increases of approximately $10,000 per year for every year through 2017.

53.     Relator determined that this particular group of cardiologists proved to be extremely lucrative to All Children's Hospital.  Dr. Gul Dadlani issued a standing order that all new patients, prior to being seen by a physician, must be given an EKG and an echocardiogram, regardless of the reason for the appointment and without any mechanism to determine whether such procedures were needed or not.  Staff of the Non-Invasive Cardiology Department of All Children's Hospital, which would conduct the tests and bill for the technical component of the procedures, wrote out actual prescriptions ordering the procedures for the physicians to sign.  Relator questioned Dr. Marguerite Crawford on this practice and she stated that it was just their standard procedure and if they did not do it, then the referring doctor would order the tests.  However, the referring doctors would have no obligation to order the tests be done at All Children's Hospital, so by issuing the standing order, the cardiologists ensured that every one of those procedures remained in-house.

54.     The nationwide 25th to 75th percentile range for pediatric cardiology physicians in FY2009, according to the aggregate of the three salary surveys, was $168,724 to $263,270.  The approved compensation plan provided for $189,734 for a physician with three years of experience like Crawford and Dadlani, or $168,724 for a physician with less than one year of experience like Dr. Stapleton.

55.     As employed physicians, Drs. Dadlani, Stapleton and Crawford made referrals which resulted in false claims being submitted by All Children's Hospital to the State of Florida for payment by Florida and the United States of America.  The following figures reflect claims made from 2009 to 2012 as a result of their referrals:

| Physician Name | Medicaid Provider Number | Claims Resulting from Referrals | Total Amount Billed as a Result of Referrals | Total Amount Reimbursed as a Result of Referrals |
|---|---|---|---|---|
| Marguerite Crawford | 274263200 | 636 | $2,286,684 | $262,198 |
| Gul Dadlani | 270510900 | 2,232 | $8,459,970 | $880,419 |
| Gary Stapleton | 278183200 | 1,145 | $8,301,478 | $899,987 |

**Pediatric Neurosurgery Practice Acquisition and Physician Employment**

56.     In or about 2008, six neurosurgeons were regularly operating at All Children's Hospital.   However, the physicians also regularly operated at Tampa General Hospital and St. Joseph's Hospital – two main competitors for All Children's.  Endeavoring to lock in market share and the massive ancillary service referrals that flow from neurosurgeries, Horton and Carnes relentlessly pursued and negotiated with Dr. Carolyn Carey, the owner of Pediatric Neurosurgery Associates a/k/a the Center for Pediatric Neurosurgery & Neuroscience.

57.     Ultimately, only four of the six of the neurosurgeons agreed to be employed by PPS.  However, All Children's Hospital was not willing to compromise on the number of procedures and referrals even though the practice group would be reduced in size by a third.  In order to ensure that at least the same number of procedures took place at All Children's Hospital and to maintain the income stream from the related referrals, the neurosurgeons' employment agreements all contained a bonus provision which was directly volume-based.  In sum, the four doctors were required to maintain the volume of procedures *at All Children's Hospital* as the six doctors has conducted the year prior.

58.     Additionally, All Children's Hospital agreed to $2,500 *per night* for trauma call pay, adding an estimated $228,000 per year in income for each physician.  PPS limited the physician's annual maximum total compensation to more than one million dollars.

21

59.     Just days after finalizing the neurosurgeons' employment agreements, PPS

entered into an Asset Purchase Agreement with Dr. Carolyn Carey to purchase her medical

practice.  In the August 14, 2009, Asset Purchase Agreement, PPS paid $500,000 for all rights

and assets of the practice *except* for the accounts receivable.  Relator reviewed the employment

contracts containing the bonus and trauma call provisions and the Asset Purchase Agreement for

the on-boarding process.  During the course of this review, Relator determined that $2,500 per

night for trauma call pay was among the highest on-call rates in the country for *any* specialty,

adult or pediatric.

