## UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA and STATE OF
FLORIDA *ex rel.* BARBARA SCHUBERT,

         Plaintiffs,

v.

ALL CHILDREN'S HEALTH SYSTEM, INC.,
PEDIATRIC PHYSICIANS SERVICES, INC. and
ALL CHILDREN'S HOSPITAL, INC.,

         Defendants.

Case No.: 8:11-cv-1687-T-27-EAJ

## DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT

All Children's Health System, Inc. ("ACHS"), Pediatric Physicians Services, Inc.

("PPS"), and All Children's Hospital, Inc. ("ACH") ("Defendants") respectfully move

pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure for an Order

dismissing with prejudice the Third Amended Complaint ("TAC") of Relator Barbara

Schubert ("Relator").  In support, Defendants state further as follows:

        1.      Relator Barbara Schubert filed this *qui tam* case on July 29, 2011, and on May

1, 2012, Relator filed a Second Amended Complaint ("SAC").  [Dkt. 2].  Neither the United

States nor the State of Florida intervened in this case, and on August 13, 2012, the Court

entered an Order unsealing the SAC.  [Dkt. 4-5].

        2.      On November 5, 2012, Relator moved for leave to file a Third Amended

Complaint.  [Dkt. 21].  The Court denied that motion on January 9, 2013, holding that it

lacked jurisdiction over the new allegations in that complaint due to the public disclosure bar,

31 U.S.C. § 3730(e)(4).  [Dkt. 33] at 5-6.

3.      On April 15, the Court dismissed the SAC on Defendants' motion, holding that Relator failed to plead the circumstances of fraud with particularity as required by Rule 9(b).  [Dkt. 44].  The Court granted Relator leave to amend to cure the deficiencies.  *Id.* at 9.

4.      Relator filed a Third Amended Complaint on April 29, 2013 (the "TAC"). [Dkt. 45].  The TAC attempts to assert many of the same allegations and claims over which the Court already held that it lacks jurisdiction.  *See* [Dkt. 33].  On May 9, 2013, Defendants moved to strike the new allegations which continue to be barred under the public disclosure bar.  [Dkt. 46].  On July 17, 2013, the Court denied the motion to strike, but did so without prejudice to Defendants asserting the public disclosure bar in a motion to dismiss.  [Dkt. 57]. Due to the page limitations set forth in the Local Rules for motions to dismiss, Defendants do not now present the public disclosure bar arguments, but reserve them.

5.      Defendants now move to dismiss the TAC pursuant to Rule 9(b) for failure to plead fraud with particularity.  Relator still fails to identify any claims made to, or payments made by, the United States, which is fatal to her federal False Claims Act counts.

6.      In addition, all four Counts should be dismissed under Rule 12(b)(6) because they are premised on erroneous regulatory interpretations.  The Florida FCA Counts (II and IV) should be dismissed because they are premised on the incorrect view that the federal Stark Law governs referral of Medicaid patients.  The federal FCA Counts (I and III) should be dismissed because they are premised on an incorrect interpretation of 42 U.S.C. § 1396b(s), and the incorrect conclusion that Defendants caused Florida to obtain excessive payments from the federal government.

7.     All Counts should also be dismissed under Rule 12(b)(6) because Relator has failed to plead violations of the Stark Law by Defendants.

## MEMORANDUM OF LAW

## ALLEGATIONS OF THE THIRD AMENDED COMPLAINT

### A.     The Parties

Defendant All Children's Hospital, Inc. ("ACH") owns and operates All Children's Hospital, a children's hospital in St. Petersburg, Florida. TAC ¶ 13. The hospital cares for many poor and disabled children who are Medicaid beneficiaries. *Id.* Defendant Pediatric Physicians Services, Inc. ("PPS") is a not-for-profit corporation that employs physicians, many of whom provide care at All Children's Hospital. *Id.* ¶ 12. Defendant All Children's Health System, Inc. ("ACHS") is the sole member (owner) of ACH and PPS. *Id.* ¶¶ 12-13. Relator Schubert is the former Director of Operations for PPS. *Id.* ¶ 10.

### B.     Medicaid and Medicare Programs

Medicaid is a joint federal-state program that provides health coverage and benefits for the poor and disabled. *Id.* ¶ 14. Florida Medicaid is regulated by the Florida Agency for Health Care Administration ('AHCA') with oversight by the federal Centers for Medicare and Medicaid Services ('CMS')." *Id.* The Social Security Act allows states to seek federal funds to cover a portion of the state's Medicaid program. *Id.* ¶ 15. The federal payment is referred to as the "federal financial participation" or "FFP." *See* 42 U.S.C. § 1396b.

The Medicare program is a federal program that provides health care coverage for the aged, individuals with end-stage renal disease, and, in certain circumstances, the disabled. *See* 42 U.S.C. § 1395c. As ACH is a children's hospital, its Medicare patient volume is very

3

low.  The TAC makes no allegations concerning Medicare.

### C.     Physician Financial Relationships

Relator alleges that Defendants entered into financial relationships with certain physicians that violated the Stark Law.  Relator's allegations fit into two categories:  (i) compensation was paid to certain physicians employed by PPS that allegedly exceeded fair market value; and (ii) compensation was allegedly paid to certain physicians based on volume of referrals.

