**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE ) <br> OF FLORIDA *ex rel.* BARBARA SCHUBERT, ) <br>                                                                      ) <br> Plaintiffs,                                         ) <br>                                                                      ) <br> v.                                                                ) <br>                                                                      ) <br> ALL CHILDREN'S HEALTH SYSTEM, INC.,    ) <br> PEDIATRIC PHYSICIANS SERVICES, INC. and ) <br> ALL CHILDREN'S HOSPITAL, INC.,              ) <br>                                                                      ) <br> Defendants.                                    ) | Case No. 8:11-cv-1687-JDW-EAJ |

---

**RELATOR'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT**

---

Relator Barbara Schubert's Third Amended Complaint ("TAC") was filed in response to this Court's Order (Dkt. 44) dismissing her Second Amended Complaint for lacking specificity concerning false claims submitted to the government. The TAC now sets forth more than thirty specific Medicaid claims for procedures performed at All Children's Hospital which resulted from referrals by physicians whose compensation arrangements were impermissible under the Stark Statute. Nevertheless, in spite of Relator's identification of specific claims and substantial details outlining the reasons that the claims give rise to state and federal False Claims Act liability, Defendants have again moved for dismissal pursuant to Fed. R. Civ. P. Rules 9(b) and 12(b)(6), and have resurrected their unsupported argument that Medicaid providers are free to flaunt the Stark Statute with impunity.

In the TAC, Relator Barbara Schubert alleges that Defendants All Children's Health System, Inc., and its subsidiaries, Pediatric Physician Services, Inc. and All Children's Hospital,

Inc. (collectively "Defendants") violated the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*, by submitting or causing to be submitted false claims in violation of the Stark Statute ("Stark"). As described below, Defendants' assertions fail both legally and factually, and therefore their motion should be denied and the stay of discovery lifted so this case may proceed toward trial.

I.  **THE STARK PROHIBITIONS APPLY TO THE MEDICAID PROGRAM.**

In their Motion to Dismiss ("MTD"), Defendants argue that that Third Amended Complaint should be dismissed in its entirety because the Stark Statute does not apply to Medicaid. MTD at 11-20. In reviewing a motion to dismiss brought under Rule 12(b)(6), a court shall accept as true all factual allegations set forth in the complaint. *Amnesty Intern., USA v. Battle*, 559 F.3d 1170, 1176 (11th Cir. 2009). A complaint's factual allegations must "raise the right of relief above the speculative level," but the Rule "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise the reasonable expectation that discovery will reveal evidence" supporting the relator's claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The court must draw all reasonable inferences in favor of the plaintiff. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 n.1 (11th Cir. 1999).

The Stark referral prohibitions are applied to Medicaid through 42 U.S.C. § 1396b(s), which provides, in relevant part,

> Notwithstanding the preceding provisions of this section, no payment shall be made to a State under this section for expenditures for medical assistance under the State plan consisting of a designated health service (as defined in subsection (h)(6) of section 1395nn of this title) furnished to an individual on the basis of a referral that would result in the denial of payment for the service under subchapter XVII of this chapter if such subchapter provided for coverage of such service to the same extent and under the same terms and conditions as under the State plan….

Defendants present two flawed and unsupported theories to claim that Relator has misapplied 42 U.S.C. § 1396b(s) ("Section 1396b(s)"): (1) that the plain language of §1396(b)(s) does not apply Stark to Medicaid, and (2) even if it did, states are still permitted by regulation to seek FFP for claims that run afoul of Stark. Defendants' arguments regarding 42 U.S.C. § 1396b(s) are contrary to the language of the statute and all existing legal authority.

### A. The Plain Language of 42 U.S.C. § 1396b(s) Applies the Stark Statute Prohibitions to Medicaid's Federal Financial Participation Payments.

Under the Medicaid statute, the federal government provides money to assist states in paying for the cost of medical care for program beneficiaries such as the poor and the disabled. *See generally* 42 U.S.C. § 1396b. The federal government does not pay Medicaid providers directly, but reimburses each state for a portion of the state's Medicaid expenditures through a mechanism known as the Medicaid Federal Financial Participation ("FFP"). [1] *Id.* The amount of FFP varies from state-to-state and adjusts annually. TAC at ¶15.

