UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA and
STATE OF FLORIDA *ex rel.*
BARBARA SCHUBERT,

      **Plaintiff,**

**vs.**                                         **Case No. 8:11-cv-01687-T-27EAJ**

**ALL CHILDREN'S HEALTH SYSTEM, INC.,**
**et al.,**

      **Defendants.**
_____/

## ORDER

      **BEFORE THE COURT** is Defendants' Motion to Dismiss Third Amended Complaint (Dkt. 58). Relator responded in opposition (Dkt. 60). With leave of Court, Defendants filed a reply (Dkt. 64) and the United States filed a statement of interest (Dkt. 59). Upon consideration, the motion (Dkt. 58) is GRANTED *in part* and DENIED *in part*, and the stay on discovery (Dkt. 32) is LIFTED. Specifically, the motion is granted to the extent that the claims concerning or related to Dr. Michael Gallant are dismissed with prejudice. In all other respects, the motion is denied.

## I.    INTRODUCTION

      Barbara Schubert ("Relator") brings this action under the *qui tam* provisions of the federal False Claims Act and the Florida False Claims Act. Defendants are related corporate entities that collectively operate All Children's Hospital in St. Petersburg, Florida (Dkt. 45 ¶¶ 11-13). Defendant All Children's Health System, Inc. ("ACHS") is an umbrella corporation that operates and manages the Hospital (*id.* ¶ 11). Defendants Pediatric Physician Services, Inc. ("PPS") and All Children's

Hospital, Inc. ("ACH") are wholly owned and operated by ACHS (*id.* ¶¶ 12-13). PPS manages physician staffing of the Hospital and is responsible for "on-boarding" newly hired physicians and practice groups (*id.* ¶ 12). ACH is responsible for the day-to-day management of the Hospital, including "making claims and receiving payments for services rendered pursuant to government healthcare coverage" (*id.* ¶ 13).

From 1998 to 2011, Relator was the Director of Operations for PPS (*id.* ¶ 10). In that role, she was privy to all "on-boarding" information for each physician hired by PPS, including the "employment contract, side letters, and any other relevant employment documents to set up the physicians on payroll with the appropriate salary and agreed-upon perks" (*id.*). In 2007, Relator was tasked with creating a new compensation plan for physicians working at the Hospital, which was to include base compensation rates and a proposed bonus incentive plan (*id.* ¶ 21). Relator alleges that during her research in preparing the compensation plan, she discovered that there was not a nationwide or regional commercial salary survey that accurately reflected the composition of the Hospital's employed staff (*id.*). Rather than relying on a single survey, Relator drew from three nationwide salary surveys to determine a fair market value and comparative salary range for physicians and specifically for pediatric subspecialists (*id.*). She alleges that taking the median salary ranges of these three surveys provides the most realistic market comparison for pediatric physician salaries (*id.*).

With this information, Relator developed a compensation plan under which guaranteed base salary for physicians would not exceed the 75th percentile or fall below the 25th percentile of the median salary range calculated from the nationwide surveys (*id.* ¶ 22). She alleges that she could not find any data to support exceeding the 75th percentile of national salary ranges, and so she

determined the 75th percentile was a reasonable ceiling on physician salaries (*id.*). Relator's compensation plan was approved by the Board of Directors of PPS and took effect October 1, 2007 (*id.*).

Relator alleges that despite this plan, William Horton and Gary Carnes, the Vice President of Strategic Business Services of ACHS and CEO of ACHS, ignored Relator's new compensation plan while aggressively recruiting pediatric physicians and practice groups (*id.* ¶ 23). According to Relator, each new compensation agreement arranged by Horton or Carnes resulted in a net operating loss to PPS, but a financial boon to the Hospital due to the physicians' referrals (*id.*). Relator extensively details the alleged overcompensation of pediatric subspecialists and practice groups by PPS in excess of the 75th percentile of nationwide salaries, contrary to Relator's compensation plan (*see, e.g., id.* ¶¶ 29, 32, 35-37, 41-42). In total, PPS hired at least seventy-five physicians over three years, nearly one-third of whom were paid above the 75th percentile of nationwide salary range (*id.* ¶¶ 61-62, 69). Relator alleges these overcompensated physicians made referrals to the Hospital that resulted in the submission of false claims to the State of Florida and the United States (*e.g. id.* ¶ 43).

The gist of Relator's theory of liability is that each claim submitted by the Hospital as a result of an overcompensated physician's referral is false because the compensation scheme violates the Stark Amendment's prohibition on "financial relationships" between entities and referring physicians. Relator has characterized her theory as "an underlying statutory violation that taints all resulting claims" (Dkt. 35 at 10).

The Third Amended *Qui Tam* Complaint asserts four causes of action against Defendants. Count I alleges "financial relationships" between the physicians and Defendants in violation of the Stark Amendment, and that all claims submitted by Defendants to Medicaid as a result of referrals

3

by seventeen specific physicians[1] were thereby false claims in violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B) (*id.* ¶¶ 68, 71, 73). Count II alleges violations of the Florida False Claims Act on the same grounds (*id.* ¶¶ 76-78). Count III alleges Defendants violated the False Claims Act by offering and paying volume-based bonuses intended to increase physicians' referrals to the Hospital in violation of the Stark Amendment (*id.* ¶ 82). The illegal bonuses were allegedly offered to four pediatric neurosurgeons, who are listed in Paragraph 83 of the Third Amended *Qui Tam* Complaint (*id.* ¶ 83). These bonuses allegedly violate §§ 3729(a)(1)(A) and 3729(a)(1)(B) (*id.* ¶ 85). Finally, Count IV alleges violations of the Florida False Claims Act based on the conduct alleged in Count III.