60.     As employed physicians, the four neurosurgeons made referrals which resulted in

false claims being submitted by All Children's Hospital to the State of Florida for payment by

Florida and the United States of America.  The following figures reflect claims made from 2009

to 2012 as a result of each of the physicians' referrals:

| Physician Name | Medicaid Provider Number | Claims Resulting from Referrals | Total Amount Billed as a Result of Referrals | Total Amount Reimbursed as a Result of Referrals |
|---|---|---|---|---|
| Carolyn Carey | 261293300 | 1,266 | $13,040,900 | $2,341,149 |
| Luis Rodriguez | 273577600 | 1,266 | $21,172,718 | $3,018,437 |
| Bruce Storrs | 270429300 | 335 | $6,101,158 | $978,114 |
| Gerald Tuite | 379363000 | 1,450 | $20,635,162 | $3,176,449 |

**Effect of the Acquisition Strategy**

61.     The deliberate and aggressive recruitment strategy was a success: at least seventy-

five physicians were acquired in approximately three years.  From 2000 to 2008, the percentage

of physicians employed by PPS or West Coast Neonatology (another ACHS subsidiary focused

on maternal-fetal medicine) doubled to nearly half of the hospital's active medical staff.

62.     After the hiring spree with its inflated salaries, PPS's operating deficit nearly

tripled in just three years, skyrocketing from just over $2 million in 2006 to $6.5 million in 2008.

By FY2010, the salaries of PPS-employed physicians exceeded fair market value by approximately $5 million annually. In July 2009, while preparing the FY2010 PPS budget, Relator calculated the amount of over-payments and provided a memo to Bill Horton reflecting the $5 million difference in contracted compensations and fair market value for the purpose of letting Horton know that PPS could not continue operating at that sort of deficit. Horton disregarded Relator's memo.

63. Despite the massive increase in PPS' operating loss, the responsible senior executives were rewarded handsomely for their efforts. From 2007 to 2010, compensation to Horton and Carnes more than doubled. Carnes was paid $603,981 by All Children's Hospital, Inc. in 2007; by 2008, his salary was $1,247,256. Carnes' total increase from 2007 to 2010 was 113%. Horton's increase was even more significant. He was paid $225,829 in 2007, which increased to $526,128 in 2008. From 2007 to 2010, the height of the acquisition period, Horton was rewarded with a 180% increase in his salary.

## DEFENDANTS' WRONGFUL CONDUCT HARMED THE GOVERNMENT

64. When a referred service was performed at All Children's Hospital, the hospital itself billed Medicaid for the technical component of the service. For example, if a radiology scan was performed based on a physician referral, the professional service would be billed by PPS under the radiologist's Medicaid number and the technical component would be billed and collected directly by All Children's Hospital.

65. All Children's Hospital billed services using one of several different Medicaid numbers, all of which were obtained by certifying compliance with federal and state statutes and regulations. Specifically, All Children's Hospital uses Medicaid numbers 010151600,

010151601, and 010151603.   From 2009 to 2012, All Children's Hospital billed claims from referrals by the physicians identified in this Complaint for a total billed amount of $218,929,906 and a total reimbursed amount of $43,301,914.

66.    The following claims are a representative sample of claims made by All Children's Hospital based on services or procedures referred by a selection of the physicians identified in this complaint:

| Claim Number | Referring Physician | Diagnosis Code | Date of Service | Amount Billed | Amount Reimbursed |
|---|---|---|---|---|---|
| 2009014201291 | Carey | 3314 | 01-01-2009 | $31,045.75 | $14,057.16 |
| 5509168059744 | Causey | 7840 | 01-14-2009 | $4,298.00 | $657.24 |
| 5509168051547 | Jimenez | 4659 | 01-28-2009 | $881.00 | $219.08 |
| 5509168009203 | Bahar-Posey | 78060 | 04-07-2009 | $3,193.05 | $1,133.79 |
| 5509168011612 | Crawford | 78650 | 04-16-2009 | $3,586.00 | $438.16 |
| 5509168046138 | Barbosa | 2860 | 04-27-2009 | $151,061.88 | $14,464.62 |
| 2009169106950 | Mularoni | 78703 | 05-27-2009 | $1,083.00 | $462.16 |
| 2009176231983 | Dadlani | 7455 | 06-19-2009 | $3,586.00 | $438.16 |
| 5510305038895 | Causey | 4659 | 08-09-2009 | $3,060.32 | $1,086.04 |
| 2009348106740 | Stapleton | 7455 | 12-01-2009 | $58,959.15 | $2,348.03 |
| 5511280135375 | Bahar-Posey | 49392 | 05-01-2010 | $1,369.01 | $1,021.50 |
| 5511280075696 | Danielson | 5409 | 06-19-2010 | $32,657.48 | $14,355.06 |
| 5511280032593 | Dadlani | 7852 | 07-09-2010 | $3,874.00 | $410.66 |
| 5511280033336 | Stapleton | 7470 | 07-13-2010 | $3,875.00 | $410.66 |
| 5511280045098 | Mularoni | 4659 | 09-05-2010 | $1,009.00 | $205.33 |
| 5511280009379 | Carey | 9962 | 09-10-2010 | $56,089.38 | $14,370.66 |
| 5511280048594 | Crawford | 74710 | 09-21-2010 | $3875.00 | $410.66 |
| 5511280057287 | Barbosa | 7862 | 11-03-2010 | $1,844.00 | $410.66 |
| 5511280058675 | Causey | 78060 | 11-08-2010 | $1,289.68 | $821.32 |
| 5511280059851 | Danielson | V573 | 11-16-2010 | $94.00 | $205.33 |
| 5511280068713 | Jimenez | 49392 | 12-10-2010 | $1,735.78 | $1,026.65 |
| 2012016085117 | Mularoni | 56400 | 01-09-2012 | $2,530.20 | $852.75 |
| 2012038158715 | Jimenez | 5589 | 01-30-2012 | $7,245.49 | $1,272.72 |
| 1112163501662 | Mularoni | 7862 | 02-21-2012 | $3,968.55 | $1,055.60 |
| 2012075170158 | Danielson | 5400 | 02-29-2012 | $30,378.10 | $11,062.68 |
| 2012079153679 | Dadlani | 7454 | 03-13-2012 | $4,358.00 | $422.24 |
| 2012103110461 | Crawford | 7852 | 03-30-2012 | $4,358.00 | $422.24 |
| 2012107106863 | Carey | V571 | 04-09-2012 | $196.00 | $211.12 |
| 2012187607429 | Stapleton | 7467 | 06-29-2012 | $341.00 | $211.12 |
| 5512328106715 | Barbosa | V5811 | 08-23-2012 | $11,180.37 | $1,777.68 |

67.     All of these claims are false because they resulted from referrals by physicians

with improper financial relationships with the entity which provided the referred service.  These

claims are merely illustrative of the thousands of claims which occurred from at least 2007 to the

present.

<u>COUNT I:</u>
**Violation of the Federal False Claims Act by Creating Employment Agreements that Far Exceed Fair Market Value in Violation of the Stark Statute**

68.     This Count alleges that Defendants have violated the Federal False Claims Act by

entering into financial relationships with multiple physicians which violate the Stark Statute by

offering and paying compensation and remuneration which far exceeded fair market value, were

not commercially reasonable and which varied in accordance with the physicians' anticipated

referrals with the intention to induce physicians to increase their referrals to All Children's

Hospital in violation of the Stark Statute.  In support, Relator incorporates paragraphs 1 through

67 as though fully set forth herein.