Relator's "fair market value" allegations purportedly stem from her 2007 efforts to create a new compensation plan "that would meet the needs of both the physicians and the hospital system."  TAC ¶ 21.  Relator admits that she determined in 2007 that ACH is unique in its services and physician makeup such that, "there was not a nationwide or regional commercial salary survey which accurately reflected the composition of All Children's Hospital's employed staff."  *Id.*  Relator further concedes that "it would be inappropriate to use any single physician compensation survey to determine fair market value for pediatric specialties" such as those ACH provides.  *Id.*  Nevertheless, despite recognizing that the surveys are not appropriate, Relator has taken "the median of three data surveys" to determine what she alleges is, "the most realistic market comparison."  *Id.*

It is this idiosyncratic analysis that forms the basis of Relator's suit.  TAC ¶¶ 21-22.  According to Relator, PPS paid compensation in excess of the 75th percentile of "fair market value," based on her own personal valuation standards, to:  (i) nine emergency room physicians; (ii) two pediatric hematology-oncology physicians; (iii) two pediatric surgeons, Richard Harmel and Paul Danielson; and (iv) four pediatric cardiologists.  *Id.* ¶¶ 29, 32, 33,

4

35-38, 40-43, 50, 52, 54.  Dr. Danielson allegedly received a "side letter" that agreed to an employment "opportunity" for his wife as a "per diem" pediatrician.  *Id.* ¶ 41.

Relator also alleges that PPS's employment agreements with four pediatric neurosurgeons contained an illegal provision that based bonus compensation on the volume of surgeries they performed.  *Id.* ¶ 57.  In addition, Relator alleges that PPS entered into an agreement with a plastic surgeon, Michael Gallant, in which he would be paid a base salary based on the expectation that he would perform 400 cases during his first year and an additional $50,000 bonus in his first year of employment if he performed in excess of 495 procedures, apparently without regard to where the procedures were performed.  *Id.* ¶¶ 44-48.

**D.     False Claims Act Counts**

Counts I and III (federal FCA counts) allege that Defendants caused Florida to submit false claims to the United States seeking FFP, as a result of Defendants' supposed Stark Law violations.  These Counts do not allege that Defendants submitted false claims to the United States.  Rather, the supposed false claims under Counts I and III were submitted by Florida.

Counts II and IV (Florida FCA counts) allege that Defendants submitted false claims to the State of Florida.  Relator alleges that the claims submitted to Florida were false because Defendants supposedly falsely certified compliance with the federal Stark Law.

## ARGUMENT

**I.     RELATOR HAS FAILED TO SATISFY RULE 9(B).**

**A.     Counts I and III Should be Dismissed Because Relator Has Still Failed to Plead False Claims Made to the United States with Particularity.**

On April 15, the Court dismissed the SAC under Rule 9(b) for failing to allege false claims.  [Dkt. 44].  The TAC has not cured these defects as to Counts I and III, the federal

FCA counts.  Accordingly, Counts I and III should be dismissed.

As the Court explained, "[t]he 'central question' in a claim brought under the False Claims Act is 'whether the defendant ever presented a 'false or fraudulent claim' to the government.'" Apr. 15, 2013 Order [Dkt. 44] at 4.  "The submission of a claim is . . . the *sine qua non* of a False Claims Act violation." *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002).  As such, the Eleventh Circuit has repeatedly held that Rule 9(b) requires the relator to plead the "'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions *to the government*[.]" *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1326-27 (11th Cir. 2009) (emphasis added).  "Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies." *Corsello v. Lincare, Inc.*, 428 F. 3d. 1008, 1012 (11th Cir. 2005).  As this Court put it, "[t]he requirement of alleging the presentment of a false claim cannot be overcome by detailing other improper activity." Apr. 15, 2013 Order [Dkt. 44] at 5.  Furthermore, the need to allege particular false claims applies both to causes of action asserted under 31 U.S.C. § 3729(a)(1)(A) (causing false claims to be submitted) and under 31 U.S.C. § 3729(a)(1)(B) (using false statement or document material to a false claim).  *See* Apr. 15, 2013 Order [Dkt. 44] at 8, n.4.

Relator does not allege that Defendants submitted false claims directly to the federal government; instead she asserts that Defendants caused *Florida* to submit false claims to the United States for FFP payments.  TAC ¶¶ 73, 85; *see also id.* at ¶18 (premising her theory on purported violations of 42 U.S.C. § 1396b(s), which only concerns relationship between federal government and the states).  The supposed false claims under Counts I and III are

claims that *Florida* submitted to the United States seeking FFP payments.

Accordingly, to satisfy Rule 9(b), Relator must identify alleged false claims that *Florida* submitted to the federal government. Here, however, Relator alleges nothing about the supposed false claims that Florida submitted for FFP. She does not state when they were submitted, how much FFP was sought, how much of the FFP could be traced to Defendants' conduct, who within the State of Florida submitted the claims, or any other information about the supposed false claims at issue in Counts I and III.

*Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1326 (11th Cir. 2009), illustrates this point. In *Hopper*, the relator alleged that a pharmaceutical company illegally marketed a nausea drug to physicians for non-FDA-approved ("off-label") indications. "The relators [did] not allege that Solvay [the pharmaceutical company] itself submitted any false claims." *Id.* at 1322. Rather, by causing physicians to write prescriptions for off-label indications, the pharmaceutical company allegedly caused others (*i.e.*, physician practices, pharmacies) to submit false claims to government health programs. The Eleventh Circuit held that the relator's complaint failed to satisfy Rule 9(b) because, among other things, it failed to allege actual false claims that the pharmaceutical company had caused others to submit to the government. *Id.* at 1326-30. It was not enough to allege how the pharmaceutical company caused others to submit false claims; to satisfy the heightened pleading requirement of Rule 9(b), the relator also needed to allege false claims. *See also United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 460 (4th Cir. 2013) (following Eleventh Circuit, and holding that Rule 9(b) requires relator to plead actual false claims that a defendant caused another to submit to the government).

Even where a relator offers detailed allegations of an illegal scheme to cause others to submit false claims to the government, Rule 9(b) still requires that the complaint allege particular facts about the false claims. *Hopper*, 588 F.3d at 1325-26.  Relator has not done so.  And as Relator does not allege that she has firsthand information into Florida's FFP claims submission activities, she cannot skirt Rule 9(b) by assuming that Florida sought FFP for the claims identified in the TAC. *Id.* at 1326; Apr. 15, 2013 Order [Dkt. 44] at 8 (refusing to relax Rule 9(b) requirement that relator allege false claims where relator lacks knowledge of the billing activities of the entity that allegedly submitted false claims).

**B.    Counts I and II Should Be Dismissed Because Relator Failed to Allege Physician Compensation in Excess of Fair Market Value.**

In Counts I and II, Relator alleges that Defendants violated the Stark Law because compensation paid to certain employed physicians supposedly exceeded fair market value. These allegations, however, are not adequately supported with factual allegations, as required under Rule 9(b). *See United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2012 WL 2871264, at *7 (S.D. Fla. July 12, 2012) (explaining that Rule 9(b) requires "fair market value" allegations be pled with particularity in an FCA case predicated on alleged Stark Law violations).  Relator must plead a benchmark of fair market value *in the same market* against which the compensation arrangements can be measured, with adequate consideration for the various elements of the compensation. *Id.*

Initially, Relator fails to properly plead with particularity the market in which the compensation arrangements should be measured.  Although Relator states that "the market for pediatric subspecialists is national and not local," TAC ¶ 21, this conclusory assertion is made with no factual support, and it need not be accepted as true for the purposes of this

motion. *See Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002). Indeed, the statement itself seems contrary to Relator's own allegations that most of physicians identified in the TAC were recruited *locally. See, e.g.*, TAC ¶ 28, 49. Without pleading facts establishing a market, Relator's "fair market value" allegations fail.

Even accepting Relator's assertion that the market is national, the claims still fail because Relator has not made relevant factual allegations to establish the fair market value for a national market for each specialty. To the contrary, Relator concedes that "[a]fter extensive research into compensation plan best practices, Relator determined that there was not a nationwide or regional commercial salary survey which accurately reflected the composition of All Children's Hospital's employed staff." TAC ¶ 21. She further admits that "it would be inappropriate to use any single physician compensation survey to determine fair market value for pediatric specialties." *Id.* Thus, Relator has admitted that she has not alleged a sufficient benchmark to support an allegation that compensation exceeded fair market value.

Having no valid benchmark to establish fair market value for the various pediatric sub-specialties, Relator nevertheless asserts that the Court can ignore this critical problem, and let her proceed with her claims on the ground that compensation arrangements exceeded the 75th percentile of the median of the invalid surveys. TAC ¶¶ 21-22. But this does not even meet the requirements of pleading a plausible claim under Rule 8(a), let alone the particularity requirements of Rule 9(b). Taking the median of admittedly unreliable surveys does not yield a reliable benchmark; to be sure, it yields a number, but that is not the same as alleging a viable standard as Rule 9(b) requires. *Oxford Asset Mgmt.*, 297 F.3d at 1188.

Furthermore, Relator has alleged nothing concerning the factors relevant to determining whether compensation is consistent with fair market value, such as the physician's reputation, seniority, special skills, productivity or agreement to work long hours. *See United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1049 (N.D. Ill. 2002) (dismissing complaint alleging above fair-market value acquisitions where Relator failed to identify what assets were purchased, the amounts paid, or anything beyond conclusory allegations that they were not commercially reasonable).

Relator's non-fair-market-value allegations also fail to satisfy Rule 9(b) when viewed in the overall context of PPS physician compensation. Relator alleges that 80 physicians in ten specialties were added between 2006 and 2008, TAC ¶ 4, yet identifies only 16 physicians paid above the 75th percentile. TAC ¶¶ 32-33, 37-38, 42-43, 54-55, 71. (The TAC identifies five other physicians, but does not allege that their compensation was above the 75th percentile. TAC ¶¶ 48, 60). Thus, Relator alleges that only 20 percent (16 of 80) or at most 26 percent (21 of 80) physicians received compensation in the highest 25th percentile. The allegations of the TAC are facially most consistent with a statistically diverse range of employed physicians. Relator cannot satisfy Rule 9(b), let alone Rule 8, by merely cherry-picking, out of more than 80 newly-hired physicians, those whose compensation falls at the high end when compared to national surveys without pleading more particular facts.