Because each state determines which claims to pay, the reimbursement process exposes the government to potentially paying a portion of a claim for designated health services for a Medicaid recipient even though that claim may have resulted from an improper referral, and would have been rejected as violating the Stark Statute if it had been submitted directly to the federal government under the Medicare program. Section 1396b(s) remedies this potential inconsistency by creating a comparative standard: If a claim for a designated health service ("DHS") would have been denied because the related referral would have violated Stark had the DHS been covered by Medicare, then a state may not receive FFP for that same claim under the Medicaid program.

---

[1] The TAC refers to FFP by its alternate name, Federal Medical Assistance Percentage, or FMAP. The terms are synonymous, but for purposes of consistency with Defendants' MTD, Relator will use FFP in this Opposition.

3

The language of Section 1396b(s) is straightforward. Every judicial review of the section has determined that the provision exists to extend the scope of the Stark Statute to the Medicaid program. *See Fresenius Medical Care Holdings, Inc. v. Francois*, 832 F.Supp.2d 1364, 1367 (N.D.Fla. 2011)(citing to 42 U.S.C. § 1396b(s) for the proposition that, "The Stark law generally prohibits a physician from referring Medicare and Medicaid patients for designated health services with an entity in which the physician has a nonexempt financial interest."); *Osheroff*, No. 09-22253-CIV, 2012 WL 271264, at *1, n.2 (same); s*ee also* United States' Statement of Interest (Dkt. 59) at 4 (collecting cases).

Defendants offer only one portion of one sentence from a 1998 proposed rulemaking session to refute the plain language of Section 1396b(s). Defendants offer this proposed language as saying, "[W]e do not believe these [Stark Law] rule and sanctions apply to physicians and providers when the referral involves Medicaid services." MTD at 12, citing 63 Fed. Reg. 1659, 1704 (Jan. 9, 1998). However, Defendants' representation of CMS's statement is misleading and incomplete. The portion of that sentence which says "these rules and sanctions" is referencing *only* Section 1877 of the Social Security Act, the original Stark Statute that explicitly addresses Medicare. However, the proposed regulation continues beyond Defendants' excerpt and *the very next sentences* say,

> The first part of section 1903(s) [codified at 42 U.S.C. 1396b(s)] prohibits the Secretary from paying FFP to a State for designated health services furnished on the basis of a referral *that would result* in a denial of payment under Medicare *if* Medicare covered the services in the same way as the State plan. This part of the provision is strictly an FFP provision. It imposes a requirement on the Secretary to review a Medicaid claim, *as if* it were under Medicare, and deny FFP *if* a referral would result in the denial of payment under Medicare.

63 Fed. Reg. 1659, 1704 (emphasis in original). This is entirely consistent with the theory of liability identified in Relator's complaint. *See* United States' Statement of Interest at 5 ("[T]he

4

proposed regulation is consistent with the Relator's theory that the Defendants **caused** the State of Florida to submit false claims to the Federal Government.")(emphasis in original).

Even without applying directly to Medicaid providers, the Stark Statute creates a basis for an actionable violation of the False Claims Act. *See U.S. ex rel. Baklid–Kunz v. Halifax Hosp. Med. Ctr.*, 2012 WL 921147, at *4 (M.D. Fla. Mar. 19, 2012)("[T]he Plaintiff's theory in regard to the Medicaid claims is that the Defendants cause the state of Florida to submit false claims to the federal government for services furnished on the basis of improper referrals. This allegation is sufficient to survive a Rule 12(b)(6) challenge); *see also* United States' Statement of Interest at 3 ("If a Medicaid provider knowing or recklessly submits to a state Medicaid program claims for services that are prohibited by 42 U.S.C. 1396b(s) without disclosing the potential Stark issue, then that provider may be held liable under the FCA for causing the state Medicaid program to submit false claims for payment to the federal government.").

Defendants stress that there is not a corresponding regulation that "implements" 42 U.S.C. § 1396b(s). However, Defendants do not – and cannot – provide any authority for their position that a codified statute is unenforceable without a corresponding regulation. It is this critical flaw that renders meritless their argument regarding the plain language of Section 1396b(s).