Defendants' motion to dismiss the Third Amended *Qui Tam* Complaint centers around three primary arguments (*see* Dkt. 58). First, Defendants argue that the Third Amended *Qui Tam* Complaint does not allege violations of the False Claims Act with the particularity required by Federal Rule of Civil Procedure 9(b). Second, Defendants argue that the Third Amended *Qui Tam* Complaint must be dismissed because it is premised on erroneous regulatory interpretations, that is, the complaint alleges violations of the Stark Amendment through submission of claims to Medicaid, whereas the Stark Amendment regulates only the referral of Medicare patients. Third, Defendants argue that Relator does not adequately allege "financial relationships" in violation of the Stark Amendment. Because the first and third arguments rely to some degree on the outcome of the second argument, the applicability of the Stark Amendment to Medicaid will be discussed first.

---

[1]The names of these seventeen physicians are found in a table in Paragraph 71 of the Third Amended *Qui Tam* Complaint.

## II.   STANDARD

To state a claim under the False Claims Act, a relator must satisfy two pleading standards. First, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This rule does not require detailed factual allegations, but it demands more than an unadorned, conclusory accusation of harm. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must "plead all facts establishing an entitlement to relief with more than 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although it is axiomatic that the Court must accept as true all of the allegations contained in the complaint, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "[L]egal conclusions can provide the framework of a complaint, [but] they must be supported by factual allegations." *Id.* at 679.

A False Claims Act complaint must also "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002). The particularity requirement of Rule 9(b) is satisfied if the complaint alleges "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (citing *Clausen*, 290 F.3d at 1310). Generally, in order to plead the submission of a false claim with particularity, "a relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012).

III.   **DISCUSSION**

    A.    **Medicaid, Medicare, the Stark Amendment, and the False Claims Act.**

        *1.*    *Medicaid*

Medicaid is a joint federal-state program that provides health coverage and benefits to the poor and disabled (Dkt. 45 ¶ 14). *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990); *Bowen v. Massachusetts*, 487 U.S. 879, 883 (1988). Under the Medicaid program, the federal government does not pay Medicaid providers directly. *See Wilder*, 496 U.S. at 503. Rather, Medicaid providers submit claims for payment to the States, which pay the claims and then seek partial reimbursement from the federal government. *See id.* The federal payment to the State is often referred to as "federal financial participation" or "FFP." *See Bowen*, 487 U.S. at 883.[2] Florida's Medicaid program is administered by the Florida Agency for Health Care Administration ("AHCA") with oversight by the federal Centers for Medicare and Medicaid Services ("CMS").

        *2.*    *Medicare*

Medicare, on the other hand, is an entirely federal program. More specifically, it is a federally subsidized health insurance program for the elderly and disabled administered by the Secretary of Health and Human Services. *Fischer v. United States*, 529 U.S. 667, 671 (2000); *Heckler v. Ringer*, 466 U.S. 602, 605 (1984); *see* 42 U.S.C. § 1395 *et seq.* Under Medicare, participating health care organizations receive federal funds on a periodic basis in exchange for rendering services. 42 U.S.C. §§ 1395g, 1395*l*; *Fischer*, 529 U.S. at 673. Although Medicare disbursements occur on a periodic basis, often in advance of a provider rendering services, the funds disbursed are calculated based on

---

[2]FFP is also sometimes referred to by its alternate name: "Federal medical assistance percentage" or "FMAP." *See* 42 U.S.C. § 1396b(a)(1). The terms are synonymous, but FFP will be used for consistency.

information provided to HHS by Medicare providers. § 1395g(a); *Fischer*, 529 U.S. at 673; *see Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 91 (1995) ("Under the Medicare reimbursement scheme . . . participating hospitals furnish services to program beneficiaries and are reimbursed by the Secretary through fiscal intermediaries.").

### 3.     *The Stark Amendment*

The Stark Amendment is codified at 42 U.S.C. § 1395nn, in the Subchapter of Title 42 governing Medicare. It "was enacted to address overutilization of services by physicians who stood to profit from referring patients to facilities or entities in which they had a financial interest." *U.S. ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 397 (4th Cir. 2012). Generally, the Stark Amendment prohibits a physician who has a "financial relationship" with an entity–such as a hospital–from making a "referral" to that hospital for the furnishing of certain "designated health services" for which payment may be made by the United States under the Medicare program. *Id.*; *see* § 1395nn(a)(1); 42 C.F.R. § 411.353(a). Hospitals are prohibited from submitting a claim to Medicare for payment for a service rendered pursuant to a prohibited referral. § 1395nn(a)(1)(B); § 411.353(b); *see Drakeford*, 675 F.3d at 397-98.

The Stark Amendment defines "a 'financial relationship' to include a 'compensation arrangement' in which 'remuneration' is paid by a hospital to a referring physician 'directly, indirectly, overtly or covertly, in cash or in kind.'" *Drakeford*, 675 F.3d at 398 (quoting §§ 1395nn(a)(2), (h)(1); § 411.354). The regulations implementing the Stark Amendment provide exceptions to the "financial relationship" rule, including certain compensation arrangements. Relevant to this case, indirect compensation arrangements do not constitute a "financial relationship" if the compensation is (1) equal to the "fair market value for services and items actually provided";

7

(2) "not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician" for the hospital; and (3) "commercially reasonable." 42 C.F.R. § 411.357(p).