69.     Nearly one-third of all PPS physicians were paid above the 75th percentile of the

nationwide salary range.  The contracted base salaries for the highest paid physicians in the

hospital exceeded the 90th percentile of nationwide comparable salaries for the year of hire:

| Physician | Date of Hire | Base Salary in Contract at 1.0 FTE | 90th Percentile of Nationwide Salary Range in Year of Hire*** |
|---|---|---|---|
| **Laleh Bahar-Posey** Emergency Medicine | 10/23/2007 | $262,080 + $20,000 signing | $196,200 |
| **Alan Causey** Emergency Medicine | 04/01/2007 | $262,080 + $50,000 signing | $196,200 |
| **Ricardo Jimenez** Emergency Medicine | 07/01/2007 | $249,6000 +$20,000 signing | $196,200 |
| **Craig Kizewic** Emergency Medicine | 04/01/2007 | $252,720 + $50,000 signing | $196,200 |
| **Thomas McLoughlin*** Emergency Medicine | 04/01/2007 | $270,400 + $20,000 signing | $196,200 |
| **Phillip Mularoni** | 07/11/2007 | $249,600 | $196,200 |

25

| | | | |
|---|---|---|---|
| Emergency Medicine | | + $20,000 signing | |
| **Joseph Perno**<br>Emergency Medicine | 04/01/2007 | $291,200<br>+ $50,000 signing | $196,200 |
| **Wassam Rahman**<br>Emergency Medicine | 04/01/2007 | $332,800<br>+ $50,000 signing | $196,200 |
| **Rafael Santiago**<br>Emergency Medicine | 07/24/2007 | $243,3600<br>+ $20,000 signing | $196,200 |
| **Jerry Barbosa***<br>Hematology/Oncology | 11/01/2007 | $500,000 | $221,544 |
| **Gregory Hale**<br>Hematology/Oncology | 12/01/2008 | $303,000<br>+ $50,000 signing | $254,643 |
| **Richard Harmel****<br>General Surgery | 12/24/2007 | $500,000 | $459,882 |
| **Paul Danielson****<br>General Surgery | 02/08/2008 | $600,000<br>+ $50,000 signing | $459,882 |
| **Marguerite Crawford***<br>Cardiology | 06/02/2008 | $320,000<br>+ $37,500 signing | $309,460 |
| **Gul Dadlani**<br>Cardiology | 11/03/2008 | $320,000<br>+ $50,000 signing | $309,460 |
| **Gary Stapleton**<br>Cardiology | 11/03/2008 | $320,000<br>+ $50,000 signing | $309,460 |

\* = Physician works less than 1.0 FTE; salary shown at 1.0 FTE
\*\* = Does not include on-call trauma pay of $1,500 or more per night
\*\*\* = The 90th percentile used in the chart is gathered from the median of the three salary surveys used in the Board-approved compensation plan.

70.     As detailed in this complaint, Defendants also recruited physicians into employment with additional forms of remuneration that continued to push their compensation past fair market value.  Perks and bonuses including, *inter alia*, covered cell phone services, payment of "tail" coverage (a notoriously expensive insurance plan to cover conduct at the previous place of employment), guaranteed state-of-the-art medical equipment purchases, promises of employment for family members, and indemnification from legal responsibility for violating existing employment agreements.   Additionally, certain physicians like Dr. Michael Gallant were provided salaries and bonuses that expressly varied based on the number of procedures, and therefore the number of referrals, conducted at All Children's Hospital.