Finally, even if Relator could cure these numerous pleading deficiencies, Relator has not established any basis for her conclusory assertion that salaries paid above the 75th percentile exceed "fair market value." To the contrary, Relator admits that "she could not find any data to support exceeding the 75th percentile, so she determined that to be the

reasonable salary cap." TAC ¶ 22. Relator's naked allegation of compensation above the nationwide 75th percentile, or even the 90th percentile, does not supply facts adequate to show that ACH paid its employed physicians above fair market value. For all of these reasons, Counts I and II should be dismissed.

## II.   ALL COUNTS SHOULD BE DISMISSED BECAUSE THEY ARE PREMISED ON ERRONEOUS REGULATORY INTERPRETATIONS.

All four Counts of the TAC should be dismissed because they are premised on erroneous interpretations of either the Stark Law, 42 U.S.C. § 1395nn, or of a Medicaid Act provision related to FFP payments to states, 42 U.S.C. § 1396b(s), that CMS has not yet implemented. In fact, as explained below, Relator has failed to allege that Defendants violated the Stark Law because that law does not regulate the referral of Medicaid patients. In addition, contrary to Relator's contention, 42 U.S.C. § 1396b(s) did not bar Florida from receiving any FFP payments that it may have received.

### A.   Counts II and IV Should Be Dismissed Because Defendants Did Not Violate the Stark Law When Submitting Medicaid Claims.

Counts II and IV assert that Defendants violated the Florida FCA because they supposedly violated the federal Stark Law. See TAC ¶¶ 17, 76-77, 79, 88-89, 91. Because the Stark Law regulates only the referral of Medicare patients (and does not regulate referral of Medicaid patients), and since the TAC makes no Medicare allegations, Defendants did not falsely certify Stark Law compliance. Therefore, Counts II and IV should be dismissed.

Congress enacted the Stark Law "to address perceived overutilization of services by physicians who stood to profit by referring patients to facilities or entities in which they had a financial interest." *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 705 (D.C. Cir.

2011). The law contains two prohibitions: a referral prohibition as to Medicare patients; and a billing prohibition that applies when the Medicare referral prohibition has been violated.

The referral prohibition provides that if a physician (or immediate family member) has a financial relationship with a hospital (or other entity) that does not fit within an exception, then the physician may not refer a patient to the hospital for the furnishing of "designated health services for which payment otherwise may be made *under this subchapter* [*i.e.*, subchapter XVIII, referring to Medicare]."[1] 42 U.S.C. § 1395nn(a)(1)(A) (emphasis added); *see also* 42 C.F.R. § 411.353(a) (stating Medicare referral prohibition). Hospital inpatient and outpatient services are examples of "designated health services." 42 U.S.C. § 1395nn(h)(6)(K); 42 C.F.R. § 411.351. The billing prohibition provides that if a physician refers a Medicare beneficiary contrary to the referral prohibition, then the hospital may not bill Medicare (or anyone else)[2] for services furnished to the Medicare beneficiary. *See* 42 U.S.C. § 1395nn(a)(1)(B); 42 C.F.R. § 411.353(b).

The Health Care Financing Administration (now known as CMS) has clearly stated that the Stark Law prohibitions do not apply to Medicaid: "[W]e do not believe these [Stark Law] rules and sanctions apply to physicians and providers when the referral involves Medicaid services." 63 Fed. Reg. 1659, 1704 (Jan. 9, 1998). CMS further advised that physicians and hospitals are "not precluded from referring Medicaid patients or from billing for designated health services." *Id.*

---

[1] Subchapter XVIII of the Social Security Act creates the Medicare program. *See* 42 U.S.C. §§ 1395a-1395kkk.

[2] Hospitals sometimes bill non-Medicare payors for services furnished to a Medicare patient if the patient or a MediGap insurer is responsible for copayment or deductible liability or if Medicare is the secondary payor and the primary payor is the patient's employer group health plan. *See Vencor, Inc. v. Standard Life & Acc. Ins. Co.*, 317 F.3d 629, 632 (6th Cir. 2003); 42 U.S.C. § 1395ss; 57 Fed. Reg. 8588, 8596 (March 11, 1992).

Accordingly, Relator has not alleged a violation of the Stark Law, let alone a false certification of Stark Law compliance. Therefore, Counts II and IV should be dismissed.

**B.      Counts I and III Should Be Dismissed Because Defendants Did Not Cause Florida To Submit False Claims; The State Was Entitled To Any FFP Payments It Received.**

As noted, CMS has advised physicians and hospitals that they are "not precluded from referring Medicaid patients or from billing for designated health services" as a result of the Stark Law. 63 Fed. Reg. at 1704. Counts I and III assert that Defendants are nonetheless liable for fraudulently causing the State of Florida to submit false claims for FFP to the federal government. Relator relies (erroneously) upon 42 U.S.C. § 1396b(s), a provision of the Medicaid statute.[3] TAC ¶ 18. Under that provision, "*if*" Medicare and a state Medicaid program cover a designated health service "to the same extent and under the same terms and conditions," then "no payment shall be made" by the federal government to the state for FFP for the services in question. *Id.* (emphasis added).

Relator's argument fails for two separate reasons. First, under CMS's regulations, the State of Florida was plainly entitled to the FFP payments it received. Second, under the most straightforward interpretation of the statute, 42 U.S.C. § 1396b(s), has not been triggered.