### B. Defendants' Reconstruction of Section 1396b(s) is Illogical and Unsupported.

Defendants contend that, even if Section 1396b(s) applies the Stark Statute to Medicaid claims, the "statute was not triggered" because it requires an exacting point-by-point comparison wherein Stark would only apply to Florida Medicaid claims if each and every aspect of Medicare and Florida Medicaid were identical. MTD at 15. Because the plain language of the statute does not support this strained theory, Defendants take it upon themselves to rewrite the statute by

5

moving around key clauses to claim that "42 U.S.C. § 1396b(s) applies only where a state Medicaid program and Medicare provide coverage under the same terms and conditions…." MTD at 16.  To illustrate the point that there are differences in the two programs, Defendants engage in a hair-splitting exploration of the differences between "medically necessary" services covered by Medicaid versus "reasonable and necessary" services covered by Medicare.  MTD at 15.  This is an unnecessary exercise because the statute does not require this hyper-technical analysis.  *See* United States' Statement of Interest at 7-8.

Predictably, federal healthcare programs that are designed to protect separate and distinct classes of individuals will have unique terms, conditions, and covered services.  Reading Section 1396b(s) to prohibit such differences would render the statute meaningless because it could never be employed.  *In re Read*, 692 F.3d 1185, 1191 (11th Cir. 2012), citing *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001)(recognizing that a cardinal principal of statutory construction is to construe statutes so "no clause, sentence, or word shall be superfluous, void, or insignificant").

In fact, the very same proposed rulemaking session relied upon by Defendants also addresses this exact question:

> **3. How the referral rules apply when Medicaid-covered designated health services differ from the services covered under Medicare.**  The statute specifically provides that a State cannot receive FFP for a designated health service if it is furnished to an individual on the basis of a referral that would result in a denial of payment for the service under Medicare *if Medicare* covered the services to the same extent and under the same terms and conditions as under the State plan.  We believe this means that Congress was aware of differences in the two programs and specifically intended to cover under section 1877 designated health services as they are covered under a State's Medicaid plan whenever this coverage differs from coverage under Medicare.

63 Fed. Reg. 1659, 1704 (emphasis in original).  The language in the proposed rule makes clear that CMS believes that Section 1396b(s) reflects Congress' intent to be *inclusive* rather than *exclusive*.  *See also* United States' Statement of Interest at 7-8.  Defendants have sought to

6

preemptively dismiss the Government's carefully reasoned analysis on this issue. However, Defendants again fail to identify any authority which is inconsistent with the Government's position, or which supports Defendants attempted reconstruction of Section 1396b(s).

### C. The State of Florida Was Not Permitted to Collect FFP.

Defendants argue that even if Stark applies to Medicaid, Counts I and III should be dismissed because Florida *was* actually allowed to collect FFP for claims that would have violated the Stark Law as to Medicare patients. MTD at 13. Defendants rely entirely on a regulation discussing the broad grant of FFP, which provides that, subject to certain limitations, "FFP is available in expenditures for Medicaid services for all beneficiaries whose coverage is required or allowed under this part." 42 C.F.R. § 435.1002(a). Defendants read "this part" to mean the regulations exclusively, as opposed to the Medicaid program as a whole. MTD at 14.

Defendants' interpretation renders the second half of the regulation superfluous. If Reg. 435.1002(a) provided for FFP in *all* situations other than the enumerated exceptions, as Defendants contend, then there would be no need for the regulation to continue past the word "beneficiaries" – i.e. the same outcome could be reached if the regulation only said "Except for the [enumerated limitations and conditions], FFP is available in expenditures for Medicaid services for all beneficiaries." Rather, by including the phrase "whose coverage is required or allowed under this part," the regulation contemplates that there will be situations where the opposite is true – that coverage is *not* required or allowed – and that FFP is not available in those situations.

Defendants further argue that because there is not a regulation repeating the limitations of Section 1396b(s), then the grant of FFP in Regulation 435.1002(a) trumps the statutory language. Essentially, Defendants argue that the regulation and Section §1396b(s) are inconsistent and,

7

accordingly, the latter is unenforceable. This assertion violates every canon of statutory construction and Defendants provide no legal support for it. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 ("Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or *manifestly contrary to the statute*.")(emphasis added). Thus, if the provisions *were* in conflict, the statute would prevail as opposed to the regulation.