### 4.     *The False Claims Act*

The False Claims Act allows private citizens to file a civil action on behalf of the United States Government against any person who

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [to the United States Government];
>
> (B) knowingly makes, uses, or causes to be made or used, a false or fraudulent claim; [or]
>
> (C) conspires to commit a violation of (A) [or] (B) . . . .

31 U.S.C. § 3729(a)(1)(A)-(C) (2009). The False Claims Act reaches "all fraudulent attempts to cause the Government to pay out sums of money," and a "claim is within the purview of the False Claims Act if it is grounded in fraud which might result in financial loss to the Government." *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975).[3]

### B.     A Violation of the False Claims Act May Be Predicated on the Submission of False Medicaid Claims.

Relator alleges that all of the claims submitted by Defendants to the State of Florida under Medicaid, which were then passed on to the United States for consideration in determining FFP, are false claims under § 3729 because the claims were generated by referrals from physicians with "financial relationships" with Defendants in violation of the Stark Amendment. Defendants' main

---

[3]In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit handed down on or before September 30, 1981.

argument in support of dismissal is that a False Claims Act claim arising from a violation of the Stark Amendment cannot be premised on the submission of false Medicaid claims, as opposed to Medicare claims. Defendants reason that because § 1395nn is located in the Subchapter governing Medicare, it is not applicable to Medicaid and, therefore, there is no corresponding prohibition on "financial relationships" with regard to Medicaid claims.

  **1.**    ***Relator Adequately Alleges Defendants Violated Federal Law by Submitting Medicaid Claims that Violate the Stark Amendment.***

  The Stark Amendment "prohibits physicians from referring their Medicare *and Medicaid* patients to business entities in which the physicians or their immediate family members have a financial interest." *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 937 (11th Cir. 2013) (emphasis added). Defendants are generally correct that the Stark Amendment applies to Medicare claims,[4] but the referral prohibitions codified in the Stark Amendment also apply to Medicaid through 42 U.S.C. § 1396b(s). That provision prohibits FFP payments to States when the designated health service was provided "on the basis of a referral that would result in the denial of payment for the service under subchapter XVIII of this chapter if such subchapter provided for coverage of such service to the same extent and under the same terms and conditions as under the State plan." § 1396b(s). Subchapter XVIII governs the Medicare program,[5] including the Stark Amendment. The substantive prohibitions contained in the Stark Amendment are therefore applicable to claims submitted to Medicaid through § 1396b(s), and Relator has adequately alleged federal and Florida

---

[4] *See* §§ 1395nn(a)(1)(A), 1395nn(a)(1)(B), 1395nn(e), 1395(e)(2).

[5] *See* 42 U.S.C. §§ 1395a–1395kkk.

False Claims Act violations.[6] *Accord U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2012 WL 2871264, at *1 n.2 (S.D. Fla. July 12, 2012); *U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, No. 6:09-cv-1002-Orl-31DAB, 2012 WL 921147, at *4 (M.D. Fla. Mar. 19, 2012); *Fresenius Med. Care Holdings, Inc. v. Francois*, 832 F. Supp. 2d 1364, 1367 (N.D. Fla. 2011).

Defendants' argument that commentary to a rule proposed, but never adopted, by the Health Care Financing Administration in 1998 prevents application of the Stark Amendment to Medicaid is unavailing. But a rule proposed, but never finally adopted, has no binding force,[7] especially when it conflicts with the plain language of the statute conferring legislative authority. *See United States v. Poly-Carb, Inc.*, 951 F. Supp. 1518, 1528 n.11 (D. Nev. 1996) ("[T]he proposed rule is just that, a proposed rule, and the EPA's opinion therefore has only persuasive value, . . . ."); *Mendell in Behalf of Viacom, Inc. v. Gollust*, 909 F.2d 724, 734 n.2 (2d Cir. 1990) (holding that proposed regulations do not govern the outcome of a case). *See generally K Mart Corp. v. Cartier*, 486 U.S. 281, 292 (1988) ("If the agency regulation is not in conflict with the plain language of the statute, a reviewing court must give deference to the agency's interpretation of the statute.").

Even if the proposed rule governed, the language cited by Defendants must be considered in its proper context. Defendants refer to the HCFA's statement that "we do not believe these rules and sanctions apply to physicians and providers when the referral involves Medicaid services." 63 F.R.

---

[6]The Florida False Claims Act is modeled after and tracks the language of the federal False Claims Act. *U.S. ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1033 n.5 (S.D. Fla. 2007); *U.S. ex rel. Mueller v. Eckerd Corp.*, 1998 U.S. Dist. LEXIS 23500, at *3 (M.D. Fla. Oct. 2, 1998), *approved and adopted* 35 F. Supp. 2d 896 (M.D. Fla. 1999). The same standards are applied to evaluations of claims under both statutes.

[7]Proposed rules may be accorded persuasive weight if they do not conflict with enacted statutes and regulations. *See Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.16 (1988).