71.     All of the above-identified physicians are approved Florida Medicaid providers. From their respective dates of hire, listed above, until the present, all claims submitted by the Defendants to Medicaid for designated health services rendered as a result of referrals by the following physicians using the following provider numbers are false claims as a result of the excessive compensation and remuneration paid to the physicians in violation of the Stark Statute:

| Physician | Medicaid Provider Number |
|---|---|
| Laleh Bahar-Posey | 371322900 |
| Alan Causey | 252285300 |
| Ricardo Jimenez | 279467500 |
| Craig Kizewic | 272007800 |
| Thomas McLoughlin | 258515400 |
| Phillip Mularoni | 277977300 |
| Joseph Perno | 267346100 |
| Wassam Rahman | 252262400 |
| Rafael Santiago | 269833100 |
| Jerry Barbosa | 057182200 |
| Gregory Hale | 000522800 |
| Richard Harmel | 061134400 |
| Paul Danielson | 000081400 |
| Marguerite Crawford | 274263200 |
| Gul Dadlani | 270510900 |
| Gary Stapleton | 278183200 |
| Michael Gallant | 059276500 |

72.     Defendants submitted claims to the Florida Agency for Health Care Administration ("AHCA") for reimbursement for services rendered as a result of improper referrals induced by Defendants' wrongful conduct.  Because of the FMAP program, Defendants knew that submitting a claim to AHCA would, in turn, cause the State of Florida to submit a claim for reimbursement to the federal government.  The Medicaid statute prohibits the state of Florida from receiving reimbursements for services that would be prohibited if the service was covered under Medicare.  Therefore, when Defendants submitted a claim to FL AHCA,

Defendants knowingly caused the State of Florida to submit a false claim to the United States of America.

73.     In doing so, Defendants knowingly violated:

(1) 31 U.S.C. §3729(a)(1)(A) by presenting, or causing to be presented, false and fraudulent claims for payment or approval to the United States, in the form of claims for reimbursement from the State of Florida to the United States for designated health services which were referred by physicians with whom Defendants had entered into prohibited financial relationships in violation of the Stark Statute; and

(2) 31 U.S.C. § 3729(a)(1)(B) by making, using or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States in the form of certifying that Defendants were in compliance with all applicable laws and regulations.

74.     To the extent any of the false claims alleged herein were submitted on or before May 20, 2009, Relator alleges that Defendants knowingly violated 31 U.S.C. §3729(a)(1) and 31 U.S.C. §3729(a)(2), prior to amendment, by engaging in the conduct described in Paragraph 73 (1) and (2), respectively.

75.     Because of the false or fraudulent claims made by Defendants, the United States has suffered and continues to suffer damages and is therefore entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT II:**
**Violation of the Florida False Claims Act by Causing the State of Florida to Make False Claims Associated with the Conduct in Count I**

76.     This Count alleges that Defendants have violated the Florida False Claims Act by offering and paying compensation and remuneration which far exceeded fair market value, were not commercially reasonable, and which varied in accordance with the physicians' anticipated referrals with the intention to induce physicians to increase their referrals to All Children's Hospital in violation of the Stark Statute.  In support, Relator incorporates paragraphs 1 through 67 and paragraphs 69 through 71 as though fully set forth herein.

77.     As described fully herein, Defendants have certified and continue to certify that they will comply with all applicable federal and state regulations in order be approved as a Medicaid-participating healthcare facility.  Without regard for these certifications, Defendants repeatedly offered and paid remuneration in the form of salaries that far exceed fair market value, excessive trauma call pay, and additional lucrative bonuses and perks.  Therefore, Defendants knew that their certifications of compliance were false or fraudulent.

78.     Defendants submitted claims to the Florida Agency for Health Care Administration ("AHCA") for reimbursement for services rendered as a result of improper referrals induced by Defendants' wrongful conduct.  Because of the FMAP program, Defendants knew that submitting a claim to AHCA would, in turn, cause the State of Florida to submit a claim for reimbursement to the federal government.  The Medicaid statute prohibits the state of Florida from receiving reimbursements for services that would be prohibited if the service was covered under Medicare.  Therefore, when Defendants submitted a claim to FL AHCA, Defendants knowingly caused the State of Florida to submit a false claim to the United States of America.