*1.      Under CMS's Regulations, Florida Was Entitled To Any FFP Payments That It Received.*

Under 42 C.F.R. § 435.1002(a), *States are entitled to FFP even where a physician referral would have violated the Stark Law as to Medicare patients*. The regulation provides

_____

[3] This provision provides in pertinent part: "[N]o payment shall be made to a State under this section [Medicaid] for expenditures for medical assistance under the State plan consisting of a designated health service (as defined in [42 U.S.C. §1395nn(h)(6)]) furnished to an individual on the basis of a referral that would result in the denial of payment for service under title XVIII of this chapter [Medicare] *if* such title provided for coverage of such service *to the same extent and under the same terms and conditions as under the State plan. . . .*" 42 U.S.C. § 1396b(s) (emphasis added).

that "[e]xcept for the limitations and conditions specified in [other regulatory provisions], *FFP is available in expenditures for Medicaid services* for all beneficiaries whose coverage is required or allowed under this part [42 C.F.R. Part 435, concerning Medicaid]"). 42 C.F.R. § 435.1002(a) (emphasis added). There is no "limitation" or "condition" corresponding to 42 U.S.C. § 1396b(s) in the Medicaid regulations. Thus, Florida was entitled to the FFP payments that Relator challenges.

In 1998, CMS proposed a regulation that would have modified 42 C.F.R. § 435.1002(a) and added a new 42 C.F.R. § 435.1012(a), to implement 42 U.S.C. § 1396b(s). *See* 63 Fed. Reg. at 1727. The proposed regulations would have parroted the statutory language. *See id.* (proposing new 42 C.F.R. §§ 435.1002(a) & 435.1012(a)). CMS, however, never finalized the proposed regulation and has never implemented 42 U.S.C. § 1396b(s). *See* 66 Reg. 856, 859 (Jan. 4, 2001) ("We intend to issue Phase II of this rulemaking to cover the remainder of [the Stark Law], including its application to the Medicaid program, shortly"); 69 Fed. Reg. 16054, 16055 (March 26, 2004) ("[W]e are reserving the Medicaid issue for a future rulemaking with one exception").

With no regulation promulgated to revise 42 C.F.R. § 435.1002(a) and implement 42 U.S.C. § 1396b(s), Florida was entitled to the FFP payments under CMS's regulations. Although agency regulations do not trump statutes, regulations do interpret statutes and 42 U.S.C. § 1396b(s), is vague as to when states may not seek FFP payments. The most straightforward way to harmonize 42 C.F.R. § 435.1002(a) and 42 U.S.C. § 1396b(s) is that, subject to promulgation of a final regulation, CMS has indicated to states that they may view their Medicaid programs and Medicare as not providing coverage under the same "terms and

conditions" and may therefore submit requests for FFP.

    2.    ***42 U.S.C. § 1396b(s) Was Not Triggered Because Florida Medicaid And Medicare Do Not Provide Coverage Under The Same "Terms And Conditions."***

Even if 42 C.F.R. § 435.1002(a) were disregarded, and even if only 42 U.S.C. § 1396b(s) were considered, Florida was still entitled to the FFP payments because under the most straightforward interpretation, 42 U.S.C. § 1396b(s) was not triggered. The statute was not triggered because Florida Medicaid and Medicare do *not* provide coverage for hospital services "to the same extent" and "under the same terms and conditions," but under significantly different material terms.

The Florida Medicaid program covers only hospital services that are "medically necessary." Fla. Stat. Ann. § 409.905. Under Florida law, this requires that there must not be available anywhere within the state an "equally effective and more conservative or less costly treatment." Fla. Admin. Code 59G-1.010(166)(a); *see also* AHCA, "Florida Medicaid Hospital Services Coverage and Limitations Handbook" at 2-1 (December 2011) ("Hospital Handbook");[4] *Hunter v. Chiles*, 944 F. Supp. 914, 921-22 (S.D. Fla. 1996) (under Florida Medicaid, medical necessity requires no equally effective and more conservative or less costly treatment alternative).

By contrast, Medicare provides coverage even if there is a more conservative or less costly alternative. Medicare requires only that the services be "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed

---

[4] The handbook is incorporated into the Florida Administrative Code. *See* Fla. Admin. Code 59G-4.150 & 4.160. The AHCA has published the handbook at https://www.flrules.org/Gateway/reference.asp?No=Ref-01232 (last visited July 23, 2013).

body member." 42 U.S.C. §1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1); *see also Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 73-74 (2d Cir. 2006) (discussing "reasonable and necessary" standard). Medicare cannot deny coverage on grounds that a less costly treatment alternative is available. *See Hays v. Sebelius*, 589 F.3d 1279, 1282-83 (D.C. Cir. 2009).

The differences in the medical necessity definition are significant. Florida has elected to combat the risk of overutilization with a narrower definition of medical necessity. For Medicaid coverage, Florida requires that health care services be the least costly alternative or the least conservative alternative. 42 U.S.C. § 1396b(s), applies only where a state Medicaid program and Medicare provide coverage under the same terms and conditions, presumably because Congress recognized that a state has other ways to address potential overutilization. Florida's approach involves a narrower definition of medical necessity than Medicare uses.