However, viewing the statute and regulation as complementary, rather than conflicting, allows full weight to be given to both. *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)("A court must interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into a harmonious whole.")(citations omitted). The prohibition in Section § 1396b(s) identifies a situation in which FFP coverage is *not* "required or allowed" – when a claim violates Stark. This is entirely consistent with Reg. 435.1002(a), which grants FFP where "coverage is required or allowed under this part." In other words, Section 1396b(s) places a limit on the broad grant of FFP provided in Reg. 435.1002(a). The two provisions work in unison to provide a complete view of FFP eligibility that is entirely consistent with Relator's theory.

### D. As a Result of Defendants' Erroneous Interpretation of Section 1396b(s), the Remainder of Defendants' Arguments Fail.

Defendants' materiality argument fails because it incorrectly concludes that Section 1396b(s) is somehow optional or discretionary. A false claim is material if it is capable of influencing the government's decision-making. *U.S. ex rel. Mathney v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1228 (11th Cir. 2012), citing *Neder v. U.S.*, 527 U.S. 1, 16 (1999). Relator need not have alleged "that CMS would in fact have refused to pay Florida for FFP payments had it known of the facts alleged by Relator." MTD at 17. Relator is obligated to allege that the

8

false statement *could* have influenced payment, not that it conclusively did. See *U.S. ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 799 (8th Cir. 2011)(holding that materiality requires the plaintiff to plead that conditions existed such that "if the government knew [the conditions] were not being followed, *might* cause it to actually refuse payment.") (emphasis added).

As Relator has pled, Section 1396b(s) provides an absolute prohibition against the payment of FFP for claims that run afoul of Stark: "[N]**o payment shall be made…**" *See also* United States' Statement of Interest at 3 ("[I]f a health care provider has a financial relationship with a physician that violates the Stark Statute, the federal government **will not** pay for Medicaid claims for designated health services that arise out of that relationship.")(emphasis added). Defendants' false certifications of Stark compliance *were* material because the government was not able to ascertain the proper information to make a decision on whether to pay the claims. *See Matheny*, 671 F.3d at 1229 (holding that falsely certifying compliance with a reporting obligation is a material misrepresentation). Had the government known about Defendants' Stark violations or that the certifications made to the state to induce payments were false, the Medicaid claims resulting from the improper referrals *would not* have been paid by the state or the federal government.

Likewise, a plain reading of Section 1396b(s) further undermines Defendants' falsity argument. Defendants' convoluted and unsupported misinterpretation of Section 1396b(s) has a singular purpose – to escape False Claims Act liability by claiming that the statute is so ambiguous that the falsity element is precluded as a matter of law. This argument fails for one major reason: there is no ambiguity in 42 U.S.C. 1396b(s). "Ambiguity suggests that reasonable persons can find different meanings in the same language." *Eberli v. Cirrus Design Corp.*, 615

9

F.Supp.2d 1369, 1372 (S.D.Fla. May 28, 2009), quoting *State v. Huggins*, 802 So.2d 276, 277 (Fla. 2001).

As detailed herein, there is only one interpretation of Section 1396b(s). The plain language of the statute, the full text of the proposed rulemaking, the full text of Regulation 435.1002(a), and every case to address the applicability of the Stark Statute to Medicaid have all reached the same conclusion. Defendants resort to rearranging the language to argue for an alternate interpretation. This statute has existed for nearly twenty years without a single legal authority even debating, let alone contradicting, its plain meaning – the Stark law applies to Medicaid. *Reeves v. Asture*, 526 F.3d 732, 734 (11th Cir.2008)("Statutory interpretation begins and ends with the text of the statute, so long as the text's meaning is clear.")

Finally, Defendants assert that prevailing case law and the rules of statutory construction do not apply here because no other court has entertained these novel theories before. Those courts reached their decisions without consideration of Defendants' theories for good reason: they are meritless.