1659-01, 1704 (Jan. 9, 1998). When the entire paragraph addressing referral prohibitions is examined, however, it is apparent that the Stark Amendment referral limitations apply with equal force to Medicaid:

> Absent an exception, section 1877(a)(1) in general prohibits a physician from making a referral to an entity with which he or she has a financial relationship for the furnishing of a designated health service covered under Medicare. The entity, in turn, may not present a claim to Medicare or bill any other individual or entity for the service furnished as the result of a prohibited referral. If physicians or entities violate these rules, they are subject to certain sanctions under section 1877(g). However, we do not believe these rules and sanctions apply to physicians and providers when the referral involves Medicaid services. The first part of section 1903(s) *prohibits the Secretary from paying FFP to a State for designated health services furnished on the basis of a referral that would result in a denial of payment under Medicare if Medicare covered the services in the same way as the State plan*. This part of the provision is strictly an FFP provision. It imposes a requirement on the Secretary to review a Medicaid Claim, as if it were under Medicare, and *deny FFP if a referral would result in the denial of payment under Medicare*. Section 1903(s) does not, for the most part, make the provisions in section 1877 that govern the actions of Medicare physicians and providers . . . apply directly to Medicaid physicians and providers. As such, these individuals and entities are not precluded from referring Medicaid patients or from billing for designated health services. A state may pay for these services, *but cannot receive FFP for them*.

63 F.R. 1659-01, at 1704. In other words, CMS cannot pay FFP for services provided under Medicaid if the payment would be prohibited under Medicare due to an illegal referral in violation of the Stark Amendment. Certifying compliance with the Stark Amendment to ensure that CMS pays FFP for Medicaid claims that violate the Stark Amendment would be a violation of the False Claims Act in the same manner that certifying compliance for full reimbursement under Medicare would be.[8]

---

[8]Conclusions as to the federal False Claims Act apply equally to the Florida False Claims Act because the Florida version mirrors the federal False Claims Act. *See U.S. ex rel. Schubert v. All Children's Health System, Inc.*, No. 8:11-cv-1687-T-27EAJ, 2013 WL 1651811 (M.D. Fla. Apr. 16, 2013) (Whittemore, J.); *Re: State Agencies-Municipalities-False Claims Act - Applicability of Florida False Claims Act to Municipalities*, Fla. AGO 2011-10,

## 2.    *The Weight of Authority Supports Relator's Claims.*

Not only is Defendants' argument undercut by the plain language of the relevant statutes and regulations, but every court to address Defendants' argument, save one,[9] has rejected it, agreeing that a false claim submitted to the Medicaid program is a false claim presented to the United States. *See, e.g., U.S. ex rel. Garbe v. Kmart Corp.,* ___ F. Supp. 2d ___, 2013 WL 5615747, at *5-6 (S.D. Ill. Sept. 18, 2013) ("[G]iven the structure of the Medicaid, Medicare, and Tricare systems, the natural and foreseeable consequence of submitting a false claim to any of them is that the United States will provide funds to pay the false claim."); *Baklid-Kunz,* 2012 WL 921147, at *3-4 (finding allegations of causing "Florida to submit false claims to the federal government for [Medicaid] services furnished on the basis of improper referrals" are sufficient to state a claim under the False Claims Act); *U.S. ex rel. Ven-A-Care v. Actavis Mid Atl. LLC,* 659 F. Supp. 2d 262, 269 (D. Mass 2009) (collecting cases holding Medicaid fraud claims are actionable under § 3729(a)(1), and finding that "a provider who submits a false Medicaid claim to the state presents a false claim for payment or approval to the United States"); *U.S. ex rel. Nichols v. Omni H.C., Inc.,* No. 02-cv-66, 2008 WL 906425, at *4 (M.D. Ga. Mar. 31, 2008) ("[G]iven the comprehensive funding and reimbursement structure between the states and federal government under the Medicaid scheme, claims that are submitted to Medicaid are claims to the federal government."). These cases are persuasive, in both

---

2011 WL 2429107 (June 16, 2011) (opinion of Florida Attorney General).

[9]*U.S. ex rel. Atkins v. McInteer,* 345 F. Supp. 2d 1302 (N.D. Ala. 2006). The same court, however, later recognized that *McInteer* may be inconsistent with the False Claims Act and that liability "may therefore attach if a fraudulent claim is presented to a non-governmental intermediary, and the intermediary subsequently presents the claim to an officer or employee of the United States government." *U.S. ex rel. Brunson v. Narrows Health & Wellness, LLC,* 469 F. Supp. 2d 1048, 1053 (N.D. Ala. 2006).

number and substance, and Defendants have not presented any convincing argument that they were wrongly decided.

   **3.     *42 C.F.R. § 435.1002(a) Does Not Absolve Defendants of Their Obligation to Comply with the Stark Amendment.***

Defendants next argue that Relator fails to allege a violation of the False Claims Act because 42 C.F.R. § 435.1002(a) allows States to receive FFP even when a physician referral would have violated the Stark Amendment and payment would have been refused under Medicare. Defendants' reading of § 435.1002(a) is an inappropriately expansive construction of a provision that supports Relator's allegations of a False Claims Act violation through noncompliance with the Stark Amendment in relation to Medicaid claims.