79.     But for Defendants false certifications and statements of compliance with the federal regulations, the State of Florida would not have paid the state portion of the claims made by Defendants.  Therefore, Defendants made false claims which damaged the State of Florida in the amount of the state share for every claim for service rendered as a result of a prohibited referral.

80.     In doing so, Defendants knowingly violated:

(1) Fla. Stat. § 68.082(2)(a) by knowingly presenting or causing to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval; and

(2) Fla. Stat. § 68.082(2)(b) by knowingly making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.

81.     Because of the false or fraudulent claims made by Defendants, the State of Florida has suffered, and continues to suffer damages and is therefore entitled to recovery as permitted by the Florida False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT III:
### Violation of the Federal False Claims Act by Paying Volume-Based Remuneration in Violation of the Stark Statute

82.     This Count alleges that Defendants have violated the Federal False Claims Act by offering and paying remuneration in the form of volume-based bonuses which are intended to induce physicians to increase their referrals to All Children's Hospital in violation of the Stark Statute.  In support, Relator incorporates paragraphs 1 through 67 through as though fully set forth herein.

83.     Defendants offered a volume-based incentive bonus to four neurosurgeons if the practice group as a whole could maintain the volume of procedures that six neurosurgeons had completed the year prior, *so long as all the procedures were conducted at All Children's Hospital*.  From their respective dates of hire until the present, all claims submitted by the Defendants to Medicaid for services rendered as a result of referrals by the following physicians using the following provider numbers are false claims as a result of the volume-based incentives paid to the physicians in violation of the Stark Statute:

| Physician | Medicaid Provider Number |
|-----------|--------------------------|
| Carolyn Carey | 261293300 |
| Luis Rodriquez | 273577600 |
| Bruce Storrs | 270429300 |
| Gerald Tuite | 379363000 |

84.     Defendants submitted claims to the Florida Agency for Health Care Administration ("AHCA") for reimbursement for services rendered as a result of improper referrals induced by Defendants' wrongful conduct.  Because of the FMAP program, Defendants knew that submitting a claim to AHCA would, in turn, cause the State of Florida to submit a claim for reimbursement to the federal government.  The Medicaid statute prohibits the state of Florida from receiving reimbursements for services that would be prohibited if the service was covered under Medicare.  Therefore, when Defendants submitted a claim to FL AHCA, Defendants knowingly caused the State of Florida to submit a false claim to the United States of America.

85.     In doing so, Defendants knowingly violated:

(1) 31 U.S.C. §3729(a)(1)(A) by presenting, or causing to be presented, false and fraudulent claims for payment or approval to the United States, in the form of claims for reimbursement from the State of Florida to the United States for designated health

31

services which were referred by physicians with whom Defendants had entered into prohibited financial relationships in violation of the Stark Statute; and

(2) 31 U.S.C. § 3729(a)(1)(B) by making, using or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States in the form of certifying that Defendants were in compliance with all applicable laws and regulations.

86.     To the extent any of the false claims alleged herein were submitted on or before May 20, 2009, Relator alleges that Defendants knowingly violated 31 U.S.C. §3729(a)(1) and 31 U.S.C. §3729(a)(2), prior to amendment, by engaging in the conduct described in Paragraph 85 (1) and (2), respectively.

87.     Because of the false or fraudulent claims made by Defendants, the United States has suffered, and continues to suffer damages and is therefore entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT IV:
### Violation of the Florida False Claims Act by Causing the State of Florida to Make False Claims Associated with the Conduct in Count III

88.     This Count alleges that Defendants have violated the Florida False Claims Act by offering and paying remuneration in the form of volume-based bonuses which are intended to induce physicians to increase their referrals to All Children's Hospital in violation of the Stark Statute.  In support, Relator incorporates paragraphs 1 through 67 and paragraph 83as though fully set forth herein.

89.     As described fully herein, Defendants have certified and continue to certify that they will comply with all applicable federal and state regulations in order be approved as a

Medicaid-participating healthcare facility.  Without regard for these certifications, Defendants

repeatedly offered and paid bonuses based on the volume of referrals to All Children's Hospital.