Previously in this case, the United States stated that whether Medicare and a state Medicaid program provide coverage under the same "terms and conditions" depends on "whether Medicare covers the types of medical services at issue and whether the services at issue are properly characterized as 'designated health services; under both the federal and state rules." United States' Statement of Interest [Dkt. 38] at 5. Nothing in the text of legislative history of 42 U.S.C. § 1396b(s) supports the Government's interpretation of "terms and conditions," which is a less straightforward interpretation than Defendants' interpretation. The Government cited only a 1998 advisory opinion letter that CMS stated may not be "relied upon" by the public. [Dkt. 38-1] at 7. As noted, CMS has not issued a regulation interpreting 42 U.S.C. § 1396b(s) that could have resolved the interpretative issue.

Accordingly, because Florida Medicaid and Medicare do not provide coverage under

the same "terms and conditions," under the most straightforward interpretation of the plain language, 42 U.S.C. § 1396b(s) did not bar Florida's claims for FFP payments.

### 3. *Relator Has Failed To Allege Materiality.*

The interpretation of 42 U.S.C. § 1396b(s) may present an interesting academic debate, but even if the debate is resolved in Relator's favor, Counts I and III should still be dismissed because Relator has failed to allege materiality. That is, Relator has failed to allege that CMS would in fact have refused to pay Florida for FFP payments had it known of the facts alleged by Relator.

As the Eleventh Circuit has explained, it is not enough that a claim must be false. The falsity must also be "material" to the federal government's decision on whether to pay the claim in order for there to be a False Claims Act violation. *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1228-29 (11th Cir. 2012); *see also United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 799 (8th Cir. 2011) (affirming motion to dismiss where relator failed to plead that alleged falsity of claim would have been material to government's decision to pay the claim); *United States ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211, 1222 (10th Cir. 2008) (same).

Here, Relator has at most come up with a clever, novel legal theory under 42 U.S.C. § 1396b(s). But, tellingly, Relator has not alleged that CMS would have refused to honor Florida's requests for FFP payments had it known the facts alleged. As noted, under CMS regulations, 42 C.F.R. § 435.1002(a), Florida was entitled to the FFP payments. CMS never finalized the proposed 1998 regulation to implement 42 U.S.C. § 1396b(s) and amend 42 C.F.R. § 435.1002(a). Under these circumstances, Relator's failure to plead that the

allegations in the TAC would have been material to CMS's decision whether to pay FFP is a

fatal omission for Counts I and III.  Indeed, Relator has failed to allege a single instance in

which CMS has ever refused to pay FFP to a state even though Stark Law violations are

routinely brought to CMS's attention.[5]

> C.    **All Counts Should Be Dismissed For Failure To Plead Falsity, Due To
> The Regulatory Ambiguities.**

However Relator attempts to construe 42 U.S.C. § 1395nn, and however she attempts

to reconcile 42 C.F.R. § 435.1002(a) and 42 U.S.C. § 1396b(s), there can be no dispute that

the regulatory framework is exceptionally ambiguous.  An FCA case, however, cannot be

predicated on the alleged violation of an ambiguous law or regulation that has not been

subsequently clarified.  *See United States ex rel. Swafford v. Borgess Med. Ctr.*, 24 F. App'x

491 (6th Cir. 2001) ("Disputes as to the interpretation of regulations do not implicate False

Claims Act liability."); *United States ex rel. Lamers v. Green Bay*, 168 F.3d 1013, 1018 (7th

Cir. 1999) (no falsity where regulation is ambiguous); *United States ex rel. Jamison v.

McKesson Corp.*, 784 F. Supp. 2d 664, 676-77 (N.D. Miss. 2011) (same).

In *United States ex rel. Walker v. R&F Props. of Lake County*, 433 F.3d 1349 (11th

Cir. 2005), the Court held that the knowing violation of an ambiguous regulation could be an

FCA violation because there was extensive informal guidance explaining the regulation and

clarifying the ambiguity.  *See id.* at 1356-57.  Here, unlike *R&F Properties*, there are no

federal agency clarifications.  First, in 1998, discussing the proposed – but never finalized –

regulation to amend 42 C.F.R. § 435.1002(a) and implement 42 U.S.C. § 1396b(s), CMS

---

[5] CMS even has a formal Stark Law self-referral protocol for health care providers to self-disclose violations of
the Stark Law.  See http://www.cms.gov/Medicare/Fraud-and-
Abuse/PhysicianSelfReferral/Self_Referral_Disclosure_Protocol.html.

advised providers that "[w]e do not believe these [Stark Law] rules and sanctions apply to physicians and providers when the referral involves Medicaid services," and that physicians and hospitals are "not precluded from referring Medicaid patients or from billing for designated health services." 63 Fed. Reg. at 1704. Second, under 42 C.F.R. § 435.1002(a) as currently on the books, Florida was entitled to FFP payments even if all Relator's allegations are assumed to be true.

It is impossible to believe that CMS set a fraud trap for pediatric hospitals by assuring them that the Stark Law does not apply to Medicaid, and by permitting states to receive FFP under 42 C.F.R. § 435.1002(a). However the Court interprets these provisions, due to the regulatory ambiguities, Relator has failed to plead falsity and all counts should be dismissed.

**D.    No Court Has Previously Addressed These Arguments.**

Relator will likely rely upon *United States ex rel. Balid-Kunz v. Halifax Med. Ctr.*, No. 09-1002, 2012 WL 921147 (M.D. Fla. Mar. 19, 2012). In *Halifax*, the district court held, *inter alia*, that a complaint stated a cause of action against a hospital for causing Florida to submit false claims for FFP payments due to alleged Stark Law violations. Respectfully, that case was wrongly decided, and this Court is not bound by the decision of another district court. *See Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991).