**II.    ALL COUNTS IN THE THIRD AMENDED COMPLAINT SATISFY RULE 9(B).**

Claims brought under the False Claims Act must satisfy Fed. R. Civ. Pro. 8(a)(2) and must also be stated with particularity pursuant to Rule 9(b). *U.S. ex rel. Clausen v. Laboratory Corp. of America*, 290 F.3d 1301, 1308-09 (11th Cir. 2002). Rule 8(a)(2) requires a short and plain statement of the claim showing that a plaintiff is entitled to relief, thereby giving the defendants fair notice of the basis for relief. *Twombly*, 550 U.S. at 545-46. Rule 9(b) is satisfied if the complaint alleges "facts as to time, place, and substance of the defendants' alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Matheny*, 671 F.3d at 1222. The Eleventh Circuit has cautioned

that, "Rule 9(b) must not be read to abrogate Rule 8…and a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directive of Rule 9(b) with the broader policy of notice pleading." *Friedlander v. Nims*, 755 F.2d 810, 813 n.3 (11th Cir. 1985).

The Eleventh Circuit does not require that a complaint plead every conceivable detail of a fraud to satisfy Rule 9(b). *See U.S. ex rel. Hill v. Morehouse Medical Assoc.*, 82 Fed. Appx. 213, 2003 WL 22019936, at *4 (11th Cir. 2003). Rather, "some indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the government." *Clausen*, 290 F.3d at 1311 (emphasis in original). Rule 9(b) exists to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *U.S. ex rel. Singh v. Bradford Reg. Med. Ctr., et al.*, No. 04-186 ERIE, 2006 WL 2642518, at *2 (W.D. Penn. Sept. 13, 2006)(citations omitted).

Moreover, although Relator has provided specific claims data, such a level of detail is not necessarily required for a Stark case. Courts have found that relators alleging FCA violations predicated on a violation of the Stark law need not specifically identify the claims at issue when the falsity does not depend on any information on the face of the claim, but rather arises from the existence of the prohibited financial arrangement. *See, e.g., Singh*, No. 04-186 ERIE, 2006 WL 2642518 at *7-8. The pleading standard is further relaxed when a relator, as in the instant case, was a corporate insider with personal knowledge as to the fraudulent conduct. *Matheny*, 671 F.3d at 1230.

### A. The TAC Properly Alleges that False Claims Were Submitted to the Government.

Defendants seek dismissal of Counts I and III based on a purported failure to allege false claims with respect to the federal false claims act. The TAC has satisfied the Eleventh Circuit's Rule 9(b) pleading requirements with respect to these claims by establishing that claims were submitted to Medicaid – a federal government program. Specifically, the TAC provides detailed and specific examples of fraudulent claims that Defendants submitted to Medicaid, including claim numbers, the referring physician, diagnosis code, date of the service, the amount billed and the amount of Medicaid reimbursement received. TAC at ¶66. It also details the joint state-federal partnership and the percentage of a claim for which each entity is responsible. TAC at ¶¶ 14-18.

Notably, Defendants do not dispute that the TAC provides specific examples of false claims submitted to Medicaid. Rather, they assert that Relator does not properly allege that false claims were submitted *to the federal government*. This is a distinction without a difference, however, because submitting a false claim to Medicaid *is* submitting a false claim to the federal government. Florida's Agency for Health Care Administration ("AHCA") is merely the agency responsible for administering the federal Medicaid program. Simply, once a claim was submitted to FL AHCA, predicated by Defendants' certification of compliance with all federal laws (TAC at ¶ 17), there was no "stop" mechanism to prevent the claim from being submitted for FFP reimbursement to the federal government. That AHCA was the initial recipient of the claims does not alter the fact that Defendants submitted or caused to be submitted false claims to a federal healthcare program, thereby triggering FCA liability.

Because Relator pled sufficient claims details to establish that the Defendants were indeed reimbursed for the claims they submitted, it would be unreasonable conjecture to presume
12

that the State of Florida did not seek FFP from the federal government for the Medicaid claims. *See U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 192 (5th Cir.2009) (holding it would "stretch the imagination" for the doctors to continually record services that were not provided, but "to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed."). Even Defendants do not allege this implausible result.