Section 435.1002(a) provides that "[e]xcept for the limitations and conditions specified in § 435.1007, § 35.1008, § 435.1009, and § 438.814 of this chapter, FFP is available in expenditures for Medicaid services for all beneficiaries whose coverage is required or allowed under this part." 42 C.F.R. § 435.1002(a) (2012). Defendants would have this regulation interpreted to allow FFP payments for claims resulting from referrals in violation of the Stark Amendment because none of the other regulations cited in § 435.1002(a) expressly prohibit such referrals. This argument fails to appreciate the final clause of the subsection, which makes FFP available only to the extent it is "allowed under this part." *Id.* Reading the regulation in harmony with § 1396b(s), "this part" incorporates all Medicaid statutes, including the prohibitions of § 1396b(s). *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into a

13

harmonious whole."). Moreover, if § 435.1002(a) is read in the manner suggested by Defendants, it would conflict with § 1396b(s) and would have no controlling weight. *See Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."). Either way, Defendants' argument concerning § 435.1002(a) is unpersuasive. *See U.S. v. Marte*, 356 F.3d 1336, 1341 (11th Cir. 2004) ("When a regulation implements a statute, the regulation must be construed in light of the statute, . . . but where a regulation conflicts with a statute, the statute controls.").[10]

### 4.    *Relator Adequately Alleges Materiality and Falsity.*

Defendants next argue that Relator fails to allege materiality and falsity because she does not allege that CMS would not have paid FFP to Florida had it known the facts surrounding the illegal referrals. To state a claim under the False Claims Act, the alleged misrepresentation made to the government must be material. *See Matheny*, 671 F.3d at 1228. "To be material, a misrepresentation must have the ability to influence the government's decision-making." *Id.* When, as here, a relator alleges a False Claims Act violation under an implied or false certification theory, "courts do not look to the contractor's actual statements; rather, the analysis focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1218 (10th Cir. 2008) (citing *U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1376

---

[10]Defendants' argument that § 1396b(s) is not triggered because Florida Medicaid and Medicare do not provide coverage under the same "terms and conditions" is without merit based on the prior conclusion that the Stark Amendment is imputed to Medicaid through § 1396b(s).

(D.C. Cir. 2000)).

It has already been established that § 1396b(s) prohibits payment of FFP when there are violations of the Stark Amendment, and Relator alleges that Defendants certify compliance with the Stark Amendment to the United States Government. Compliance with the Stark Amendment is undoubtedly "a prerequisite to the government's payment." *Id.* The allegations are therefore sufficient to allege materiality and falsity to support the alleged violations of the False Claims Act. *See U.S. ex rel. McNutt v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) ("When a violator of government regulations is ineligible to participate in a government program and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the [False Claims Act], for its submission of those false claims.").

### 5.   The Claims Are Not Based on Defendants' Interpretation of an Ambiguous Regulation.

Defendants argue that regulatory ambiguities relieve them of any potential liability under the False Claims Act. They argue that § 1395nn, § 1396b(s), and § 435.1002(a) are "exceptionally ambiguous," and claims brought under the False Claims Act cannot be based on the alleged violation of an ambiguous law or regulation that has not been subsequently clarified (Dkt. 58 at 18). This argument also fails.

There is authority suggesting that "[d]isputes as to the interpretation of regulations do not implicate False Claims Act liability." *U.S. ex rel. Swafford v. Borgess Med. Ctr.*, 24 Fed. Appx. 491, 491 (6th Cir. 2001); *see U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir.

15

1999) (reasoning that "faulty calculations," "flawed reasoning," "imprecise statements," or "differences in interpretation growing out of a disputed legal question" are not "false" under the False Claims Act); *U.S. ex rel. Jamison v. McKesson Corp.*, 784 F. Supp. 2d 664, 676 (N.D. Miss. 2011) (finding in favor of defendants where FCA claims rested on a "subjective interpretation of Defendants' regulatory duties"). These cases demonstrate that a defendant cannot be liable for violating the False Claims Act if the relator's claims are premised on an action taken by the defendant based on that defendant's reasonable interpretation of an ambiguous regulation.[11] The courts reasoned that a claim cannot be knowingly false if it is based on what a defendant believes to be a reasonable interpretation of an ambiguous statute.

The relevant Medicaid statutes and regulations do not contain regulatory ambiguities similar to those in the cases cited by Defendants, and, in any event, the allegations of the Third Amended *Qui Tam* Complaint do not establish that Defendants' alleged violations are predicated entirely on an erroneous interpretation of a vague, ambiguous, or confusing statute or regulation. This argument relies on statutory and regulatory interpretations previously rejected in this Order, including Defendants' overly broad reading of § 435.1002(a). There is substantial support for Relator's allegation that the Stark Amendment applies to Medicaid claims through § 1396b(s), and Relator adequately alleges that Defendants knowingly and falsely certified compliance with the Stark

---

[11]For example, in *U.S. ex rel. Sharp v. Eastern Oklahoma Orthopedic Center*, the relator argued that the defendant violated the False Claims Act by failing to maintain *signed* written records of delivery in violation of a Medicare Supplier Standard. No. 05-CV-572-TCK-TLW, 2009 WL 499375, at *20-21 (N.D. Okla. Feb. 27, 2009). The court determined that the allegations failed to state a claim because the Medicare regulations did not explicitly require a signature, and the relator therefore failed to sufficiently allege falsity. *Id.* at *21. Similarly, in *Jamison*, the district court identified a regulatory ambiguity in Medicare Supplier Standard One and pointed to the Government's prior acceptance of the defendant's interpretation of the regulation as evidence that it was ambiguous after the Government reversed course. *Jamison*, 784 F. Supp. 2d at 678.

Amendment. Relator adequately alleges that Defendants knowingly and falsely certified compliance with the Stark Amendment, and taking the allegations in the light most favorable to the Relator, dismissal on the basis of regulatory ambiguity is inappropriate.