Therefore, Defendants knew that their certifications of compliance were false or fraudulent.

90.     Defendants submitted claims to the Florida Agency for Health Care

Administration ("AHCA") for reimbursement for services rendered as a result of improper

referrals induced by Defendants' wrongful conduct.  Because of the FMAP program, Defendants

knew that submitting a claim to AHCA would, in turn, cause the State of Florida to submit a

claim for reimbursement to the federal government.  The Medicaid statute prohibits the state of

Florida from receiving reimbursements for services that would be prohibited if the service was

covered under Medicare.  Therefore, when Defendants submitted a claim to FL AHCA,

Defendants knowingly caused the State of Florida to submit a false claim to the United States of

America.

91.     But for Defendants false certifications and statements of compliance with the

federal regulations, the State of Florida would not have paid the state portion of the claims made

by Defendants.  Therefore, Defendants made false claims which damaged the State of Florida in

the amount of the state share for every claim for service rendered as a result of a prohibited

referral.

92.     In doing so, Defendants knowingly violated:

(1) Fla. Stat. § 68.082(2)(a) by knowingly presenting or causing to be presented to

an officer or employee of an agency a false or fraudulent claim for payment or approval;

and

(2) Fla. Stat. § 68.082(2)(b) by knowingly making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.

93.     Because of the false or fraudulent claims made by Defendants, the State of Florida has suffered, and continues to suffer damages and is therefore entitled to recovery as permitted by the Florida False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## PRAYER

WHEREFORE, Relator Barbara Schubert, on behalf of the United States of America and the State of Florida, requests:

a.      That Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating 31 U.S.C. § 3729, *et seq.*; and

b.      That Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating Fla. Stat. 68.081, *et seq.*; and

c.      That judgment be entered in favor of the United State, the State of Florida and Relator and against the Defendants in the amount of each and every false or fraudulent claim multiplied as provided by 31 U.S.C. § 3729 and Fla. Stat. 68.082(2), plus a civil penalty of not less than $5,500.00 and no more than $11,000.00 per claim, to the extent such multiplied penalties shall fairly compensate the United State of America and the State of Florida for losses resulting from the various schemes undertaken by the Defendant, together with penalties for additional specific claims to be identified at trial after full discovery; and

d.      That Relator be awarded the maximum amount permissible according to 31 U.S.C. § 3730 (c) and Fla. Stat. 68.085; and

e.      That judgment be granted for the United States of America, the State of Florida and Relator for all violations by the Defendants of the Federal False Claims Act, the Florida False Claims Act, the Stark Statute, and all other applicable laws referenced herein; and

f.      That judgment be granted for the United States of America, the State of Florida and Relator and against all Defendants for any costs, including but not limited to court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this case; and

g.      That the United States of America, the State of Florida and Relator be granted such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

A jury trial is requested for all issues so triable.


Respectfully submitted this 29th day of April, 2013,

  /s/ Jillian L. Estes_____
JILLIAN L. ESTES
Fla. Bar No. 055774
jestes@jameshoyer.com
CHRISTOPHER CASPER
Fla. Bar No. 048320
ccasper@jameshoyer.com
SEAN P. KEEFE
Fla. Bar No. 413828
skeefe@jameshoyer.com
**JAMES, HOYER, NEWCOMER &
SMILJANICH, P.A.**
4830 W. Kennedy Blvd.
One Urban Center, Suite 550
Tampa, FL   33609
Tel.  813-397-2300
Fax  813-397-2310

**Counsel for Relator**

## <u>CERTIFICATE OF SERVICE</u>

I, Jillian Levy Estes, hereby certify that the foregoing document was served on all parties

of record using the CM/ECF system on April 29, 2013.

 /s/ Jillian L. Estes_____
JILLIAN L. ESTES