The *Halifax* Court was not presented with the arguments Defendants present in this motion. The defendant did not explain the importance of 42 C.F.R. § 435.1002(a) or mention that in 1998, CMS expressly stated that the Stark Law does not preclude Medicaid referrals or billing. Furthermore, in *Halifax*, the relationship between the Stark Law and Medicaid was just one of many legal issues raised by the motion to dismiss, and was a comparatively

minor issue since the hospital treated both Medicare and Medicaid patients.  In this case, by

contrast, the relationship between the Stark Law and Medicaid is the key legal issue, and is

dispositive as to this entire case.  Under these circumstances, a fresh consideration of the

issues, without deference to the *Halifax* outcome, is warranted.

Defendants also note that in *Fresenius Med. Care Holdings v. Tucker*, 704 F.3d 935

(11th Cir. 2013), the Eleventh Circuit stated in *dictum* that the Stark Law "prohibits

physicians from referring their Medicare *and Medicaid patients* to business entities in which

the physicians or their immediate family members have a financial interest."  *Id.* at 937

(emphasis added).  As support, the Court cited only the Stark Law itself, 42 U.S.C. §

1395nn(a).  *See id.*  As noted above, however, under its plain language, the Stark Law itself

does not regulate referrals of Medicaid patients or billing for them.  *Supra* at 11-13.  In

addition, the Court did not address the interpretation of 42 C.F.R. § 435.1002(a) and 42

U.S.C. § 1396b(s), or even cite those authorities.  Accordingly, the *Fresenius dictum* has no

binding effect on any of the issues before this Court.  *See Edwards v. Prime, Inc.*, 602 F.3d

1276, 1298 (11th Cir. 2010) ("*dicta* is not binding on anyone for any purpose"); *Epolito v.*

*Prudential Ins. Co. of Am.*, 737 F. Supp. 2d 1364, 1381 n. 8 (M.D. Fla. 2010).

**III.    RELATOR HAS NOT PLED FINANCIAL RELATIONSHIPS BETWEEN ACH
AND PHYSICIANS, AND HAS NOT PLED REFERRALS OF DESIGNATED
HEALTH SERVICES TO THE OTHER DEFENDANTS, ACHS AND PPS.**

Even if 42 U.S.C. § 1396b(s) did apply (which it does not), Relator's allegations

regarding the emergency room physicians (¶¶ 27-33); hematology/oncology physicians (¶¶

34-38), pediatric surgeons (¶¶ 39-43), and the plastic surgeon (¶¶ 44-48), should be

dismissed because Relator has failed to state a violation of the Stark Law with respect to

those physicians.  For a Stark Law violation to occur:  (1) there must be a financial

relationship between a physician and an entity that does not fit within an exception; (2) the

physician refers Medicare patients to the entity for certain designated health services (*e.g.*,

hospital services); and (3) the entity billed for the improperly referred services.  *See* 42

C.F.R. § 411.353(a)-(b).

Here, Relator has failed to allege a "financial relationship" between ACH and the

emergency room physicians, the hematology/oncology physicians, the pediatric surgeons,

and the plastic surgeon.  All Counts should be dismissed for claims relating to patients

referred by those physicians.  In addition, all Counts should be dismissed as to PPS and

ACHS because there is no allegation that those two Defendants received referrals for the

provision of designated health services or billed for any such services.

**A.      Relator's "Fair Market Value" Allegations Do Not Establish A "Financial Relationship" Between ACH and Physicians.**

Relator has failed to allege a "financial relationship" between ACH and the referring

physicians, and thus has failed to allege a Stark Law violation.  CMS's Stark regulations

define two types of "financial relationships":  (1) ownership interests; and (2) compensation

arrangements.  *See* 42 C.F.R. § 411.354(a).  The TAC does not allege that any physician has

an ownership interest in any Defendant, leaving only the possibility of compensation

arrangements.  CMS's regulations sub-divide "compensation arrangements" into two

categories:  (1) "direct compensation arrangements"; and (2) "indirect compensation

arrangements."  42 C.F.R. § 411.354(a)(ii) & (c).

For a "direct compensation arrangement," remuneration must pass between ACH and

a physician "without any intervening person or entities."  42 C.F.R. § 411.354(c)(1)(i).

21

Relator has not alleged that remuneration passes directly between ACH and any of the physicians described above. To the contrary, the TAC alleges that PPS employs and pays the physicians. TAC ¶¶ 12, 19, 35, 36, 44, 50, 51, 57.

Thus, the only possible financial relationship between ACH and a referring physician is an "indirect compensation arrangement." *See United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 398, 407 (4th Cir. 2012). But to state an "indirect compensation arrangement," Relator must allege, among other things, that the referring physicians received "aggregate compensation from the … entity in the chain with which the physician has a direct financial relationship with [PPS] that *varies with, or takes into account, the volume or value of referrals or other business generated* by the referring physician for the entity furnishing the designated health services [ACH]." 42 C.F.R. § 411.354(c)(2)(ii) (emphasis added). The TAC, however, fails to allege facts necessary to establish that element of an indirect financial relationship.