By pleading the details of the Medicaid program and providing reimbursement figures showing that the claims were paid, Relator has satisfied the Rule 9(b) standard for showing that false claims were submitted to (and paid by) the federal government. Significantly, the amount of extensive information found in the TAC far exceeds the detail provided in other complaints that the Eleventh Circuit has deemed to be sufficient. *See U.S. ex rel. Walker v. R&F Properties of Lake County, Inc.,* 433 F.3d 1349, 1360 (11th Cir. 2005).

### B. Defendants Reliance on Off-Label Marketing Cases is Misplaced.

Defendants improperly rely on cases where courts have dismissed *qui tam* complaints alleging that pharmaceutical companies engaged in off-label marketing in violation of federal regulations. These cases are readily distinguishable from the instant case because those complaints were purely speculative and failed to allege that the fraudulent conduct actually led to *any* claims being submitted to the government.

Both *Hopper v. Solvay Pharmaceuticals, Inc*., 588 F.3d 1318 (11th Cir. 2009), and *U.S. ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc*., 707 F.3d 451 (4th Cir. 2013), involve allegations of a pharmaceutical company's off-label marketing scheme wherein the relators alleged the scheme generally but did not make the connection that any unlawful claims were submitted to the government as a result of the off-label promotions. *See Hopper*, 588 F.3d at 1326 (the court was "unable to discern from the complaint a specific person or entity that is

alleged to have presented a claim of any kind, let alone a false or fraudulent claim" and the "complaint does little more than hazard a guess that unknown third parties submitted false claims for Medicaid reimbursement.") and *Nathan*, 707 F.3d at 458 (the relator did not plausibly allege that the targeted doctors "wrote any off-label prescriptions that were submitted to the government for payment.")

The conclusory assumptions and inference which proved fatal in *Hopper* and *Nathan* are not present in this case. The TAC specifically identifies dozens of false claims that Defendants submitted to the Medicaid program as a result of improper referrals by the identified physicians. *Id*. at ¶¶ 33, 38, 43, 48, 55, 60, 66. It further identifies the reimbursement amount that was paid for each of those claims and that Defendants were fully aware that submitting their fraudulent claims to the State of Florida would cause unlawful claims to be submitted to the federal government. *Id*. at ¶¶ 66, 72, 90. As such, reliance on the off-label cases is misplaced.

## III. RELATOR ADEQUATELY PLED FINANCIAL RELATIONSHIPS FOR ALL DEFENDANTS.

### A. The Third Amended Complaint Identifies an Indirect Compensation Arrangement between All Children's Hospital and the Identified Physicians.

Defendants seek to dismiss all allegations against certain physicians[2] based on an alleged failure to identify a financial relationship between those physicians and All Children's Hospital. The financial relationships at issue in the instant case are mostly indirect compensation arrangements.[3]  Defendants' argument rests solely on whether Relator has adequately pled the

---

[2] Defendants do not include the pediatric cardiology group nor the pediatric neurosurgeons in this section. The TAC satisfactorily identifies both direct and indirect compensation arrangements related to these physicians.

[3] An indirect compensation arrangement exists if: (1) there is an unbroken chain of financial relationships between the entity furnishing DHS and the referring physician; (2) the referring physician receives compensation from entity in the chain with which the physician has a direct financial relationship that varies with, or takes into consideration, the volume or value of referrals or other business generated for the entity furnishing DHS by the referring physician; and (3) the entity furnishing DHS had actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the business generated for the entity furnishing DHS by the referring physician. 42 C.F.R. 354(c)(2)(i)-(iii).

second requirement of an indirect compensation arrangement: that the physicians' compensation varied with or took into account the volume or value of referrals, or other business generated for All Children's Hospital. Defendants essentially argue that Relator did not meet this standard because "alleging above fair market value compensation does not adequately allege an indirect compensation arrangement" because there may be other reasons as to why a physician was paid in excess of fair market value. MTD at 22-23.