**B.      The Third Amended *Qui Tam* Complaint Pleads Violations of the Federal and Florida False Claims Act with Sufficient Particularity.**

Defendants' next set of arguments in support of dismissal relates to the requirement that claims brought under the False Claims Act be pled with "particularity" under Rule 9(b). This standard requires relators to allege the presentment of a specific false claim because the "central question" in a claim brought under the False Claims Act is "whether the defendant ever presented a 'false or fraudulent claim' to the government." *Hopper*, 588 F.3d at 1326 (quoting *Clausen*, 290 F.3d at 1311). The submission of a false claim is the *sine qua non* of a False Claims Act violation. *Clausen*, 290 F.3d at 1311.

Specifically, Defendants argue that the Third Amended *Qui Tam* Complaint lacks the requisite particularity because Relator (1) fails to identify specific false claims presented by the State of Florida to the United States, and (2) fails to sufficiently allege physician compensation in excess of fair market value. Neither of these arguments prevails.

**1.      *Relator Adequately Alleges with Particularity the False Claims Defendants Caused to Be Presented, as well as Sufficient Indicia of Reliability to Satisfy the Particularity Standard.***

Defendants first argue that Relator fails to allege Defendants submitted false claims directly to the United States because the State of Florida, rather than Defendants, actually submitted the claims to the United States.

17

a.      The weight of authority supports Relator's claims.

The argument that the complaint must be dismissed because it does not identify claims submitted directly by Defendants to the United States is a derivative of the previous contention that the Stark Amendment does not apply to claims made under Medicaid. Courts have recognized this argument's similarity to the prior argument and it has likewise been considered and rejected. *See, e.g., Halifax Hosp.*, 2012 WL 921147, at *4; *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, ___ F. Supp. 2d ___, 2013 WL 5304057, at *8 (S.D. Tex. Sept. 30, 2013) (holding that defendant may be liable under the federal False Claims Act for submitting Medicaid claims to Texas, which caused the state to submit a claim in violation of the Stark Amendment). *See also U.S. v. Bushwick United Housing Dev. Fund Corp.*, ___ F. Supp. 2d ___, 2013 WL 5607181, at *2 n.2 (E.D.N.Y. Oct. 14, 2013) (assuming Medicaid claim submitted to a state government for reimbursement to be paid at least in part from federal funds may trigger federal False Claims Act liability). The reasoning of those decisions is persuasive and consistent with the earlier conclusions of this Order.

b.      Relator Alleges Presentment of Claims with Particularity.

Under the federal and Florida False Claims Acts, a defendant may be liable for *causing* another to submit a false claim. *See* 31 U.S.C. § 3729(a)(1). Relator alleges that Defendants' presentment of false claims to Florida in violation of § 1396b(s) caused Florida to submit those claims to the United States for FFP. Defendants do not argue that Relator does not identify specific false claims submitted by Defendants to the State of Florida. Indeed, the Third Amended *Qui Tam* Complaint identifies thirty specific false claims and details the financial relationships alleged to be illegal. Instead, Defendants argue that Relator does not identify the specific claims that *Florida*

18

submitted to the United States. The Eleventh Circuit does not, however, require that a complaint plead every conceivable detail of a fraud to satisfy Rule 9(b). *See Hill v. Morehouse Med. Assocs., Inc.*, 82 Fed. Appx. 213, 2003 WL 22019936, at *4 (11th Cir. Aug. 15, 2003). By identifying thirty false claims submitted to the State of Florida by Defendants and alleging that these claims were passed on to the United States when Florida submitted claims for FFP under Medicaid, Relator adequately alleges that Defendants *caused* the presentment of specific false claims to the United States with the particularity required under Rule 9(b).

c.   Relator Alleges Indicia of Reliability that Satisfy Rule 9(b).

Even if specific false claims were not alleged, Relator has alleged sufficient indicia of reliability. Relators are excused from identifying specific false claims, certifications, or referrals if the court can infer an "indicia of reliability" from the relator's position or circumstances. *Clausen*, 290 F.3d 1311. For example, the relator in *Hill* satisfied Rule 9(b) without identifying specific false claims because she "worked in the very department where she alleged the fraudulent billing scheme occurred" and was privy to the details of the alleged fraud. 2003 WL 22019936, at *4.

While Relator did not work in the "very department where she alleged the fraudulent billing scheme occurred," the Third Amended *Qui Tam* Complaint alleges that she was privy to conversations concerning the acquisition of medical practices, had specific authority to review copies of all signed documents passing through PPS, and reviewed "each and every physician employment contract, side letter, and associated document in the course of her employment" (Dkt. 45 ¶ 10). Considered with the significant detail concerning physician salaries and claims submitted, the Third Amended *Qui Tam* Complaint reflects sufficient "indicia of reliability" to survive a challenge under

19

Rule 9(b) due to Relator's position within PPS and her exposure to critical documents forming the basis of the allegedly illegal remuneration scheme.

d.   <em>Hopper</em> and <em>Nathan</em> are distinguishable.

The cases cited by Defendants in support of their argument that Relator must identify specific false claims submitted by Florida do not stand for the broad proposition for which they are cited. As Relator convincingly argues, *Hopper* and *Nathan* are distinguishable because the relators in those cases failed to identify *any* claims that were submitted to either the state or federal government. *See Hopper*, 588 F.3d at 1326; *U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 460 (4th Cir. 2013).

In sum, Relator adequately alleges with particularity the presentment of specific false claims in violation of the False Claims Act and sufficient indicia of reliability to support a claim brought under the False Claims Act.