### 1. *Alleging Above Fair-Market-Value Compensation Does Not Adequately Allege an Indirect Compensation Arrangement.*

Paragraphs 27 through 43 assert that PPS-employed emergency room physicians (¶¶ 27-33); hematology/oncology physicians (¶¶ 34-38), pediatric surgeons (¶¶ 39-43), were paid in excess of fair market value. This is not the same, however, as alleging that they were paid an amount that varies with or takes into account referrals to All Children's Hospital. Compensation in excess of fair market value and compensation that "varies with, or takes into account, the volume or value of referrals, or other business generated" are different concepts. There are many reasons why a physician may be compensated in excess of fair market value that have nothing to do with the volume or value of referrals or other business

generated.  For example, the employer may have misjudged the market and overpaid, or the local supply-and-demand conditions for physician labor in certain specialties may not be consistent with the survey data relied upon in the TAC.  Or there could be a pressing need to fill a position, driving up the salary.

Here, Relator does not allege that the salaries paid to the ER physicians, the hematology/oncology physicians, or the pediatric surgeons varied with or took into account the volume or value of referrals to ACH.  42 C.F.R. § 411.354(c)(2)(ii).  In the case of the ER physicians, Relator alleges poor management but nothing more.  TAC ¶¶ 27-33. Moreover, the suggestion that compensation paid to an employed ER physician might vary with or take into account the volume or value of referrals makes little sense; ER physician "referrals" to the hospital are dictated by the exigency of the circumstances in which their patients come in for treatment.  *See United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 93 (3d Cir. 2009) (explaining that hospital-based anesthesiologists do not make referrals).  And, there is no allegation that ER physicians make inpatient referrals to ACH, so there is no allegation that ER physicians admit patients who could be sent home.

Relator alleges that hematology/oncology physicians (who treat leukemia patients) generally make a "high volume" of referrals for blood work, imaging tests and chemotherapy.  TAC ¶ 34.  She also asserts that PPS paid Dr. Barbosa and Dr. Hale more than she thinks was fair market value, with Dr. Barbosa especially "driving a hard bargain." TAC ¶¶ 34-37.  Missing, however, is any allegation that PPS actually took into account the value or volume of these physicians' referrals when entering into agreements with them.

And, as to the pediatric surgeons, Relator acknowledges a shortage on the medical

staff. "ACH had only one pediatric surgeon on staff" and was forced to rely upon "*multiple non-employed locum tenens* physicians to maintain their staffing obligations to the Bayfront Medical Center trauma program." *Id.* ¶ 39 (emphasis added). The most reasonable inference from these allegations is that the compensation packages to the pediatric surgeons were dictated by market conditions, and there is no suggestion that the salaries paid to any of these physicians varied or took into account their referrals.

**2.    *No Indirect Compensation Arrangement With Dr. Gallant.***

The allegations regarding Dr. Gallant also do not establish a Stark Law violation. Relator states that the contract provided, "For the first nineteen (19) months of the Period of Active Employment, the Physician will be paid [$350,000] with an expectation that Physician perform at least 400 cases during the first year of the Period of Active Employment" and "potential bonus of $50,000 if he performed 495 procedures in his first year of employment." TAC ¶¶ 45-46. But nothing in the allegations state that such procedures had to be performed at ACH. *Id.* Accordingly, Relator has not established that the compensation "takes into account, the volume or value of referrals or other business generated by the referring physician *for the entity furnishing the designated health services* [ACH]." 42 C.F.R. § 411.354(c)(2)(ii) (emphasis added). The bonus offered to Dr. Gallant was a legitimate bonus based on his own productivity and hard work, not referrals to ACH.

**B.    There is No Allegation That Physicians Referred Patients To ACHS Or PPS For Designated Health Services, Or That ACHS Or PPS Billed For Designated Health Services.**

The TAC does not allege that any physician made referrals to ACHS or to PPS for designated health services. It also fails to allege that ACHS or PPS billed for designated

24

health services.  Although inpatient and outpatient hospital services are designated health services, 42 C.F.R. § 411.351, neither ACHS nor PPS is a hospital and neither provides hospital services.  TAC ¶¶ 12-13.  Thus, the TAC fails to allege a Stark Law violation on the part of either ACHS or PPS.  All claims against these two entities should be dismissed.

## CONCLUSION

For the foregoing reasons, the Third Amended Complaint should be dismissed with prejudice.

Dated:  July 26, 2013                                  Respectfully submitted,


                                                        /s/ Latour "LT" Lafferty
Jesse A. Witten (*pro hac vice*)                        Latour "LT" Lafferty, FBN 0975575
Mark H. M. Sosnowsky (*pro hac vice*)                   Fowler White Boggs P.A.
Drinker Biddle & Reath LLP                              501 E. Kennedy Blvd., Suite 1700
1500 K Street, NW, Suite 1100                           Tampa, FL  33602
Washington, DC 20005                                    Tel.:  (813) 222-1106
Telephone:  (202) 842-8800                              Fax:  (813) 384-2830
Facsimile:  (202) 842-8465                              ltlafferty@fowlerwhite.com
jesse.witten@dbr.com
mark.sosnowsky@dbr.com


                                                        *Attorneys for Defendants*


## CERTIFICATE OF SERVICE

I certify that on July 26, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.

                                                        /s/ Latour "LT" Lafferty
                                                        Latour "LT" Lafferty, FBN 0975575