      Relator repeatedly alleges the compensation arrangements were motivated by the referrals that would flow from the physicians' employment. *See*, e.g., TAC at ¶1 ("The plan was simple – pay whatever it takes to guarantee that the medical procedures, ancillary services and referrals were directed to All Children's Hospital) and TAC at ¶2 ("Multiple physicians were hired at salaries that far exceeded fair market value *without justification*")(emphasis added). Relator also includes practice-specific allegations throughout the complaint which address the motivation for offering inflated salaries. For example, Relator alleged that Bill Horton specifically wanted to employ the ER physicians to "control the front door" – a phrase which plainly means to control the number of admissions to All Children's Hospital – and that the resulting salaries to the ER physicians were "not based on the physicians' productivity." TAC at ¶¶27, 29. Similarly, Relator's allegations regarding the *locum tenens* surgeons indicate that the hospital was adequately meeting its staffing requirements and there was *not* a "pressing need" to employ physicians which would justify salaries exceeding fair market value. TAC at ¶39. These are far more than allegations of mismanagement or misjudging of the market; these are conclusive statements that the salaries paid to the identified physicians were determined and approved in anticipation of the volume or value of referrals that would flow to All Children's Hospital as a result of the physicians' employment.

Defendants also entirely disregard the paragraph of Relator's complaint that explains that the variable compensation and bonuses provided to Dr. Michael Gallant were directly related to procedures – and the resulting referrals – at All Children's Hospital. *See* TAC at ¶47 ("Based on conversations and observations, Relator understood that Gallant's contract was structured so that Gallant's base salary would be increased only if he could increase the number of procedures performed <u>at All Children's</u> by a significant margin.")(emphasis added.) Defendants may later assert that Dr. Gallant's bonus was based on personally performed services, but the TAC unquestionably establishes that his base salary met the standard for an indirect compensation arrangement.

**B. Having Established the Existence of an Indirect Financial Relationship, Defendants Seek to Burden Relator with Improper Pleading Standards.**

In seeking to justify the excessive compensation, Defendants place improper pleading standards on Relator. Although Defendants separate the two, this argument is directly related to Defendants' assertion that Relator failed to satisfy Rule 9(b) by not identifying potential alternative reasons for Defendants providing salaries that grossly exceed fair market value. However, Defendants' arguments fail under both Rule 9(b) or Rule 12(b)(6) because Relator pleads the fair market valuation with the requisite specificity and is not required to anticipate and refute any Stark exceptions that Defendants may raise as defenses.

Defendants rely singularly on *U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2012 WL 2871264 (S.D. Fla. July 12, 2012), for the proposition that Relator must plead fair market value allegations with specificity. Unlike the *Osheroff* relator, Relator *did* include factual allegations which identify the appropriate fair market valuation with specificity. Relator provides elaborate details as to the methodology used to determine the appropriate salary range for newly-acquired physicians. TAC at ¶ 21. Relator conducted extensive research and

16

determined that it was appropriate to use a median of three nationwide salary surveys to determine fair market value for pediatric physician salaries. *Id.* Relator's findings were developed into a detailed compensation plan which was reviewed and approved by the PPS Board of Directors, effective October 1, 2007. TAC at ¶ 22. The Board of Directors' approval validated both Relator's methodology for determining fair market value and Relator's determination that the appropriate range of compensation was within the 25th to 75th percentiles for each pediatric practice group. Finally, Relator identified the resulting fair market value range for each practice group at issue. TAC at ¶ 32, 37, 42 and 54.

These are far more than "conclusory allegations." Rather, these are clear factual assertions that must be taken as true in this stage of the pleading. Though Defendants may now launch attacks on the approved methodology in an attempt to show that their conduct qualifies for a Stark exception, a Motion to Dismiss is not the appropriate forum for that argument (which actually emphasizes the need for discovery on this issue). There is no question that Relator pled with specificity the details of the fair market valuations that were used in acquiring the identified physicians.

Having pled with specificity that an improper financial relationship exists, the burden shifts to the defendant to establish that the conduct was permitted by an enumerated Stark exception, such as the indirect compensation exception. *U.S. ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 395, 405 (4th Cir. 2012). The indirect compensation exception removes a financial relationship from the Stark referral prohibition if the compensation *is* consistent with fair market value and is not determined in a manner that takes into account the volume or value of referrals. 42 C.F.R. § 411.375(p).

17

Defendants attempt to place this burden back on Relator by asserting that she must address potential other reasons for Defendants' excessive compensation arrangements. This is not Relator's obligation. Defendants' repeated, yet unsupported, explanations for the physicians' salaries are clearly attempts at establishing this exception and are not part of Relator's *prima facie* case. Of note, Defendants do not identify their attempted explanations as an exception, but failure to use the proper terminology does not make it any less accurate.