<strong>2.    <em>Relator Adequately Alleges Physician Compensation In Excess of Fair Market Value with Particularity.</em></strong>

Defendants also argue that Relator does not allege physician compensation in excess of fair market value with the requisite particularity. Specifically, Defendants argue that Relator fails to allege a "benchmark" of fair market value in the same market in which the Hospital operates, and that Relator makes unreasonable and implausible allegations by assuming that the 75th percentile of median salaries in nationwide surveys constitutes a ceiling on the fair market value of salaries.

This argument is grounded in an exception to the general prohibition on financial relationships between physicians and entities to which referrals are made. *See* § 1395nn(a)(1)(A);

20

§ 1396b(s). Referrals are appropriate if the financial relationship between the physician and the entity is a bona fide employment relationship. *See* § 1395nn(e)(2). A physician has a bona fide employment relationship with an entity if (a) the employment is for identifiable services; (b) the amount of remuneration for employment "is consistent with the fair market value of the services" and does not take into account the volume or value of referrals; (c) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer, and (d) the employment meets "other such requirements as the Secretary may impose." *Id.*

Defendants rely on *Osheroff*, but that case is inapposite on this point. *See Osheroff*, 2012 WL 2871264. In *Osheroff*, the district court dismissed the *qui tam* complaint for failure to state a claim because the relator failed to allege a benchmark of fair market value against which the allegedly below-market rents offered to physicians could be tested. *Id.* at \*7. It was not that Osheroff conclusorily alleged a benchmark or did not allege the benchmark with particularity that warranted dismissal. Rather, the complaint was dismissed because Osheroff failed to allege any benchmark of fair market value whatsoever. *Id.*

In comparison, Relator alleges in significant detail a proposed benchmark of fair market value against which the physicians' salaries should be compared. Recognizing that there is not a "nationwide or regional commercial salary survey which accurately reflected the composition of All Children's Hospital's employed staff," Relator endeavored to create a fair market value benchmark by drawing from the median of three nationwide salary surveys and creating a competitive salary range (Dkt. 45 ¶ 21). She then uses that information to allege a fair market value benchmark for all subspecialists identified in the complaint, and alleges that the salaries identified in the complaint

21

exceed that benchmark. Assuming these allegations to be true, as required at this stage, they are sufficiently particular to satisfy Rule 9(b).[12]

**C.      Relator Adequately Alleges Financial Relationships.**

Defendants' final set of arguments is asserted under Rule 12(b)(6). They argue that the complaint must be dismissed because Relator fails to allege specific elements of her Stark Amendment claim, including (1) compensation arrangements that vary with, or take into account, the volume or value of referrals or other business generated, (2) a financial relationship with Dr. Michael Gallant, and (3) any wrongdoing by PPS or ACHS. The first and third arguments are unpersuasive, but Defendants persuasively argue that Relator fails to state a claim as to referrals by Dr. Michael Gallant.

> ***1.      Relator Adequately Alleges Financial Relationships That Vary With, or Take Into Account, the Volume or Value of Referrals or Other Business Generated by the Referring Physician.***

Defendants first argue that Relator fails to adequately plead a "financial relationship" between ACH and the referring physicians, and therefore fails to state a False Claims Act violation premised on a violation of the Stark Amendment. In the context of the Stark Amendment, a "financial relationship" is a "direct or indirect compensation arrangement . . . with an entity that furnishes" designated health services.[13] 42 C.F.R. § 411.354(a)(1)(ii). Relator acknowledges that "most" of the alleged financial relationships are indirect rather than direct. In relevant part, an

---

[12]Defendants also assail Relator's allegation that the market for pediatric subspecialists is national, not local, as a conclusory assertion lacking factual support, but that argument is not persuasive. The allegation is not a legal conclusion, and therefore must be assumed to be true.

[13]The term "designated health services" is often abbreviated in regulations as "DHS." *See* 42 C.F.R. § 411.351.

indirect compensation arrangement exists if

> (i) Between the referring physician . . . and the entity furnishing DHS there exists an unbroken chain of any number (but not fewer than one) of persons or entities that have financial relationships (as defined in paragraph (a) of this section) between them (that is, each link in the chain has either an ownership or investment interest or a compensation arrangement with the preceding link);

> (ii) The referring physician . . . receives aggregate compensation from the person or entity in the chain with which the physician . . . has a direct financial relationship that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the DHS, . . . ; and

> (iii) The entity furnishing DHS has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician . . . receives aggregate compensation that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity . . . .

*Id.* § 411.354(c)(2)(i)-(c)(2)(iii). Defendants argue that Relator has not sufficiently alleged subpart (ii) by omitting allegations that the physicians' direct financial relationships "var[y] with, or take[] into account, the volume or value of referrals."

The Fourth Circuit analyzed this element at length in *Drakeford*. It explained that the Stark Amendment "'establishes a straightforward test that compensation arrangements should be at fair market value for the work or service performed,' and should not be 'inflated to compensate for the physician's ability to generate other revenues.'" 675 F.3d at 408 (quoting 66 F.R. 856-01, 877 (Jan. 4, 2001)). Final HHS commentary on the regulations defining indirect compensation arrangements notes that fixed compensation "take[s] into account or otherwise reflect the volume or value of referrals" if, for example, "the payment exceeds the fair market value for the items or services provided." 72 F.R. 51012-01, 51029 (Sept. 5, 2007). Conversely, compensation does not take into

23

account the volume or value of referrals if the compensation "is fair market value and does not vary during the course of the arrangement in any manner that takes into account DHS referrals." *Id.* at 51030. Whether compensation does, in fact, take into account or otherwise reflect the volume or value of referrals "will require a case-by-case determination based on the facts and circumstances." *Id.* at 51029. The burden is on the parties to the arrangement to demonstrate how the transaction meets the compensation exceptions. *Id.* at 51060.