Exceptions to the Stark Statute are affirmative defenses. *See U.S. ex rel. Baklid–Kunz v. Halifax Hosp. Med. Ctr.*, 2012 WL 921147 (M.D. Fla. Mar. 19, 2012) ("[W]hile the Stark Amendment sets forth these exceptions, nothing in its language requires that the applicability of such exceptions be denied in the initial pleadings. And the Defendants have not cited to any cases imposing such a requirement. Rather, these exceptions would appear to be affirmative defenses that must be raised by the Defendants."); s*ee also U.S. ex rel. Singh v. Bradford Regional Med. Center*, 752 F. Supp. 2d 602, 629 (M.D. Penn. 2010) ("[W]e conclude that the burden of establishing whether a fixed compensation arrangement is consistent with fair market value rests with the defendant when raising an exception."). Defendants have not identified any legal support for their position that Relator must have anticipated and preemptively pled around Defendants' possible defenses in her complaint. As such, this attempted burden-shifting should be rejected.

### C. Defendants All Children's Health System, Inc. and Pediatric Physician Services, Inc. Participated in the Scheme and Therefore Caused All Children's Hospital, Inc. to Submit False Claims to the State of Florida and the United States.

Defendants' efforts to dismiss all claims against All Children's Health System, Inc. ("ACHS") and Pediatric Physician Services, Inc. ("PPS") demonstrate a failure to understand the "caused to be submitted" language of both the federal and Florida False Claims Acts. Relator

need not have alleged that any physician made referrals to PPS or ACHS, or that the entities submitted bills for DHS. Rather, Relator very clearly established that both entities were critical cogs in the wheel that *caused* false claims to be submitted to the government. Relator pled that (1) ACHS owned and operated both ACH and PPS (TAC at ¶¶ 11-13); (2) that the physicians were employed by PPS, whose singular purpose was to provide physicians for All Children's Hospital (TAC at ¶ 12), (3) that William Horton and Gary Carnes were employed by ACHS or ACH, but conducted employment negotiations on behalf of PPS (TAC at ¶ 23), and (4) that ACH, not PPS, provided certain incentives directly to the physicians, such as the unlimited legal services in the event the cardiologists were sued for breach of contract by a previous employer (TAC at ¶51). Relator further alleges that each corporate entity was complicit and aided in the success of the scheme by transferring millions of dollars from ACH – the direct beneficiary of the lucrative referral increase – through ACHS to PPS – the entity suffering the losses from the exorbitant physician salaries. TAC at ¶3.

Relator has undisputedly pled an unbroken chain among all three defendants and established conduct contributing to the submission of false claims by all three entities. Defendants do not offer any law or theories which would justify dismissing any claims against All Children's Health Systems, Inc. or Pediatric Physician Services, Inc. *See generally U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp.2d 1017, 1049 (S.D. Tex. Aug. 18, 1998)(discussing the liability of corporate parent companies and holding that discovery should be pursued before such dismissals can be determined).

## IV. CONCLUSION

For the foregoing reasons, Relator respectfully requests that this Court find that Relator has met all of her pleading standards and DENY Defendants' Motion to Dismiss Relator's Third Amended Complaint in its entirety.

Respectfully submitted this 12th day of August, 2013,

/s/  Christopher C. Casper_____
Christopher C. Casper
Fla. Bar No. 048320
ccasper@jameshoyer.com
Jillian Levy Estes
Fla. Bar No. 055774
jestes@jameshoyer.com
Sean P. Keefe
Fla. Bar No. 413828
skeefe@jameshoyer.com
JAMES, HOYER, NEWCOMER & SMILJANICH, P.A.
4830 West Kennedy Blvd.
One Urban Center, Suite 550
Tampa, FL   33626
Tel. 813-397-2300
Fax  813-397-2310

*Counsel for Relator Barbara Schubert*

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2013, I served all parties of record with Relator's Memorandum in Opposition to Defendants' Motion to Dismiss Third Amended Complaint via the CM/ECF system.

/s/  Christopher C. Casper_____
Christopher C. Casper