Reading the Third Amended *Qui Tam* Complaint in the light most favorable to Relator, it adequately alleges that physicians' salaries were inflated above fair market value to compensate them for their ability to generate additional revenue for Defendants through referrals and tests. Relator alleges in the first paragraph that Defendants' plan was to "pay whatever it takes to guarantee that the medical procedures, ancillary services and referrals were directed to All Children's Hospital." Dkt. 45 ¶ 1. That introduction is buttressed by detailed allegations of a payment scheme consistently rewarding physicians with compensation above fair market value to compensate for anticipated referrals. Under the regulations and agency commentary, these allegations adequately form the basis for an indirect compensation arrangement that violates the Stark Amendment. Moreover, whether compensation does, in fact, take into account the volume or value of referrals requires a case-by-case determination, further supporting the conclusion that dismissal is unwarranted. *See* 72 F.R. at 51029.

2. ***Relator Does Not Adequately Allege a Violation of the Stark Amendment as to Dr. Michael Gallant.***

Paragraphs 44 through 48 describe the compensation arrangement with Dr. Michael Gallant, a pediatric plastic surgeon. Relator alleges that Dr. Gallant's compensation arrangement created a

"volume-based incentive for *base* salary," in which Dr. Gallant would receive his base salary if he performed at least 400 procedures during his first year, with a potential $50,000 bonus if he performed 495 procedures (Dkt. 45 ¶¶ 45, 46).

Unit-based compensation does not take into account the volume or value of referrals as long as the compensation is commensurate with fair market value and does not vary during the course of the arrangement. 72 F.R. at 51030. Relator does not allege that Dr. Gallant's salary exceeds fair market value or that it is structured to vary during the course of the arrangement unless Dr. Gallant reaches a certain level of productivity. And under the current regulatory scheme, productivity bonuses are not problematic. HHS specifically declined to promulgate rules prohibiting productivity bonuses as long as the procedures are personally performed by the physician receiving the bonus. *See* 72 F.R. at 51045.[14]

Relator argues that she alleges an indirect compensation agreement in violation of the Stark Amendment because the compensation arrangement was structured so that compensation would be increased if a certain number of procedures were performed at All Children's Hospital. There is, however, nothing inherently improper with volume based compensation agreements, as long as they do not take into account the volume or value of referrals and the procedures are personally performed by the physician. *U.S. ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1051 (N.D. Ill. 2002) (citing § 1395nn(e)(2)).

Moreover, nothing in the Stark Amendment prohibits hospitals from requiring their employees to perform procedures at the hospital rather than elsewhere. The Stark Amendment

---

[14]Relator does not allege that Dr. Gallant did not personally perform the procedures.

prohibits only claims resulting from illegal referrals. A "referral" includes "any test or procedure ordered by or to be performed by (or under the supervision of) that other physician, but not including any designated health service *personally performed* or provided by the referring physician." 42 C.F.R. § 411.351 (emphasis added). As long as the procedures were personally performed by Dr. Gallant–and Relator does not allege that they were not–then they cannot constitute a "referral" in the manner required to allege a violation of the Stark Amendment.

In sum, Relator fails to allege an indirect compensation arrangement and therefore a financial relationship between Defendants and Dr. Gallant because there are no allegations that Dr. Gallant was paid above fair market value or that his compensation arrangement took into account the volume or value of referrals. Accordingly, all of the claims with regard to Dr. Gallant will be dismissed.

### 3. *Relator Adequately Alleges that ACHS and PPS Caused False Claims to Be Submitted.*

Finally, Defendants argue that all of the claims against ACHS and PPS should be dismissed because Relator does not allege that patients were referred to PPS or ACHS or that PPS or ACHS billed for designated health services. Relator alleges, however, that ACHS and PPS *caused* false claims to be submitted, supporting her False Claims Act claims. *See* §§ 3729(a)(1)(A), (a)(1)(B). Moreover, given Relator's allegations that Defendants are interrelated corporate entities, dismissal is inappropriate until discovery addresses the nature of the relationships among the three corporations. *See U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1049 (S.D. Tex. 1998).

## IV.   CONCLUSION

Accordingly, Defendants' Motion to Dismiss Third Amended Complaint (Dkt. 58) is

**GRANTED** to the extent that the claims concerning Dr. Michael Gallant are **DISMISSED** *with*

*prejudice.*[15] In all other respects, the motion is **DENIED**. Defendants shall answer the Third

Amended *Qui Tam* Complaint (with the exception of the allegations addressing Dr. Michael Gallant)

within **fourteen (14) days** of the date of this Order. The stay on discovery (Dkt. 32) is **LIFTED**.

**DONE AND ORDERED** this _*15*_ day of November, 2013.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record

---

[15]On the fourth attempt to plead claims, dismissal with prejudice is appropriate. *See Estate of Cosio v. Alvarez*, 181 Fed. Appx. 894, 896 (11th Cir. 2006). In any event, given the allegations addressing Dr. Gallant's compensation agreement, it does not appear that there is any conceivable set of facts Relator could allege that would state a claim for violating the False Claims Act with regard to Dr. Gallant's financial relationship with Defendants. *See O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1206 (11th Cir. 2003).